# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ST. DOMINIC ACADEMY, a d/b/a of the ROMAN CATHOLIC BISHOP OF PORTLAND, a corporation sole; ROMAN CATHOLIC BISHOP OF PORTLAND, a corporation sole; and KEITH and VALORI RADONIS, on their own behalf and as next friends of their children K.Q.R., L.R.R., and L.T.R., | No. 2:23-cv-00246 |
| *Plaintiffs*, | **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION & MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| v. | **Oral Argument Requested** |
| A. PENDER MAKIN, in her personal capacity and in her official capacity as Commissioner of the Maine Department of Education, and JEFFERSON ASHBY, EDWARD DAVID, JULIE ANN O'BRIEN, MARK WALKER, and THOMAS DOUGLAS, in their personal capacities and in their official capacities as Commissioners of the Maine Human Rights Commission, | |
| *Defendants*. | |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS ...........................................................................................2

LEGAL STANDARD...................................................................................................4

ARGUMENT ................................................................................................................5

    I.   Plaintiffs are likely to succeed on the merits of their First
          Amendment claims. ........................................................................................5

        A.  Maine's rules violate the Free Exercise Clause by targeting religion. ..........................5

        B.  Maine's rules violate the Free Exercise Clause by re-imposing the
            same exclusion from a public benefits program invalidated in *Carson*......................10

        C.  Maine's rules violate the Free Exercise Clause because they are not
            generally applicable. ....................................................................12

        D.  Maine's rules violate the Free Exercise Clause by infringing on the
            rights of parents to direct the religious education of their children. ..........................12

        E.  Maine's "equal religious expression" rule violates the Free Speech
            Clause because it compels speech by religious schools................................13

        F.  Maine's "equal religious expression" rule violates the Free Speech
            Clause right of expressive association. ........................................................14

        G.  Maine's rules violate the Establishment Clause because they invite
            excessive entanglement under *Carson*.....................................................15

        H.  Maine's rules violate the First Amendment right of religious autonomy...................17

        I.   Maine's rules impose unconstitutional conditions on the program. ..........................18

        J.   Maine's rules cannot satisfy strict scrutiny................................................19

    II.  The remaining injunction factors favor the Plaintiffs. .......................................19

    CONCLUSION.......................................................................................20

    CERTIFICATE OF SERVICE ......................................................................22

    CERTIFICATE OF COMPLIANCE .............................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013)..................................................................................................18

*Beers v. Mentor ABI LLC*,
No. 21-171, 2021 WL 5999161 (D. Me. Dec. 20, 2021).........................................7

*Bryce v. Episcopal Church*,
289 F.3d 648 (10th Cir. 2002) ...............................................................................17

*Carson v. Makin*,
142 S. Ct. 1987 (2022)..................................................................................*passim*

*Carson v. Makin*,
401 F. Supp. 3d 207 (D. Me. 2019) ........................................................................18

*Carson v. Makin*,
979 F.3d 21 (1st Cir. 2020)..........................................................................*passim*

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993)......................................................................................*passim*

*Comcast v. Mills*,
435 F. Supp. 3d 228 (D. Me. 2019) ........................................................................20

*Corp. of Presiding Bishop v. Amos*,
483 U.S. 327 (1987)................................................................................................17

*Employment Division v. Smith*,
494 U.S. 872 (1990)...........................................................................................1, 12

*Espinoza v. Mont. Dep't of Revenue*,
140 S. Ct. 2246 (2020).................................................................................*passim*

*Fulton v. City of Philadelphia*,
141 S. Ct. 1868 (2021)....................................................................................9, 12, 19

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012)..........................................................................................14, 17

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Grp. of Boston*,
515 U.S. 557 (1995)........................................................................................... 13-14

*Judkins v. Saint Joseph's Coll. of Maine*,
    483 F. Supp. 2d 60 (D. Me. 2007) ...................................................7

*Kennedy v. Bremerton Sch. Dist.*,
    142 S. Ct. 2407 (2022) ...................................................19

*Larson v. Valente*,
    456 U.S. 228 (1982) ...................................................15

*Mahanoy Area Sch. Dist. v. B.L.*,
    141 S. Ct. 2038 (2021) ...................................................15, 18

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
    138 S. Ct. 1719 (2018) ...................................................8

*Nken v. Holder*,
    556 U.S. 418 (2009) ...................................................20

*NLRB v. Catholic Bishop*,
    440 U.S. 490 (1979) ...................................................16, 17

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    140 S. Ct. 2049 (2020) ...................................................15, 17, 19

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ...................................................14

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020) ...................................................20

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,
    699 F.3d 1, 10 (1st Cir. 2012) ...................................................5, 20

*Singh v. Carter*,
    168 F. Supp. 3d 216 (D.D.C. 2016) ...................................................20

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021) ...................................................12

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017) ...................................................10

*Troxel v. Granville*,
    530 U.S. 57 (2000) ...................................................12

*W. Va. Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ...................................................13

iv

*We the People PAC v. Bellows*,
   519 F. Supp. 3d 13 (D. Me. 2021) ...........................................................................20

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972)................................................................................12, 13, 14

**Statutes**

5 M.R.S. § 4553 ...............................................................................................2, 7, 12

5 M.R.S. § 4566 .......................................................................................................3

5 M.R.S. § 4573-A ..................................................................................................17

5 M.R.S. § 4602 ........................................................................................... *passim*

5 M.R.S. § 4612 .......................................................................................................3

5 M.R.S. § 4613 .......................................................................................................3

5 M.R.S. § 4621 .......................................................................................................3

20-A M.R.S. § 2951 .................................................................................................2

20-A M.R.S. § 3252 .................................................................................................8

20-A M.R.S. § 5203 .................................................................................................2

20-A M.R.S. § 5204 .................................................................................................2

Me. Pub. L. 2021, ch. 366, sec. 19................................................................2, 6, 7

**Other Authorities**

Catechism of the Catholic Church ......................................................................3, 16

Ryan Fecteau (@SpeakerFecteau), Twitter (June 26, 2022, 8:51 AM)..........................8

L.D. 1833, 131st Leg. (Me. 2023) ..........................................................................9

Letter from Amy M. Sneirson, Exec. Dir. of the Me. Hum. Rts. Comm'n to Hon.
   Anne Carney, Me. Senate Chair, et al. (Apr. 20, 2021)...........................................18

List of Schools Approved for Tuition Purposes, 2022-23 ...............................................9

Maine Dep't of Ed., Private Schools Approved for the Receipt of Public Funds,
   2014-15, *et seq.* .................................................................................................8

Me. Const. Art. VIII................................................................................................2

Me. Hum. Rights Comm'n, "Interpretation of the Education Provisions of the
      MHRA," (Jan. 13, 2016) ......................................................................................3, 16

Memorandum from John. P Gause, Comm'n Couns., to Patricia E. Ryan, Exec.
      Dir., (May 8, 2007) .................................................................................................7

Pope Francis, *Amoris Laetitia*, no. 56 (2016) ...............................................................16

Statement of Maine Attorney General Aaron Frey on Supreme Court Decision in
      *Carson v. Makin*, Office of the Maine Attorney General (June 21, 2022) ............18

Aaron Tang, *There's a Way to Outmaneuver the Supreme Court, and Maine Has
      Found It*, N.Y. Times (June 23, 2022) ....................................................................9

## INTRODUCTION

Maine's Constitution promises Maine children an education paid for by the state. Because some parts of Maine are too rural to operate their own schools, Maine satisfies its constitutional obligations by paying for children in those districts to attend private schools. For over a century, Maine helped its children by letting their parents pick the best school. But in the early 1980s, Maine abruptly excluded religious schools from participating in this program—for the sole reason that they are religious.

Maine defended its exclusion of religious schools across five lawsuits and decades of litigation. But it finally lost in *Carson v. Makin*, where the Supreme Court unequivocally held that "there is nothing neutral about Maine's program," because excluding schools on the grounds that they are religious *is* "discrimination against religion." 142 S. Ct. 1987, 1998 (2022). That should have ended Maine's shameful and illegal discrimination. But Maine refuses to comply. Instead Maine doubled down, amending its human rights law in ways specifically intended to make it impossible for religious schools to participate while maintaining their religious identity. These new rules re-erect the barrier struck down in *Carson* and are unconstitutional in their own right. Maine is so eager to continue excluding religious schools that it now seeks to control their hiring and entangle itself in the details of their religious curriculum and expression.

None of this is lawful. After *Carson*, it is clearly established that excluding religious schools from Maine's tuition assistance program is unconstitutional. Whether Maine accomplishes this through the flat ban struck down in *Carson* or through the web of entangling laws enacted in *Carson's* shadow, Maine's rules are unconstitutional. And any ruling that Maine's rules are neutral and generally applicable would just demonstrate why *Employment Division v. Smith* should be overruled. 494 U.S. 872 (1990). Mainers like the Radonis family and religious schools like St. Dominic Academy have now endured generations of illegal exclusion. They should not be forced to endure yet another year of Maine's bigotry. Plaintiffs respectfully request that the Court enjoin Maine's newest discriminatory program rules by **August 31, 2023**, in time for St. Dominic to apply for 2023-24 tuitioning approval.

**STATEMENT OF FACTS**

The Maine Constitution guarantees each Maine child a publicly funded education. *See* Me. Const. Art. VIII. Rural towns that do not provide public school (or contract with particular schools to educate their resident students) instead pay tuition for their students to attend public or private schools of their choice that are "approved for tuition purposes" by the Department of Education. 20-A M.R.S. §§ 5203, 5204, 2951. Catholic schools—including diocesan schools like St. Dominic Academy—had long partnered with the State of Maine through its town tuitioning program (the "program") to educate young Mainers in areas without public schools. Compl. ¶¶ 1, 78.

Then in the 1980s, Maine banned so-called "sectarian" schools from participating in the program. *Id.* ¶¶ 79-87. For decades, Maine parents—including some whose children attended St. Dominic—challenged Maine's exclusion of Catholic and other religious schools from the program as a violation of the First Amendment. *Id.* ¶¶ 1, 96. Last year, the United States Supreme Court struck down Maine's religious exclusion in *Carson*. The Court explained that Maine's exclusion violates the Free Exercise Clause because it "operates to identify and exclude otherwise eligible schools on the basis of their religious exercise." 142 S. Ct. at 2002.

But as soon as the parents in *Carson* sought Supreme Court review in Spring 2021, Maine looked for new ways to keep Catholic and other disfavored religious schools out of the program. Compl. ¶¶ 2, 99-124. In June 2021 Maine enacted L.D. 1688, which made three major changes to the Maine Human Rights Act (MHRA) that apply only to co-ed schools participating in the program. *Id.* ¶¶ 106-09; *see also* 5 M.R.S. § 4553(2-A); *infra* note 7. First, L.D. 1688 added a new religious neutrality requirement, stating that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing." 5 M.R.S. § 4602(5)(D). Second, the law prohibited these schools from discriminating on the basis of students' "religion." *Id.* § 4602(1). And third, the law repealed the religious exemption that had previously allowed religious (but "nonsectarian") schools to handle sensitive issues relating to sexual orientation and gender identity in a way that reflected their faith commitments. Me. Pub. L. 2021, ch. 366, sec. 19 (repealing 5 M.R.S. § 4602(4)). In its place, L.D. 1688 put an "exemption" that disappears once a

religious school receives town tuition. 5 M.R.S. § 4602(5)(C). Maine also reinterpreted the MHRA's employment provisions to keep religious schools out: it argued that religious schools that accept public funds lose their religious hiring rights. Compl. ¶¶ 101-04, 155-56.

Maine's Speaker of the House bragged publicly that Maine had "changed the guidelines" with L.D. 1688 because it "[a]nticipated the ludicrous [*Carson*] decision from the far-right SCOTUS." *Id.* ¶ 122. And critics of religious schools praised Maine for "outmaneuver[ing]" the Supreme Court with this "legislative fix" to "avoid the consequences of [the *Carson*] ruling." *Id.* ¶¶ 12, 121. So far, Maine's maneuver has been successful—only one religious school in the state has applied to take part in the program since *Carson* struck down Maine's religious exclusion. *Id.* ¶ 123.

Diocesan schools like St. Dominic Academy—though otherwise qualified for the program, *id.* ¶¶ 18, 45—cannot apply for those funds today. That is because, if they were approved, they would immediately become subject to liability under the MHRA. Such challenges could come from both the Maine Human Rights Commission, which has the authority to investigate and enforce the MHRA, and private citizens, who may file a complaint with the Commission or initiate a civil lawsuit in state court. 5 M.R.S. § 4566 (Commission investigations); 5 M.R.S. § 4612 (private party complaints with the Commission); 5 M.R.S. § 4621 (private party lawsuits in Superior Court). Penalties for repeated noncompliance with the MHRA can be up to $100,000. 5 M.R.S. § 4613.

Maine's new rules mean that everything from the identity of the religion teacher to the content of morning prayers could be the subject of a state human rights complaint. Moreover, the Commission has stated that the MHRA requires schools to facilitate a student's gender identity transition over the objection of their parents, something that Diocesan schools cannot promise to do.[1] Because these religious schools cannot cede to the Commission the determination of matters core to their Catholic identity, they are—as Maine intended—excluded from the program. Compl. ¶¶ 2, 12-14, 133-46, 157-58.

---

[1]   *Compare* Maine Human Rights Commission Memo, *Interpretation of the Education Provisions of the MHRA* at 4 (Jan. 13, 2016), https://perma.cc/GU3F-6Q4B, *with* Catechism of the Catholic Church § 2221 ("The right and the duty of parents to educate their children are primordial and inalienable.").

St. Dominic Academy is a pre-K through 12 school with campuses in Lewiston and Auburn. *Id.* ¶¶ 40-41. Because the school's purpose is to help students "become faith-filled Christians," the Catholic faith permeates every aspect of St. Dominic. *Id.* ¶¶ 33, 133-36, 148, 236. All students attend Catholic religion classes and Mass. *Id.* ¶ 35. All subjects are taught with a "concern for teaching the integration of faith, culture, and life." *Id.* ¶ 38. Though the school admits non-Catholic students, each student must "understand, accept, and [be] willing to support the mission and goals of the school" and agree to uphold "Catholic Christian morals." *Id.* ¶¶ 34-36. And because one of the school's missions is to support Catholic parents, it gives preference to Catholic students in admissions and financial aid. *Id.* ¶ 34. Teachers and other employees are "critical to achieving this ministry" in Catholic schools. *Id.* ¶ 38. All employees thus agree to "[l]ive personal lives in such a way that fundamental teachings of the Catholic Church are upheld." *Id.* ¶ 39.

Maine Catholic parents like Plaintiffs Keith and Valori Radonis rely on Catholic schools to help them fulfill their religious duty to provide their children with an education and to form them in the faith. *Id.* ¶¶ 52, 58-59. The Radonises' children K.Q.R. and L.R.R. attended St. Michael School—a parish school in Augusta—and L.T.R. studies there now. *Id.* ¶¶ 61-62. In fall 2023, the Radonises plan to enroll L.R.R. at St. Dominic for tenth grade. *Id.* ¶¶ 63, 65. Because the Radonises' town has no high school, it pays tuition for resident students to attend grades 9 through 12 elsewhere. *Id.* ¶ 51. Were it not for Maine's deliberate exclusion of religious schools, St. Dominic would be "approved for tuition purposes," and the Radonises' town would pay L.R.R.'s tuition at St. Dominic this fall. *Id.* ¶¶ 4-6, 12, 19, 64-65, 124, 168. But because of Maine's discriminatory rules, Catholic families like the Radonises continue to be barred from using their tuition dollars to provide their children with an education that is consistent with their religious beliefs. *Id.* ¶¶ 168, 217-18. Without immediate relief, St. Dominic will not be able to meet the August 31, 2023, deadline to apply for approval, and Plaintiffs will suffer another year of discrimination. *Id.* ¶¶ 15-16, 76.

## LEGAL STANDARD

"In considering a plaintiff's motion for a preliminary injunction, the district court weighs four factors: (1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm

4

in the absence of an injunction; (3) whether issuing the injunction will burden the defendants less than denying an injunction would burden the plaintiffs and (4) the effect, if any, on the public interest. Though each factor is important," the "sine qua non … is likelihood of success." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (cleaned up).

Where there is a "conflict between the Free Exercise Clause and the application of" state laws that prohibit funding for religious schools, this Court must "disregard[]" the state laws and "decide[] this case 'conformably to the [C]onstitution' of the United States," which "condemns discrimination against religious schools and the families whose children attend them." *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2262-63 (2020).

## ARGUMENT

### I. Plaintiffs are likely to succeed on the merits of their First Amendment claims.

Maine's ongoing efforts to exclude religious schools from the program violate Plaintiffs' First Amendment rights in nine different ways: (1) by targeting religion in violation of the Free Exercise Clause (*Lukumi*); (2) by denying access to an otherwise available public benefit program in violation of the Free Exercise Clause (*Carson*); (3) by categorically exempting certain secular schools from the burdens imposed on religious schools (*Tandon*); (4) by infringing on the rights of parents to direct the religious education of their children in violation of the Free Exercise Clause (*Yoder*); (5) by coercing speech on religious matters in violation of the Free Speech Clause (*Hurley*); (6) by interfering with Plaintiffs' right of expressive association in violation of the Free Speech Clause (*Roberts*); (7) by causing entanglement of church and state in violation of the Establishment Clause (*Carson*); (8) by interfering with the operation of religious schools in violation of church autonomy principles (*Our Lady of Guadalupe*); and (9) by imposing unconstitutional conditions in violation of the First Amendment (*AOSI*). Any one of these violations would justify a preliminary injunction; Plaintiffs are likely to succeed on each.

### A. Maine's rules violate the Free Exercise Clause by targeting religion.

In *Lukumi*, the Supreme Court struck down a set of city ordinances that were neutral on their face but had the "impermissible object" of singling out the disfavored religious practice of animal

sacrifice. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 524, 534 (1993). The Court held that the "ordinances may be treated as a group for neutrality purposes," *id*. at 540, and carefully analyzed their practical impact, because "the effect of a law in its real operation is strong evidence of its object." *Id*. at 535. The Court concluded that the laws were not neutral, since in practice they acted as "religious gerrymanders" by excluding animal sacrifice while allowing other practices—like butchering hogs for food and dressing hunted game—that posed similar risks to the government's stated interests. *Id*. at 534.

So too here. Maine knew exactly which rules would create the most significant conflicts for religious schools, because during discovery in *Carson* two such schools described in detail the religious practices they wished to protect.[2]

- The schools led students in devotional religious exercises and taught even secular subjects from a religious perspective; Maine changed its law to instead require "equal religious expression."[3]

- The schools asked prospective families to affirm their support for the schools' religious mission and beliefs; Maine changed its law to prohibit schools from engaging in what it deemed "religious discrimination."[4]

- The schools handled religiously-sensitive issues surrounding gender and sexuality on a stu-

---

[2]    In fact, Maine asserted that the religious schools in *Carson* were so unlikely to take part in a tuition program that included these conditions that the case should be dismissed for lack of standing. *Carson v. Makin*, 979 F.3d 21, 30 (1st Cir. 2020), rev'd and remanded, 142 S. Ct. 1987 (2022).

[3]    *Compare* Joint Stipulated Facts at ¶ 96, *Carson v. Makin*, No. 18-327 (D. Me. Mar. 15, 2019), Doc. 25 (school's goal is to "lead each unsaved student to trust Christ as his/her personal savior"); ¶ 103 ("attending chapel is mandatory"); ¶ 101 (school's "religious instruction is completely intertwined" with academic instruction), *with* 5 M.R.S. § 4602(5)(D), *as amended by* Me. Pub. L. 2021, ch. 366, sec. 19 ("[T]o the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing.").

[4]    *Compare* Joint Stipulated Facts, *supra* note 3, at ¶ 88 (one school is "willing to consider admitting students from any religious background or faith so long as they are willing to support" the school's "philosophy of Christian education and conduct."); ¶ 152 (another school generally requires that students be Christians or, at a minimum, support the school's statement of faith), *with* 5 M.R.S. § 4602(1)(A), *as amended by* Me. Pub. L. 2021, ch. 366, sec. 19 ("It is unlawful educational discrimination … on the basis of … religion, to … exclude a person from participation in … any … program or activity.").

dent-by-student basis as guided by their religious beliefs; Maine stripped out the religious exemption in its sexual orientation and gender identity law, giving the Maine Human Rights Commission—not parents and schools—the final word.[5]

- Perhaps above all, the schools prized their constitutional right to decide who could teach the faith to their students; Maine said that if the schools took town tuition money, they would lose their religious exemption from the Maine Human Rights Act and once again give the Commission—not the school—the final word on who could teach the faith to the next generation.[6]

Maine's rules subject religious schools in Maine to intrusive Commission oversight that is not required of many other participants in the program. For example, Maine pays town tuitioning money to many schools outside of Maine—none of which are subject to the MHRA at all.[7] Maine also pays Maine State Grant Program funds to private, post-secondary schools within the state, which are likewise not subject to the MHRA's educational discrimination provisions. *See* 5 M.R.S. § 4553(2-A). In recent years, Maine has paid for tuition at all-boys military academies in Virginia and Pennsylvania, all-girls schools in Massachusetts and Connecticut, boarding schools in Utah for students recovering from substance abuse, and elite fine arts and wilderness schools as far away

---

[5]   *Compare* Joint Stipulated Facts, *supra* note 3, at ¶¶ 91-92 (school staff would have conversations and engage in counseling with students who presented themselves as a gender other than the one listed on their birth certificate, or who regularly communicated that they were gay to other students; students who expressed continued disagreement with the school's religious beliefs about sex and gender would be asked to leave), *with* 5 M.R.S. § 4602(1)(A), *as amended by* Me. Pub. L. 2021, ch. 366, sec. 19 ("It is unlawful educational discrimination … on the basis of … sexual orientation or gender identity, to … exclude a person from participation in … any … program or activity.").

[6]   *Compare* Joint Stipulated Facts, *supra* note 3, at ¶ 183 (school would not accept public funds if that meant that it were required to accept teachers who did not share its faith or were unwilling to agree to the school's religious conduct rules), *with* Maine's Mot. Summ. J. at 13, *Carson v. Makin*, No. 18-327 (D. Me. Apr. 5, 2019), Doc. 29 (asserting that under 5 M.R.S. § 4553(10)(G), schools accepting public funds would lose their religious hiring rights); *see also* Maine's Br. at 23, *Carson v. Makin*, No. 19-1746 (1st Cir. Oct. 30, 2019) (same). This interpretation of Maine law was disputed by the *Carson* plaintiffs and questioned by the First Circuit. *See infra* I(D); *see also Carson v. Makin*, 979 F.3d 21, 31 (1st Cir. 2020), *rev'd and remanded*, 142 S. Ct. 1987 (2022).

[7]   *Judkins v. Saint Joseph's Coll. of Maine*, 483 F. Supp. 2d 60, 65 (D. Me. 2007) (holding that the Maine Human Rights Act has no extraterritorial application); *Beers v. Mentor ABI LLC*, No. 21-171, 2021 WL 5999161, at *2 (D. Me. Dec. 20, 2021), *reconsideration denied*, No. 21-171, 2022 WL 911257 (D. Me. Mar. 29, 2022), *and aff'd*, No. 22-1310, 2023 WL 3514102 (1st Cir. Jan. 19, 2023) (same); *but see* Memorandum from John. P Gause, Comm'n Couns., to Patricia E. Ryan, Exec. Dir., (May 8, 2007) (disagreeing with *Judkins* and arguing that the MHRA applies to Maine employers with respect to employees outside of Maine), https://perma.cc/AS93-8BK6. The Commission has never filed a case in court seeking to enforce the educational nondiscrimination requirements at any school outside of Maine.

as Michigan and Colorado.[8] When circumstances warrant, Maine may also pay for students in unorganized territories to go to school in Quebec. 20-A M.R.S. § 3252(6). The end result is that all-girls' schools in Massachusetts or all-boys military academies in Virginia may take part in Maine's program without worrying that their sex-based admissions policies will trigger a Commission investigation. And public schools in Canada (which has no Establishment Clause at all) can follow their own rules about religious expression in public school without wondering whether Maine would agree. But Maine's religious schools are excluded by rules these out-of-state recipient schools do not face.

None of this is accidental. Evidence of a law's lack of neutrality can come from its "historical background," the "series of events" spurring its enactment, and "contemporaneous statements" made by lawmakers. *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018) (quoting *Lukumi*, 508 U.S. at 540). Here, Maine's words and deeds raise more than "slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices." *Id.* The historical background of Maine's discrimination against religious schools, the sequencing of its move to continue excluding religious schools from its public program by attaching religiously unacceptable conditions on their participation, and contemporaneous statements from Maine officials all demonstrate religious targeting.

The week after *Carson* was decided, Maine's then-Speaker of the House bragged publicly that Maine "changed the guidelines" with L.D. 1688 because it "[a]nticipated" the "ludicrous [*Carson*] decision from the far-right SCOTUS."[9] Two days after *Carson,* an op-ed in the New York Times praised Maine lawmakers for enacting L.D. 1688, referring to it as "a crucial amendment to the

---

[8]    Maine Dep't of Ed., Private Schools Approved for the Receipt of Public Funds, 2014-15: https://perma.cc/5RXJ-TLTF; 2015-16: https://perma.cc/2GRS-NZW8; 2016-17: https://perma.cc/728J-CJUF; 2017-18: https://perma.cc/TB26-5MAP; 2018-19: https://perma.cc/J9QC-A5R9; 2019-20: https://perma.cc/8JT9-4SXQ; 2020-21: https://perma.cc/C6DV-WK62; 2021-22: https://perma.cc/3UDF-WPDJ; 2022-23: https://perma.cc/3RYC-EYE4.

[9]    Ryan Fecteau (@SpeakerFecteau), Twitter (June 26, 2022, 8:51 AM), https://twitter.com/SpeakerFecteau/status/1541041572636237826.

state's anti-discrimination law last year in order to counteract the expected ruling."[10] And before the ink on the Supreme Court's decision was dry, Maine's Attorney General vowed to work with the Maine legislature to pass laws that would continue to exclude the religious schools in *Carson* from the program. The Attorney General was open about the religiously targeted motivations of such legislation, castigating the religious schools "at issue" in *Carson* for "refus[ing] to admit gay and transgender children, and openly discriminat[ing] in hiring teachers and staff." He was also frank about the end goal: "ensur[ing] that public money is not used to promote" the schools' asserted "discrimination, intolerance, and bigotry."[11]

And Maine has not stopped there. This spring, the religious school in *Crosspoint Church*, a parallel case, cited the fact that the MHRA currently exempts single-sex schools from its nondiscrimination requirements as evidence that Maine's rules are not generally applicable. Complaint at 20, *Crosspoint Church v. Makin*, No. 23-146 (D. Me. Mar. 27, 2023) (citing 5 M.R.S. § 4553(2-A)). Maine has paid tuition funds to single-sex schools for decades, including two all-girls schools in Massachusetts this year. *See* List of Schools Approved for Tuition Purposes, 2022-23: https://perma.cc/3RYC-EYE4. Yet within a month after the filing of *Crosspoint*, Maine lawmakers introduced a bill to remove the exemption for single-sex schools. The Commission testified in support of this bill. The revision passed on June 12, 2023, and is awaiting the governor's signature. L.D. 1833, 131st Leg. (Me. 2023).

In this way, the whole is worse than the sum of its parts: each piece of Maine's new regulatory scheme is intended to prevent religious schools like St. Dominic from participating in Maine's program, and actually does so. Yet Maine continues to send tuition money to private post-secondary schools and out of state and international schools that are beyond the scope of the MHRA. This

---

[10]    Aaron Tang, *There's a Way to Outmaneuver the Supreme Court, and Maine Has Found It*, N.Y. Times (June 23, 2022), https://perma.cc/YUR2-YYZX.

[11]    Notwithstanding that this mischaracterizes the views of Diocesan schools, *see supra* at 4, *infra* at 16, Compl. ¶¶ 138-49, it is significant that allowing religious schools to participate in the program in a manner consistent with their faith commitments does nothing to close off the many other schooling options available to LGBT families. *Cf. Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1875 (2021) (observing that "[n]o same-sex couple has ever sought certification from [Catholic Social Services]" and "[i]f one did, CSS would direct the couple to one of the more than 20 other agencies in the City, all of which currently certify same-sex couples").

"religious gerrymander"—adopted by government officials who boasted about their success in continuing to exclude Maine's religious schools—renders Maine's law not neutral.

### B. Maine's rules violate the Free Exercise Clause by re-imposing the same exclusion from a public benefits program invalidated in *Carson*.

Under the Free Exercise Clause, Maine may not exclude religious schools from a benefits program like the program because they are religious. *Carson*, 142 S. Ct. at 1997-98, 2002. The Supreme Court has thrice held that a state "violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson*, 142 S. Ct. at 1996; *see also Trinity Lutheran v. Comer*, 582 U.S. 449 (2017); *Espinoza*, 140 S. Ct. at 2262. Moreover, "condition[ing] the availability of benefits" on a school's lack of religious character "'effectively penalizes the free exercise' of religion" and violates the First Amendment. *Carson,* 142 S. Ct. at 1997-98.

Despite this clear teaching from the Supreme Court, Maine continues to exclude religious schools from its program today. As discussed in Section I.A, it does this in many ways, but two are most direct: Maine prohibits schools from discriminating based on "religion," 5 M.R.S. § 4602(1), and forbids schools that allow religious expression from "discriminat[ing] between religions in so doing." *Id.* § 4602(5)(D). These two provisions work in tandem to prevent religious schools from maintaining their religious identity if they receive town tuitioning funds. Religious institutions like St. Dominic are therefore excluded unless and until they forfeit their religious character. By enacting these two provisions, Maine has effectively revived the same exclusionary policy that the Supreme Court struck down in *Carson*.

The prohibition on religious discrimination excludes religious institutions from the program because it prevents participating schools from giving even a slight preference to students that share the school's religious beliefs. 5 M.R.S. § 4602(1)(D)-(E) (admissions and financial aid). Although St. Dominic admits students of any faith or no faith at all, it does give preference to Catholic families for admission and scholarships. Compl. ¶ 34. That practice, which is rooted in the school's religious beliefs, would disqualify the school from receiving town tuitioning funds.

Similarly, the religious expression provision forces schools to abandon their religious identities upon receiving town tuitioning funds. That provision requires a school that permits religious expression in any form to allow religious expression in all forms and from all viewpoints. 5 M.R.S. § 4602(5)(D). St. Dominic is a Catholic institution that expresses its faith in myriad ways on campus. For example, it teaches Catholic doctrine and holds regular Mass that all students are required to attend. Compl. ¶¶ 33, 35, 38, 134. But under L.D. 1688, if the Diocesan schools want to continue sharing their Catholic faith with students, they must also allow all other forms of religious expression at the school. This would prevent the schools from placing any limitations on students' religious expression at school. St. Dominic could not, for example, prohibit students from publicly denigrating the Catholic faith or from seeking to dissuade other students from believing in Catholic doctrines. Nor could St. Dominic prevent students from distributing literature doing the same thing. Nor could it continue requiring teachers and staff to uphold Catholic teaching, regardless of the individual employee's personal religious beliefs. In fact, the law would require St. Dominic to affirmatively create a space for dissenting religious views. For example, because the school holds regular Mass, it would also have to allow prayer services led by rabbis, imams, or Protestant ministers if a student or staff member requested it. St. Dominic would, in essence, need to stop being a distinctly Catholic institution.

The Supreme Court has already told Maine once that it cannot require schools to abandon their religious identities to receive town tuitioning funds. Maine has tried to dress up its discriminatory policies in the hopes that it can continue to exclude religious schools from its public program. But masked discrimination is still discrimination. *See Lukumi*, 508 U.S. at 534. The religious nondiscrimination and expression provisions in L.D. 1688 make the receipt of town tuitioning funds conditional on the abandonment of religious identity, effectively disqualifying religious institutions "solely because they are religious." *Espinoza*, 140 S. Ct. at 2261. "That is discrimination against religion." *Carson*, 142 S. Ct. at 1998. Maine's new rules still violate the Free Exercise Clause.

**C. Maine's rules violate the Free Exercise Clause because they are not generally applicable.**

A law is not generally applicable if it treats "*any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam); *see also Fulton*, 141 S. Ct. at 1877 ("A law … lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."). As described above, Maine's rules are a religious gerrymander with categorical exclusions from the MHRA's nondiscrimination provisions for out-of-state and international schools, private post-secondary schools, and (for the time being) single-sex private schools that participate in the program.[12] This renders the rules "underinclusive" because "[t]hey fail to prohibit nonreligious conduct that endangers [the State's nondiscrimination] interests in a similar or greater degree than" religious schools purportedly do. *Lukumi*, 508 U.S. at 543. Maine must therefore meet strict scrutiny, *Tandon*, 141 S. Ct. at 1296, which it cannot, *infra* Part I.J.

**D. Maine's rules violate the Free Exercise Clause by infringing on the rights of parents to direct the religious education of their children.**

Maine's new rules also impinge on "the fundamental interest of parents, as contrasted with that of the State, to guide the religious future and education of their children." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). "[T]he traditional interest of parents with respect to the religious upbringing of their children" is a "fundamental right[] and interest[]" and is "specifically protected by the Free Exercise Clause of the First Amendment." *Id.* at 214. It is also "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Incursions on this fundamental right trigger strict scrutiny. *Yoder*, 406 U.S. at 214; *Smith*, 494 U.S. at 881 (citing *Yoder*, 406 U.S. 205).

---

[12]   *See* 5 M.R.S. § 4553(2-A). The Legislature's litigation-driven decision to eliminate the latter categorical exception underscores the problems with *Smith*'s atextual and ahistorical rubric. *Fulton*, 141 S. Ct. at 1887 (Alito, J., concurring) (criticizing *Smith* on the ground that, "if the City wants to get around today's decision, it can simply eliminate the never-used exemption power" and "the parties will be back where they started"). But despite this pending revision, Maine's program remains one that lacks general applicability given its exceptions for non-religious secondary schools outside of Maine and private, post-secondary schools within Maine. *See Tandon*, 141 S. Ct. at 1296 (2021) (per curiam) ("It is no answer that a State treats *some* comparable secular … activities as poorly as or even less favorably than the religious exercise at issue." (emphasis added)).

The Radonises, like many other Catholic Mainers, strive to raise their children according to their shared Catholic faith. Compl. ¶ 52. Because they live in an area that does not provide a public high school, they are eligible to receive tuition assistance payments to cover the cost of educating their children for grades 9-12. *Id.* ¶ 51. The Radonises believe that they have a religious responsibility as parents to nurture and cultivate the Catholic faith in their children, and that providing a Catholic education is the best way to create a foundation of faith for their children that will last a lifetime. *Id.* ¶¶ 58-59. But Maine's rules have interfered and continue to interfere with their ability and right to do so. Were it not for Maine's exclusion of religious schools from the program, the Radonises would have previously used their town tuitioning dollars to send their eldest and middle children to St. Dominic for high school instead of the secular private high school they have been attending. *Id.* ¶ 64. Going forward, they would like to send their middle and youngest children to St. Dominic for high school. *Id.* ¶¶ 65, 67. But Maine's religious gerrymander stands in the way. By conditioning the use of otherwise generally available funding for religious schools on those schools abandoning core elements of what makes them *religious* in the first place, Maine has interfered with the Radonises' and other parents' right to direct the religious upbringing of their children. *Yoder*, 406 U.S. at 235.

### E.  Maine's "equal religious expression" rule violates the Free Speech Clause because it compels speech by religious schools.

Maine's "equal religious expression" clause also independently violates Plaintiffs' rights under the Free Speech Clause by forcing them to allow speech that they disagree with on their school campuses. The religious expression provision requires any school that engages in one kind of religious speech to permit religious speech of all kinds. By its very nature, the rule forces schools to express religious viewpoints with which they do not agree. But Maine cannot "compel [a] speaker to alter [its] message by including one more acceptable to others." *Hurley v. Irish-American Gay, Lesbian, and Bisexual Grp. of Boston*, 515 U.S. 557, 581 (1995); *see also W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

In *Hurley*, the Supreme Court unanimously held that the First Amendment protected the right

of a private parade organizer to exclude a group from participating in the parade because of the message that the group sought to convey. *See* 515 U.S. at 570, 574. The Court explained that the parade was a form of protected expression. *Id.* at 569. "Since every participating unit affects the message conveyed by the private organizers," forcing the parade organizers to include an unwanted unit would "alter the expressive content of their parade." *Id.* at 572-73. The Court held that this would violate "the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id.* at 573.

Likewise in this case, forcing the Diocesan schools to allow religious expression—including religious expression that is *contrary* to the Catholic faith the school exists to impart—would alter the message the schools seek to convey to their students. St. Dominic exists "to strengthen the Catholic Church and to create an environment in which the faith is preserved, nourished, shaped and communicated." *See* Compl. ¶ 33. Its primary goal is to assist parents in raising their children in the Catholic faith. *Id.* ¶¶ 30, 34. Accordingly, it infuses Catholic teaching into all that it does. But if Maine has its way, then St. Dominic would be forbidden from "discriminating" against messages that contradict its religious teachings. That violates the school's right to "choose the content of [its] own message." *Hurley*, 515 U.S. at 573.

### F. Maine's "equal religious expression" rule violates the Free Speech Clause right of expressive association.

The equal religious expression provision also interferes with the Plaintiffs' expressive association rights. The First Amendment protects the rights of individuals, as well as institutions, to "associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, … and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984). "Religious groups" like the Diocese and its schools "are the archetype of associations formed for expressive purposes." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 200 (2012) (Alito, J., joined by Kagan, J., concurring). The First Amendment also protects the rights of parents to direct the education of their children, and by extension the right to associate with others of their choosing to accomplish that purpose. *See Yoder*, 406 U.S. at 232; *see*

*also Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2053 (2021) (Alito, J., joined by Gorsuch, N., concurring) ("In our society, parents, not the State, have the primary authority and duty to raise, educate, and form the character of their children.").

St. Dominic was formed to partner with Catholic families, like the Radonises, in educating their children according to the Catholic faith. Compl. ¶¶ 30-33. To accomplish that purpose, the school must be free to express its Catholic message without intervention by the state. But Maine is now conditioning the receipt of town-tuitioning funds on the forfeiture of a school's ability to control the religious messages conveyed on its own campus. In doing so, Maine interferes with the ability of the Diocesan schools and Catholic families to join together to impart Catholic teachings to the next generation. That intrusion violates the First Amendment.

### G.  Maine's rules violate the Establishment Clause because they invite excessive entanglement under *Carson*.

*Carson* also explained that "scrutinizing whether and how a religious school pursues its educational mission" would "raise serious concerns about state entanglement with religion and denominational favoritism," both of which violate the Establishment Clause. 142 S. Ct. at 2001 (citing *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2064 (2020); *Larson v. Valente*, 456 U.S. 228, 244 (1982)). But Maine's new rules do just that: they reach into the heart of religious schools and give the Commission—not parents and the religious schools they partner with—the authority to say how the schools should be run.

As discussed above, in order to participate in the program, Diocesan schools must give the Maine Human Rights Commission authority to investigate and determine questions like where, when, and how often to allow prayer in school; whether a Catholic school must allow Protestant worship; what the school may teach about its own Catholic beliefs and the beliefs of other religions; whether families and students may be asked to support the religious mission of the school; and who is qualified to teach students in a Catholic school about Catholicism.

This is only the entanglement created by the MHRA's religious discrimination and equal reli-

gious expression clauses. The MHRA's provisions on sexual orientation and gender identity discrimination are just as entangling. Diocesan schools do not inquire about a student's sexual orientation or gender identity at the time of admission. Compl. ¶ 138. But the requirements of the MHRA do not end at the schoolhouse door. According to the Commission, the MHRA requires a school to facilitate a student's efforts to change his or her gender identity even if the school knows that the student's parents object.[13] This approach is inconsistent with the Diocese's commitment to respect parents' "primordial and inalienable" "right" and "duty" to educate their children.[14] In the Commission's view, schools subject to the MHRA must also "require" employees and "instruct" other students to use a student's preferred pronouns. *Supra* note 15. Thus, the Commission could require a Catholic school to discipline a Catholic teacher for following the teachings of Pope Francis on sex and gender.[15]

All of these actions violate the Establishment Clause because they create excessive entanglement between the state of Maine and religious schools—an entanglement that inevitably invites Maine officials to condone the actions of religious schools who have beliefs the government agrees with and sanction those who do not. Further, "[i]t is not only the conclusions that may be reached by the [Commission] which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *NLRB v. Catholic Bishop*, 440 U.S. 490, 502 (1979). As *Carson* recognized, this kind of government interference in the internal policies of religious organizations is anathema to our constitutional order. 142 S. Ct. at 2001.

---

[13]   *See* Me. Hum. Rights Comm'n, "Interpretation of the Education Provisions of the MHRA," at 4 (Jan. 13, 2016), https://perma.cc/D5Z3-PMP8.

[14]   Catechism of the Catholic Church § 2221; *compare Espinoza*, 140 S. Ct. at 2261 ("Drawing on 'enduring American tradition,' we have long recognized the rights of parents to direct 'the religious upbringing' of their children.").

[15]   Pope Francis has counseled that Catholics must be "understanding of human weakness and the complexities of life," while emphasizing that "biological sex and the socio-cultural role of sex (gender) can be distinguished but not separated" and that "protecting our humanity" means first of all "accepting it and respecting it as it was created." Pope Francis, *Amoris Laetitia*, no. 56 (2016) (quoting the *Relatio Finalis*, no. 58 (2015)).

**H.  Maine's rules violate the First Amendment right of religious autonomy.**

In addition to raising entanglement concerns, Maine's rules violate the right of religious autonomy as well. Religious autonomy, which arises from the nexus of the Free Exercise and Establishment clauses, was what *Carson* had in mind when it reminded Maine that "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Id.* (citing *Our Lady*, 140 S. Ct. at 2064, and *Hosanna-Tabor*, 565 U.S. at 192). The right to select who will carry out these important functions is at the heart of religious autonomy. For that reason, cases like *Hosanna-Tabor* and *Our Lady* have held that teachers at Catholic schools who are responsible for imparting the faith to the next generation are "ministers" whose employment is exempt from state and federal employment discrimination law. *Our Lady*, 140 S. Ct. at 2064. Likewise, religious schools have the constitutional right—long protected in Maine and Federal employment law—to hire non-ministerial staff that support their religious mission in word and deed. *See, e.g., Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 329 (1987) (construing Section 702 of Title VII of the Civil Rights Act of 1964 to allow a church-owned gym to discharge a janitor for failing to conform to the church's teachings in his personal life); *Bryce v. Episcopal Church*, 289 F.3d 648, 660 (10th Cir. 2002) (recognizing religious autonomy right to make "personnel decision[s] based on religious doctrine"); *see also* 5 M.R.S. § 4573-A (recognizing that religious organizations may "require that all applicants and employees conform to the religious tenets of that organization").[16]

Maine has made it abundantly clear that it does not intend to respect the religious autonomy of religious schools that take part in the program. Throughout the *Carson* litigation, Maine warned that religious schools would lose their religious exemption under the state's employment discrimination law if they took part in the program, and could be forced to accept teachers who disagreed with their religious beliefs, including their religious beliefs surrounding marriage, gender, and

---

[16]   Were there any ambiguity about the scope of this right under Maine law, this Court must "decline to construe" Maine law "in a manner that could" require courts to "resolve difficult and sensitive questions arising out of the guarantees of the First Amendment Religion Clauses." *Catholic Bishop*, 440 U.S. at 507.

sex.[17] The Commission likewise stated in legislative testimony given while the *Carson* certiorari petition was pending that "a religiously-affiliated school … may continue to operate within its own beliefs, at its own expense, but once public funds … are utilized … the organization must not discriminate" in "employment."[18] And immediately after *Carson* was decided, Maine's Attorney General warned that religious schools participating in Maine's tuitioning program would have to "eliminate" their religious hiring practices.[19] These efforts to strip religious schools of their hiring rights violate religious autonomy.

## I. Maine's rules impose unconstitutional conditions on the program.

At a basic level, Maine's efforts to control the internal operations of religious schools run headlong into the doctrine of unconstitutional conditions.[20] "[A] State 'may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom … even if he has no entitlement to that benefit.'" *Mahanoy*, 141 S. Ct. at 2053-54 (quoting *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc*., 570 U.S. 205, 214 (2013)) (*AOSI*). Under this doctrine, the government may not "go[] beyond defining the limits of the [government] funded program to defining the recipient" by seeking to control the internal policies of the recipient itself. *AOSI*, 570 U.S. at 218. Thus, in *AOSI*, the federal government could require grant recipients to use federal money to promote the government's anti-AIDS message and to oppose legalized prostitution—but it could not require grantees to adopt the government's policies opposing legalized prostitution as their own. *Id.* at 220-21.

Each of Maine's new funding conditions runs afoul of *AOSI*. Maine's rules force religious schools to stop being religious. This it cannot do. "Maine has decided *not* to operate schools of its own, but instead to offer tuition assistance that parents may direct to the public or private schools

---

[17]   Maine Mot. for Summ. J. at 13, *Carson v. Makin*, 401 F. Supp. 3d 207 (D. Me. 2019) (No. 18-327), Dkt. 29; *see also* Maine Br. at 17, *Carson*, 142 S. Ct. 1987 (2022) (No. 19-1746) (same).

[18]   Letter from Amy M. Sneirson, Exec. Dir. of the Me. Hum. Rts. Comm'n to Hon. Anne Carney, Me. Senate Chair, et al. 3 (Apr. 20, 2021), https://perma.cc/7B9E-2J2X.

[19]   Statement of Maine Attorney General Aaron Frey on Supreme Court Decision in *Carson v. Makin*, Office of the Maine Attorney General (June 21, 2022), https://perma.cc/544J-DAFN.

[20]   This is not new. In *Carson*, the First Circuit recognized that *Trinity Lutheran* and *Espinoza* "resonate[] with unconstitutional conditions doctrine in the First Amendment area more generally." *Carson,* 979 F.3d at 34 n.1.

of *their* choice. Maine's administration of that benefit is subject to the [First Amendment] princi-ples governing any such public benefit program" which means, among other things, that it "cannot disqualify some private schools solely because they are religious." *Carson*, 142 S. Ct. at 2000.

### J.  Maine's rules cannot satisfy strict scrutiny.

Not all of Plaintiffs' claims require a strict scrutiny analysis.[21] But for those that do, Maine's rules fail because they are not narrowly tailored to serve a compelling government interest.

"A law that targets religious conduct for distinctive treatment or advances legitimate govern-mental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546. This case is not one of them. In the parallel case *Crosspoint Church*, Maine has asserted a compelling interest in preventing discrimination in education.[22] The First Amendment, however, "demands a more precise analysis." *Fulton,* 141 S. Ct. at 1881. The question is not whether Maine "has a compelling interest in enforcing its non-discrimination poli-cies generally, but whether it has such an interest in denying an exception" to schools like St. Dominic. *Id.* Maine does not pursue its "broadly formulated interest" when it pays grants to private post-secondary schools or pays tuition for out-of-state and out-of-country schools—and until it was called out in litigation this year, it did not pursue these interests when it paid tuition for single-sex schools either. Maine "offers no compelling reason why it has a particular interest in denying an exception" to the Radonis family or St. Dominic "while making them available to others." *Id.* at 1882. Because Maine's rules are "underinclusive to a substantial extent" and "it is only conduct moti-vated by religious conviction that bears the weight of the governmental restrictions," "[t]here can be no serious claim" that Maine's interests justify its rules. *Lukumi*, 508 U.S. at 547.

## II.  The remaining injunction factors favor the Plaintiffs.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably

---

[21]   Where government targets religious exercise, attempts to interfere with church autonomy, or becomes entangled in religious affairs, a court must "'set aside' such policies without further inquiry" and without the need for a strict scrutiny analysis. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 n.1 (2022) (religious targeting); *see also Our Lady*, 140 S. Ct. at 2060 (church autonomy/entanglement).

[22]   Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction at 15-16, *Crosspoint Church v. Makin*, No. 23-146 (D. Me. Apr. 28, 2023), Dkt.  14.

constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). This is why "irreparable injury is presumed upon a determination that the movants are likely to prevail on their First Amendment claim." *Sindicato*, 699 F.3d at 11. That injury is compounded where, as here, Maine has singled out religious schools and families for exclusionary treatment. "[B]eing subjected to discrimination is by itself an irreparable harm." *Singh v. Carter*, 168 F. Supp. 3d 216, 233 (D.D.C. 2016) (citing *Smith v. City of Jackson*, 544 U.S. 228, 249 (2005) (O'Connor, J., concurring) ("discriminating against" a person is "*inherently harmful* to the targeted individual" (emphasis in original))). Plaintiffs are therefore suffering and will continue to suffer irreparable harm due to the ongoing violation of their First Amendment rights.

In addition to depriving Plaintiffs of their constitutional rights, the Radonis family will be irreparably harmed by the loss of educational opportunities for L.R.R. The Radonis family wants to send L.R.R. to St. Dominic beginning this fall. Compl. ¶ 65. However, Maine's discriminatory policies bar them from using town-tuitioning funds to do so. This lost opportunity cannot be restored to L.R.R. or the Radonis family.

The balance of the equities and public interest also favor Plaintiffs. Where the government is the defendant, these factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Absent an injunction, Plaintiffs will continue to be deprived of their First Amendment rights and educational opportunities, and suffer financially from Maine's discriminatory denial of town-tuitioning funds. By contrast, "the burden on the State depends on its right to enforce unconstitutional provisions." *We the People PAC v. Bellows*, 519 F. Supp. 3d 13, 52-53 (D. Me. 2021). Because Maine has no right to enforce unconstitutional laws, its interests "must bend to the Plaintiffs' legitimate First Amendment rights." *Id.* And "[t]he public interest is served by protecting First Amendment rights from likely unconstitutional infringement." *Comcast v. Mills*, 435 F. Supp. 3d 228, 250 (D. Me. 2019), *aff'd* 988 F.3d 607 (1st Cir. 2021).

## CONCLUSION

The Court should grant a preliminary injunction barring defendants from enforcing the provisions in the Maine Human Rights Act that conflict with Plaintiffs' religious beliefs.

Respectfully submitted,


s/ *Adèle Auxier Keim*
Adèle Auxier Keim*
Mark L. Rienzi*
Daniel D. Benson*
Benjamin A. Fleshman*
Michael O'Brien*†
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave., NW
  Suite 400
Washington, DC 20006
Telephone: (202) 955-0095
Facsimile: (202) 955-0090


\* Admission *pro hac vice* pending
† Not a member of the DC Bar; admitted in Louisi-
ana. Practice limited to cases in federal court.

s/ *James B. Haddow*
James B. Haddow
Maine Bar No. 003340
Petruccelli, Martin & Haddow LLP
Two Monument Square, Suite 900
Portland, ME 04112-8555
Telephone: (207) 775-0200 x 6413
Fax: (207) 775-2360


*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on June 14, 2023, I caused the foregoing to be served electronically via the Court's electronic filing system on all parties.

/s/ *Adèle Auxier Keim*
Adèle Auxier Keim

Dated: June 14, 2023

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the form and length requirements of Local Rule 7(d) because it has 20 pages and has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Times New Roman font.

/s/ *Adèle Auxier Keim*
Adèle Auxier Keim

Dated: June 14, 2023

23