# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

ST. DOMINIC ACADEMY, a d/b/a of       )
the ROMAN CATHOLIC BISHOP OF          )
PORTLAND, et al.                      )
                                      )
        Plaintiffs,                   )
                                      )
        v.                            )        Civil Action No. 23-cv-00246-JAW
                                      )
A. PENDER MAKIN, in her  personal     )
and official capacity as Commissioner of )
the Maine Department of Education, et al.,  )
                                      )
        Defendants.                   )

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION, WITH INCORPORATED MEMORANDUM OF LAW

In Maine, public schools and private schools approved to receive public funds through the State's tuitioning program are subject to provisions in the Maine Human Rights Act ("MHRA") prohibiting education discrimination.  According to the Roman Catholic Bishop of Portland and other Plaintiffs, this "make[s] it impossible for religious schools to participate while maintaining their religious identity."  Pltf. M., at 1.  The Plaintiffs do not mention, though, that another of the Bishop's <u>own</u> schools – Cheverus High School – has been participating in the program since the start of the last school year.  Plaintiffs fail to reconcile this with their claim that it would be impossible for the Bishop's other school – St. Dominic Academy – to do so, nor do they demonstrate that complying with the MHRA would interfere with their religious practices or expression.

But the Court should not even reach the merits.  *Pullman* abstention is appropriate because this case largely turns on the extent to which recent amendments to the MHRA's education provisions would interfere with Plaintiffs' exercise of First Amendment rights.  To

Defendants' knowledge, no state court has interpreted these amendments or considered how the MHRA's educational provisions would apply to a religious school. Further, the case is not ripe. The Plaintiffs essentially seek an advisory ruling regarding the extent to which the First Amendment would bar theoretical MHRA claims against St. Dominic. This issue would become ripe only if St. Dominic were to participate in the tuition program, do something in alleged violation of the MHRA, and face a complaint. And even then, there would be no need to reach First Amendment issues if the complained-of conduct does not violate the yet-to-be-interpreted provisions of the MHRA. The Plaintiffs' claims are best resolved in the context of an actual claim of discrimination, should one ever arise.

If the Court does reach the merits, Plaintiffs are not entitled to a preliminary injunction. Again, Plaintiffs do not demonstrate how the MHRA would burden or interfere with their religious practices. And even if they did, the MHRA is a neutral and generally applicable law, and its educational provisions could be constitutionally applied to <u>all</u> religious schools, regardless of whether they accept public funds. Maine did not go that far and instead narrowed the scope of the MHRA by exempting private schools that forego public funds. Far from being an "unconstitutional condition," this provides an option for schools that claim their religious beliefs prevent them from complying with the MHRA. In any event, under established Supreme Court precedent, requiring publicly-funded private schools to comply with the MHRA survives strict scrutiny.

## MEMORANDUM OF LAW

### Legislative Background

In Maine, a school administrative unit ("SAU") that neither operates a secondary school nor contracts for schooling privileges "shall pay the tuition . . . at the public school or the

approved private school of the parent's choice at which the student is accepted." 20-A M.R.S. § 5204(4). By statute, a private school approved for the receipt of public funds for tuition purposes must be "a nonsectarian school," 20-A M.R.S. § 2951(2), but the Maine Department of Education ("DOE") is no longer applying that requirement in light of the Supreme Court's decision in *Carson v. Makin*, 142 S. Ct. 1987 (2022). Welter Aff., ¶ 4.

On July 28, 2022, Cheverus High School (a sectarian school in Portland operated by the Bishop) applied to participate in the tuitioning program, and its application was approved on September 16, 2022. *Id*, ¶¶ 5-7; https://portlanddiocese.org/find-a-school. During the 2022-23 school year, five students attended Cheverus at public expense. *Id*., ¶ 8. On September 23, 2022, the Superintendent of Maine Catholic Schools contacted the DOE to inquire about St. Dominic applying to participate in the tuitioning program – the DOE informed the Superintendent that the application deadline had passed but that the school was welcome to apply for the following year. *Id*., ¶ 10.

Plaintiffs are challenging not the statutes governing the school tuitioning program but the application of the MHRA to religious schools. As originally enacted in 1971, the MHRA prohibited only unlawful employment, housing, and public accommodations discrimination. Me. Pub. L. 1971, c. 501. In these three areas, it prohibited discrimination based on race, color, religion, ancestry, or national origin, and, with respect to employment discrimination, age. *Id*. Since the beginning, the MHRA has expressly permitted non-profit religious organizations to limit employment to members of their own religion. *Id; see also* 5 M.R.S. § 4553(4). A 1995 amendment expressly permitted any religious organization to "require that all applicants and employees conform to the religious tenets of that organization." Me. Pub. L. 1995 c. 393, § 21, *codified at* 5 M.R.S. § 4573-A(2).

3

In 1983, the Legislature added Subchapter V-B to the MHRA to prohibit discrimination in education.  Me. Pub. L. 1987 c. 578, § 3.  However, it prohibited only discrimination based on sex.  *Id*.  "Educational institution" was defined as "any public school or educational program, any public post-secondary institution, any private school or educational program approved for tuition purposes if both male and female students are admitted and the governing body of each such school or program."  *Id*., § 2, *codified at* 5 M.R.S. § 4553(2-A).  Single-sex schools were thus excluded entirely from the new educational provisions prohibiting sex discrimination.  The Legislature subsequently prohibited other forms of educational discrimination.  *See* Me. Pub. L. 1987, c. 478 (physical or mental disability); Me. Pub. L. 1989 c. 725 (national origin); Me. Pub. L. 1991 c. 100 (race).  In 2005, the Legislature extended protection from discrimination based on sexual orientation to all aspects of the MHRA – employment, public accommodations, housing, and education.  Me. Pub. L. 2005 c. 10.[1]  However, "education facility[ies] owned, controlled or operated by a bona fide religious corporation, association or society" were exempted from the provisions prohibiting education discrimination based on sexual orientation.  *Id*., § 21. Moreover, non-profit religious organizations that <u>do not receive public funds</u> were exempted from the provisions prohibiting employment and housing discrimination based on sexual orientation.  *Id*., § 6, *codified at* 5 M.R.S. § 4553(10)(G).[2]  That religious organizations'

---

[1] "Sexual orientation" was defined as including "gender identity or expression," Me. Pub. L. 2005 c. 10, § 3, so the prohibition of sexual orientation discrimination encompassed gender identity discrimination. This remains the case today, but in recognition of the difference between sexual orientation and gender identity, the MHRA now has a separate definition for gender identity, which is defined as "the gender-related identity, appearance, mannerisms or other gender-related characteristics of an individual, regardless of the individual's assigned sex at birth."  5 M.R.S. § 4553(5-C). Wherever discrimination based on sexual orientation was prohibited prior to amendments to the MHRA in 2021, the MHRA now prohibits discrimination based on "sexual orientation or gender identity."

[2] This law also exempted non-profit religious organizations that do not receive public funds from the prohibition against sexual orientation discrimination in education, but, as noted above, a separate provision exempted <u>all</u> religious organizations from that prohibition.

compliance with sexual orientation provisions was tied to the receipt of public funds for employment and housing but not for education may simply have reflected the fact that until *Carson*, no religious schools could receive public funds. As will be discussed, this inconsistent treatment was corrected in 2021.

As additional categories of unlawful discrimination were added to the section addressing educational discrimination, the Legislature, for the most part, did not go back and address the definition of "educational institution." [3] It is likely that this was inadvertent inasmuch as there is otherwise no plausible explanation for, as an example, allowing single-sex schools to discriminate based on race. In any event, the oddity has now been fixed. On June 15, 2023, the Governor signed into law Maine Pub. L. 2023, ch. 188, which removes the exclusion of single-sex schools from the MHRA's definition of "educational institution." *See* Exhibit 1.

Plaintiffs' challenge focuses on 2021 amendments to the MHRA, which arose out of a twelve-page bill the MHRC submitted on May 6, 2021 addressing multiple provisions of the MHRA. *See* L.D. 1688, "An Act to Improve Consistency Within the Maine Human Rights Act," attached hereto as Exhibit 2.[4] Among the purposes of the bill was to "clarify[] the scope of the Maine Human Rights Act application in education." *Id*., at 11. With respect to Section 19 of the bill, the MHRC's Executive Director testified that "[t]he MHRA's current education coverage is woefully out of date, and inconsistent with the rest of the Act." *See* Exhibit 3, at 5. In addition to reformatting Section 4602, the bill added ancestry, color, and religion to the protected

---

[3] The one exception was that in 1995, the Legislature added the following to the definition: "For purposes related to disability-related discrimination, 'educational institution' also means any private school or educational program approved for tuition purposes." Me. Pub. L. 1995 c. 393, § 4.

[4] The MHRC's Executive Director testified that the MHRA's provisions were "amended in a piecemeal fashion," resulting in "internal inconsistencies," sometimes with no "logical rationale." Exhibit 3, at 1.

categories to make it consistent with the MHRA's general protections against discrimination.[5] The bill struck the provision exempting all religious organizations from the prohibition against sexual orientation discrimination and replaced it with a provision stating: "Nothing in this section . . . [r]equires a religious corporation, association or society that does not receive public funding to comply with this section as it relates to sexual orientation or gender identity." Exhibit 2, § 19, *codified at* 5 M.R.S. § 4602(5)(C). This made the education discrimination provision pertaining to sexual orientation or gender identity discrimination consistent with the provisions governing employment and housing discrimination, which already exempted only religious organizations that do not receive public funds. 5 M.R.S. § 4553(10)(G). The bill also stated that educational institutions are not required "to participate in or endorse any religious beliefs or practices," but that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing." Exhibit 2, § 19, *codified at* 5 M.R.S. § 4602(5)(D). With some amendments not relevant here, LD 1688 was passed in both chambers of the Legislature on June 17, 2021 and signed into law by the Governor on June 24, 2021.[6]

## ARGUMENT

"To grant a preliminary injunction, a district court must find the following four elements satisfied: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 171 (1st Cir. 2015). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if

---

[5] Gender identity was also separately named, but was not added as a protected class, since sexual orientation was already defined as including "gender identity or expression." *See* n.1, *supra*. LD 1688 changed references to "sexual orientation" to "sexual orientation or gender identity" throughout the MHRA to make clear that gender identity is protected. Exhibit 2, at 2 n.3.
[6] *See* https://legislature.maine.gov/LawMakerWeb/summary.asp?paper=SP0544&SessionID=14.

the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).  Here, the Plaintiffs are not likely to prevail on the merits and the remaining factors support denying injunctive relief.

### I.  <u>The Plaintiffs Are Not Likely to Prevail on the Merits</u>.

### A.  The Court Should Abstain Because of Uncertain Issues of State Law.

Pursuant to *R.R. Comm'n of Tex. v. Pullman*, 312 U.S. 496 (1941) and its progeny, a federal court should abstain from exercising jurisdiction "where (1) substantial uncertainty exists over the meaning of the state law in question, and (2) settling the question of state law will or may well obviate the need to resolve a significant federal constitutional question." *Batterman v. Leahy*, 544 F.3d 370, 373 (1st Cir. 2008).  The essence of Plaintiffs' claims is that the 2021 amendments to the MHRA's education provisions would burden their religious practices or otherwise violate their First Amendment rights.  To Defendants' knowledge, though, no state court has yet interpreted the new amendments, much less how they would be applied to a religious school.  So, it is not clear, for example, whether the amendments would, as St. Dominic argues, require it to allow imams and rabbis on campus to lead prayer sessions, address students by preferred names and pronouns over parents' objections, or stop giving preference to Catholics for admissions and scholarships.  Depending on how these amendments are interpreted, it might be unnecessary to decide the constitutional issues raised by Plaintiffs.  At the very least, state court interpretation will better focus the constitutional inquiry.  The Court should thus abstain from deciding this case, at least until Maine courts have had the opportunity to interpret the new amendments to the MHRA.

7

### B.  This Lawsuit is Not Ripe.

"[T]he doctrine of ripeness has roots in both the Article III case or controversy requirement and in prudential considerations." *Mangual v. Rotger-Sabat*, 317 F.3d 45, 59 (1st Cir. 2003).  "The basic rationale of the ripeness inquiry is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements in violation of Article III's case or controversy requirement." *Lab. Rels. Div. of Constr. Indus. of Massachusetts, Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016) (cleaned up).  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up). The plaintiff "bears the burden of alleging facts sufficient to demonstrate ripeness," and "[e]ven a facial challenge to a statute is constitutionally unripe until a plaintiff can show that federal court adjudication would redress some sort of imminent injury that he or she faces." *Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017).

Presently, the extent to which the MHRA applies to St. Dominic should it accept public funds is a purely hypothetical issue.  First, the school has not yet applied to participate in the tuitioning program.  Second, even if it were to participate and be accepted, a claim would arise only if it then allegedly violated the MHRA and the aggrieved person or a staff member of the MHRC were to make a charge of discrimination to the MHRC.  As is discussed below, because St. Dominic apparently does not discriminate in admissions and would still be permitted to limit employment to Catholics who conform to the Bishop's religious tenets, it seems unlikely that a claim would arise in either of those contexts.  The other scenarios that Plaintiffs posit seem entirely speculative, such as a student distributing literature "denigrating the Catholic faith" or demanding that a rabbi or imam be allowed on school grounds to conduct prayer services.  Pltf.

M., at 11.  It is not clear that these things would ever happen or, if they did, whether they would constitute violations of the MHRA.  That this case is not ripe is further evidenced by the fact that one of the Bishop's other schools participated in the tuitioning program for a full school year, and Plaintiffs do not claim that any charge of discrimination was made (or even threatened) against that school or that the school had to curtail any of its religious practices.

**C.  Prohibitions Against Discrimination Do Not Violate Plaintiffs' Free Exercise Rights.**

*1.  The Prohibitions Do Not Burden Plaintiffs' Religious Practices.*

The First Amendment's Free Exercise Clause states: "Congress shall make no law . . . prohibiting the free exercise" of religion.  U.S. Const. amend. I.  Plaintiffs claim that participating in the tuitioning program would mean "ced[ing] to the [MHRC] the determination of matters core to their Catholic identity."  Pltf. M., at 3.  But they fail to demonstrate that application of the MHRA to St. Dominic would have any meaningful impact on it, much less burden or interfere with its religious practices.  Starting with St. Dominic's admissions practices, it "admits students of any faith or no faith at all."  *Id*., at 10.  It does not claim to discriminate based on any other protected class, such as sexual orientation or gender identity.  St. Dominic "does give preference to Catholic families for admission and scholarships."  *Id*.  But even if a state court were to consider that a violation of the MHRA (and it is not clear whether it would), Plaintiffs provide no evidence that St. Dominic would, in fact, end up denying admissions or scholarships to non-Catholics.  For example, it might be that there are sufficient spots for all applicants, such that the religion preference never comes into play.

Turning to hiring practices, even if St. Dominic accepted public funds, it would still be entitled to limit employment of all staff, including teachers, to Catholics conforming to the Bishop's religious tenets.  5 M.R.S. § 4573-A(2); *see also* 5 M.R.S. § 4553(4).  Moreover, under

binding Supreme Court precedent, the MHRA's employment provisions cannot be applied against St. Dominic with respect to employment actions relating to employees whose positions fall within the ministerial exception.  *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012).  It is likely that many – and perhaps all – of St. Dominic's teachers would fall within this exception.  It is hard to see, then, the basis for Plaintiffs' claim that the MHRA could make "the identity of the religion teacher" subject to a discrimination complaint.  Pltf. M., at 3.

Finally, Plaintiffs fail to demonstrate that application of the MHRA to St. Dominic would have any real impact on its day-to-day operations and practices.  St. Dominic would still be free to conduct morning prayers however it wants, teach from a Catholic perspective, and promote Catholicism to the exclusion of all other religions.  It is true that it would need to permit other religious expression.  5 M.R.S. § 4602(5)(D).  But that provision expressly states that it does not require educational institutions "to participate in or endorse any religious beliefs or practices." *Id*.  It is doubtful, then, that St. Dominic would need to allow rabbis or imams to come onto school grounds and lead services or to "affirmatively create a space for dissenting religious views."  Pltf. M., at 11.  Moreover, it is not clear whether St. Dominic currently allows students to express religious view that differ from those of the Bishop or how allowing them to do so would burden Plaintiffs' religious practices.

Plaintiffs claim that complying with the MHRA would force St. Dominic to "facilitate a student's efforts to change his or her gender identity" over parents' objections.  Pltf. M., at 16. By "facilitating" a gender change, plaintiffs just mean using a student's preferred name and pronoun and allowing a student to dress in a manner consistent with their gender identity.  The MHRC guidance document the Plaintiffs cite to, though, says that when a parent objects, a

school "should, <u>whenever possible</u>, abide by the wishes of the student with regard their gender identity and expression while at school."  *See* https://perma.cc/D5Z3-PMP8, at 4 (emphasis added).  It is not clear how this guidance would apply to St. Dominic, or whether a state court would even agree with the guidance.  And it is difficult to see how allowing students to wear the clothes of their gender identity and addressing them by their preferred names and pronouns interferes with "parents' 'primordial and inalienable' 'right' and 'duty' to educate their children."  Pltf. M., at 16 (quoting Catechism of the Catholic Church § 2221).  The education children receive has nothing to do with what they are called or what they wear while at school.

Perhaps the most compelling evidence that the 2021 amendments will not burden St. Dominic's religious practices is that one of the Bishop's other schools – Cheverus – has been participating in the tuitioning program since the start of the last school year.  Presumably, Cheverus would not have done so if it meant abandoning its religious identity.  Plaintiffs do not even mention that Cheverus participates in the tuitioning program, much less explain why Cheverus can comply with the MHRA but not St. Dominic.

### 2. The Prohibitions Against Discrimination are Neutral and Generally Applicable.

Even if there were some burden on Plaintiffs' religious practices, Supreme Court cases "establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (citing *Employment Division v. Smith*, 494 U.S. 872 (1990)); *see also City of Boerne v. Flores*, 521 U.S. 507, 514 (1997) ("[N]eutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest.").  So while the First Amendment protects religious objections, "it is a

general rule that such objections do not allow business owners and other actors in the economy

and in society to deny protected persons equal access to goods and services under a neutral and

generally applicable public accommodations law." *Masterpiece Cakeshop, Ltd. v. Colorado*

*C.R. Comm'n*, 138 S. Ct. 1719, 1727 (2018); *see also Newman v. Piggie Park Enterprises, Inc.*,

390 U.S. 400, 402-03 n.5 (1968) (per curiam) (referring to restaurants' argument that law

prohibiting racial discrimination interfered with their free exercise of religion as "patently

frivolous").

A law is not neutral when its object "is to infringe upon or restrict practices because of

their religious motivation." *Lukumi*, 508 U.S. at 533; *see also Fulton v. City of Philadelphia,*

*Pennsylvania*, 141 S. Ct. 1868, 1876 (2021) ("Government fails to act neutrally when it proceeds

in a manner intolerant of religious beliefs or restricts practices because of their religious

nature.").  "Factors relevant to the assessment of governmental neutrality include 'the historical

background of the decision under challenge, the specific series of events leading to the

enactment or official policy in question, and the legislative or administrative history, including

contemporaneous statements made by members of the decisionmaking body.'" *Masterpiece*

*Cakeshop*, 138 S. Ct. at 1731 (2018) (quoting *Lukumi*, 508 U.S. at 540).  A law is not generally

applicable "if it prohibits religious conduct while permitting secular conduct that undermines the

government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877.  A law may also be

not generally applicable if it "permit[s] the government to grant exemptions based on the

circumstances underlying each application." *Id.*; *see also Kennedy v. Bremerton Sch. Dist.*, 142

S. Ct. 2407, 2422 (2022).  If the law is not neutral and generally applicable, it is subject to strict

scrutiny and must be narrowly tailored to serve a compelling state interest. *Kennedy*, 142 S. Ct. at 2426; *Lukumi*, 508 U.S. at 546.

a.   <u>The Prohibitions Against Discrimination are Neutral.</u>

The 2021 amendments to the MHRA were neither designed to impinge on religious practices nor motivated by any animus toward religion. The amendments made the educational provisions of the MHRA consistent with those addressing employment and housing. If they were motivated in part by the possibility that the Supreme Court would strike down the exclusion of religious schools from the tuitioning program,[7] that is not evidence of improper motive. The State has a compelling interest in ensuring that public money is not used to fund discrimination, so it was entirely appropriate for it to ensure that religious schools, which previously could not receive public funds, would comply with the MHRA's educational provisions if they choose to participate in the tuitioning program as a result of new legal precedent. To the extent the Court gives any consideration to a "tweet" from Maine's former Speaker of the House,[8] it is best read in this context.

While Plaintiffs cite to statements from Maine's Attorney General, these statements were made a year <u>after</u> LD 1688 was signed into law. Moreover, the Attorney General did not, as plaintiffs claim, "vow[] to work with the Maine legislature to pass laws that would continue to exclude the religious schools in *Carson* from the program." Pltf. M., at 9. What he did promise

---

[7] LD 1688 was enacted after both this Court and the First Circuit had <u>upheld</u> the statutory provision excluding sectarian schools from the tuitioning program and before the Supreme Court had granted certiorari. *Carson v. Makin*, 141 S. Ct. 2883 (Mem.). Moreover, the Supreme Court had three times before denied certiorari petitions seeking review of decisions from the First Circuit and the Maine Law Court upholding the exclusion of sectarian schools. *Anderson v. Town of Durham, Maine*, 549 U.S. 1051 (2006) (Mem.); *Bagley v. Raymond Sch. Dep't*, 528 U.S. 947 (1999) (Mem.); *Strout v. Albanese*, 528 U.S. 931 (1999) (Mem.).
[8] *See Lukumi*, 508 U.S. at 558 (Scalia, J., concurring) ("[I]t is virtually impossible to determine the singular 'motive' of a collective legislative body, . . . and this Court has a long tradition of refraining from such inquiries.").

was to explore ways to prevent public funds from being used to further discriminatory actions. *See* https://perma.cc/544J-DAFN.  Nor is recent legislation removing the exemption for single-sex schools evidence of animus.  While Plaintiffs refer to this as a "litigation-driven decision," Plf. M., at 12 n.12, it is clear, as discussed above, that the exemption for single-sex schools was simply a mistake, which has now been corrected.  The correction was "litigation-driven" only in the sense that litigation brought the mistake to light.

b. <u>The Prohibitions Against Discrimination are Generally Applicable.</u>

Plaintiffs argue that the educational provisions of the MHRA are not generally applicable because out-of-state and international schools, private post-secondary schools, and single-sex private schools are exempt.  Pltf. M., at 12.  Schools outside of Maine are not subject to the MHRA because Maine has no jurisdiction over them.  Plaintiffs offer no support for the proposition that a state law is not generally applicable unless it applies across the United States.  Moreover, religious schools outside of Maine are treated exactly the same as non-religious schools – none are subject to the MHRA.  Nor is it relevant that post-secondary private schools are exempted from the educational provisions of the MHRA.  *See* 5 M.R.S. § 4553(2-A).  Colleges, universities, and other post-secondary schools simply are not comparable to elementary and high schools.  More importantly, the exemption means that <u>no</u> religious post-secondary schools in Maine are subject to the educational provisions of the MHRA.  Finally, while single-sex private schools were exempt from all educational provisions of the MHRA except those relating to disability, that error has now been corrected, as discussed above.

The Supreme Court's decision in *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661 (2010) is instructive.  There, a public law school conditioned student organizations' eligibility for financial support and other benefits on

their agreement to not discriminate with respect to membership and leadership (referred to as the "accept-all-comers policy"). *Id*., at 667. A religious organization argued that this violated their rights to free speech, expressive association, and the free exercise of religion by requiring them, as a condition of financial support, to accept members who do not share their beliefs about religion and sexual orientation. *Id*. The Court decided both the speech and association claims under a limited public forum framework. *Id*., at 680-683. The Court found that the all-comers policy was reasonable, noting, among other things, that it ensured that no student would be "forced to fund a group that would reject her as a member" and that by subsuming "state-law proscriptions on discrimination," it conveyed the school's decision "'to decline to subsidize with public monies and benefits conduct of which the people of California disapprove.'" *Id*., at 688-90 (quoting school's brief). The Court went on to find that the all-comers policy was "textbook viewpoint neutral" and rejected the free speech and expressive association claims. *Id*., at 694-97; *see also id*., at 669 (stating that while "[t]he First Amendment shields [the religious organization] against state prohibition of the organization's expressive activity, however exclusionary that activity may be," the organization "enjoys no constitutional right to state subvention of its selectivity").

In a footnote, the Court summarily disposed of the free exercise challenge, holding that under *Smith*, 494 U.S. at 872, "the Free Exercise Clause does not inhibit enforcement of otherwise valid regulations of general application that incidentally burden religious conduct." *Id*., at 697 n.27. The Court further commented that in seeking an exemption from the all-comers policy, the religious organization "seeks preferential, not equal, treatment; it therefore cannot moor its request for accommodation to the Free Exercise Clause." *Id*. In sum, even if the

15

MHRA does burden Plaintiffs' religious exercise, it is a neutral and generally applicable anti-discrimination law and survives a free exercise challenge.

### D.  The Prohibitions Against Discrimination Do Not Infringe on Parental Rights.

Requiring private religious schools that accept public funds to comply with the MHRA does not infringe on the rights of parents to raise their children and direct their religious upbringing.  *See Runyon v. McCrary*, 427 U.S. 160, 176-77 (1976).  Parents who want a religion-based education for their children are free to send their children to appropriate schools, and these schools do not even need to be approved by the State in order for attending students to satisfy Maine's compulsory attendance law.  20-A M.R.S. § 5001-A(3)(A)(2).  Maine permits parents to school their children at home, with only minimal requirements.  20-A M.R.S. § 5001-A(3)(A)(4).  Parents thus have broad authority to select an education that is most appropriate for their children.  That some parents might not be able to afford to send their children to a particular religious school because the school is not participating in the tuitioning program is not a violation of their constitutional rights.  Indeed, if Plaintiffs' argument were correct, it would mean that every family in Maine, including those who live in districts with public schools, has a constitutional right to receive public funds to send their children to private religious (or non-religious) schools of their choice.  There is no such right.  *See, e.g., Regan v. Tax'n With Representation of Washington*, 461 U.S. 540, 549 (1983) ("We have held in several contexts that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny.").[9]

---

[9] Plaintiffs' reliance on *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and *Troxel v. Granville*, 530 U.S. 57 (2000) is misplaced.  In *Yoder*, a state required all children to attend high school, which interfered with Amish families' exercise of their religious beliefs and "would do little to serve" the State's purported interests.  406 U.S. at 222.  At the same time, the Court recognized that "activities of individuals, even when religiously based, are often subject to regulation by the States in the exercise of their undoubted power to promote the health, safety, and general welfare."  *Id.*, at 220; *see also Norwood v. Harrison*, 413

### E. The Prohibitions Against Discrimination Do Not Compel Speech.

Plaintiffs claim that by requiring St. Dominic to allow students to engage in religious speech inconsistent with Catholic teachings, it is "force[d] . . . to express religious viewpoints with which [it] does not agree."  Pltf. M., at 13.  But the speech would be that of students, not the Plaintiffs.  The Supreme Court's decision in *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) does not support Plaintiffs.  Indeed, the Court recognized that public accommodation statutes prohibiting discrimination "do not, as a general matter, violate the First or Fourteenth Amendments."  *Id.*, at 572.  But with respect to the parade that was at issue, applying the antidiscrimination statute "had the effect of declaring the sponsors' speech itself to be the public accommodation."  *Id.*, at 573.  Here, on the other hand, application of the MHRA is consistent with the permissible purpose of "prevent[ing] any denial of access to (or discriminatory treatment in) public accommodations on proscribed grounds."  *Id.*, at 578. Further, the *Hurley* Court concluded that the public would view a group's inclusion in the parade as representing the parade sponsor's views.  515 U.S. at 575-577.[10]  It is doubtful that the public would view a student's support of a religion other than Catholicism as representing the Bishop's views.[11]  *See Rumsfeld v. Forum. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 65 (2006) ("[H]igh school students can appreciate the difference between speech a school sponsors and

---

U.S. 455, 462 (1973) (while private schools have the right to exist and operate, this does not mean that they have the right to share in the "state largesse").  *Troxel* is even less relevant – a court had required a mother to allow grandparents to visit her children over her objection.  It is impossible to see what that has to do with this case.

[10] The Supreme Court's recent decision in *303 Creative LLC v. Elenis*, 2023 WL 4277208 (2023) does not help Plaintiffs.  There, a website designer engaged in her own "pure speech" by creating wedding websites, and application of a state law requiring her to create websites for same-sex couples would "compel speech [she] does not wish to provide."  *Id.*, *9.  Application of the MHRA to St. Dominic would not compel any speech.  At most, it might require the school to allow students to express their own views, which would not be attributed to the school.

[11] The only other case Plaintiffs cite in support of their argument is *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943), where all public school students were required to salute the American flag.  Here, Plaintiffs are not being compelled to engage in any speech or expressive conduct.

speech the school permits because legally required to do so, pursuant to an equal access policy."); [12] *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 87-88 (1980) (rejecting shopping center's compelled speech challenge where views expressed by members of the public on its premises would not likely be identified with those of the shopping center itself).

**F.  The Prohibitions Against Discrimination Do Not Violate Plaintiffs' Right to Associate.**

Plaintiffs argue that applying the "equal religious express" provision (5 M.R.S. § 4602(5)(D)) to St. Dominic would violate their right to expressive association because St. Dominic could no longer "control the religious messages conveyed on its own campus."  Pltf. M., at 15.[13]  They fail to demonstrate, though, that allowing students to express their own religious views would impose a "serious burden" on Plaintiffs' associational rights.  *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 626 (1984).  In *Roberts*, the Supreme Court held that a state's "compelling interest in eradicating discrimination against its female citizens justifies the impact that application of the statute to the Jaycees may have on the male members' associational freedoms."  *Id.*, at 623.  Here, even if there is some interference with Plaintiffs' associational rights, it is outweighed by the State's interest in ensuring that schools educating students at public expense do not discriminate.[14]  And Plaintiffs are free to exclude anyone they want so long as they do it without public funds.

---

[12] It was in part because there was no risk of attribution that the Court held that colleges' First Amendment rights were not violated by being forced to host military recruiters who expressed messages with which they disagreed.  *Id.*, at 63-65.

[13] St. Dominic admits students of any faith or no faith, Pltf. M., at 10, and they do not argue that the MHRA would force them to take students they do not want.

[14] In the event that the Court concludes that requiring St. Dominic to allow students to express different religious views violates either Plaintiffs' free speech or associational rights, it should only enjoin application of the second phrase in 5 M.R.S. § 4602(5)(D) and not the other applicable MHRA provisions.  *See* 1 M.R.S. § 71(8).

### G. The Prohibitions Against Discrimination Do Not Result in Excessive Entanglement.

Plaintiffs claim, without any factual or legal support, that if St. Dominic participated in the tuitioning program, the MHRC could investigate "where, when, and how often" there is prayer, what the school may teach about Catholicism, and who is qualified to teach its students. Pltf. M., at 15.  It is difficult to see why the MHRC would ever have to look into such matters to determine whether the MHRA was violated.  Moreover, when it comes to litigation, religious organizations do not have some sort of blanket immunity from relevant factual inquiries.  For example, in *Our Lady of Guadalupe*, 140 S. Ct. at 2066, the Supreme Court examined the religious missions of the schools at issue and the specific duties and responsibilities of two teachers to determine whether they were "ministers."  Presumably, this inquiry did not violate the Establishment Clause.  While Plaintiffs argue that the MHRA might require St. Dominic's staff to use students' preferred pronouns, this goes to whether the MHRA burdens Plaintiffs' religious practices (and is addressed above).  It is not entanglement.

### H. The Prohibitions Against Discrimination Do Not Violate "Religious Autonomy."

The Supreme Court has recognized that while religious entities do not have "general immunity from secular laws," they do have autonomy "with respect to internal management decisions that are essential to the institution's central mission."  *Our Lady of Guadalupe*, 140 S. Ct. at 2060.  The only such decisions Plaintiffs mention are those relating to who St. Dominic will employ.  As discussed above, though, those decisions are protected.  St. Dominic is free to employ only Catholics who subscribe to the Bishop's religious tenets.  The "ministerial exception" further protects St. Dominic's employment decisions.  Plaintiffs claim that the State said in the *Carson* litigation that "schools accepting public funds would lose their religious hiring rights."  Pltf. M., at 7 & n.6.  This is <u>not</u> what the State said.  What it did say is that religious

organizations that take public funds would no longer be allowed to discriminate in hiring based on sexual orientation or gender identity. *See, e.g.,* Maine Mot. for Summ. J. at 13, *Carson v. Makin*, 401 F. Supp. 3d 207 (D. Me. 2019) (No. 18-327), Dkt. 29.[15] They would still be free to employ only members of their religion who conform to their religious tenets.[16]

## I. The Prohibitions Against Discrimination Do Not Impose Unconstitutional Conditions.

Citing to *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ("*AOSI*"), Plaintiffs claim that Maine is imposing unconstitutional conditions by requiring religious schools that take public funds to comply with the MHRA. According to them, this "force[s] religious schools to stop being religious." Pltf. M., at 18. As discussed above, compliance with the MHRA in no way burdens St. Dominic's religious practices, interferes with its internal operations, or causes it to lose its religious identity. Again, Cheverus is participating in the program while, presumably, still being religious. Moreover, Plaintiffs are coming at this from the wrong direction. Because the MHRA is a neutral and generally applicable law, it does not need to have <u>any</u> exceptions for religious schools (apart from exceptions to protect some employment practices). Maine has not gone that far, and instead allows religious schools to exempt themselves from the MHRA's educational provisions by not accepting public funds.

---

[15] The Attorney General did not, as Plaintiffs claim, "warn[] that religious schools participating in Maine's tuitioning program would have to 'eliminate' their religious hiring practices." Pltf. M, at 18. What he did say is that taking public funds "would require some religious schools to eliminate their current discriminatory practices." *See* https://perma.cc/544J-DAFN. He never suggested that schools would no longer be allowed to limit employment to members of their religion or require employees to conform to their religious tenets. Similarly, nothing in the letter from the MHRC's executive director suggests that a religious school accepting public funds would no longer be able to limit employment to members of the same religion conforming to the schools' religious tenets. *See* https://perma.cc/7B9E-2J2X.

[16] Plaintiffs do not claim that homosexual and transgender individuals are unable to conform to the Bishop's religious tenets, and, if they did make such a claim, is not clear whether a state court would conclude that the Bishop's employment actions based on sexual orientation and gender identity are actionable under the MHRA. In any event, regardless of the scope of Maine law, federal law would likely allow the Bishop to make employment decisions based on sexual orientation and gender identity when it comes to employees qualifying for the ministerial exception.

This is not an unconstitutional condition.  It is a benefit that give religious schools an option if their religious beliefs prevent them from complying with the MHRA.  *See Grove City Coll. v. Bell*, 465 U.S. 555, 575-76 (1984) (holding that federal law requiring colleges receiving federal financial assistance to comply with Title IX's prohibition against sex discrimination did not violate college's First Amendment rights because college was free to avoid the requirement by not accepting federal funds*); Evans v. City of Berkeley*, 129 P.3d 394, 400-02 (Cal. 2006) (holding that "a government entity may constitutionally require a recipient of funding or subsidy to provide written, unambiguous assurances of compliance with a generally applicable nondiscrimination policy").  Finally, as the Court in *AOSI* recognized, unconstitutional condition concerns arise when the government tries to "reach outside" the subsidized program.  570 U.S. at 217.  Maine is not reaching outside the tuition program when it requires schools who will be educating children at public expense to comply with its anti-discrimination law.

### J.  The Prohibitions Against Discrimination Survive Strict Scrutiny.

To the extent the Court concludes that strict scrutiny applies, the provisions at issue survive.  There can be no dispute that states have a compelling interest in eliminating discrimination.  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 609 (1982) (recognizing that a state has a substantial interest in protecting its citizens from "the political, social, and moral damage of discrimination"); *see also Roberts*, 468 U.S. at 624 (eliminating discrimination "plainly services compelling state interests of the highest order").  States have an even greater interest in ensuring that publicly-funded institutions do not discriminate.  *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) ("It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice."); *Norwood*

*v. Harrison*, 413 U.S. 455, 463 (1973) ("That the Constitution may compel toleration of private discrimination in some circumstances does not mean that it requires state support for such discrimination.").

As the Supreme Court's decision in *Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) makes clear, Maine's compelling interest in eliminating discrimination outweighs whatever interest St. Dominic might have in engaging in discrimination.  At issue in *Bob Jones* was an I.R.S. ruling making private schools with racially discriminatory admissions policies ineligible for tax-exempt status.  Two Christian colleges challenged the ruling, arguing that their racially discriminatory policies were based on sincerely held religious beliefs and that applying the ruling to them would violate their rights under the Free Exercise Clause.  *Id*., at 579-585, 602-03.  The Supreme Court rejected the challenge, noting that while "[d]enial of tax benefits will inevitably have a substantial impact on the operation of private religious schools," it "will not prevent those schools from observing their religious tenets."  *Id*., at 604-04; *see also Bowen v. Roy*, 476 U.S. 693, 706 (1986) ("We conclude then that government regulation that indirectly and incidentally calls for a choice between securing a governmental benefit and adherence to religious beliefs is wholly different from governmental action or legislation that criminalizes religiously inspired activity or inescapably compels conduct that some find objectionable for religious reasons.").  The Court found that the government had a "compelling," "fundamental," and "overriding" interest in eliminating racial discrimination in education.  *Bob Jones Univ*., 461 U.S. at 604.  The Court further concluded that this interest "substantially outweighs whatever burden denial of tax benefits places on [the colleges'] exercise of their religious beliefs" and that no less restrictive means were available to achieve the government's interest.  *Id*; *see also*

22

*Roberts*, 468 U.S. at 623.[17]  If denying tax benefits to discriminatory religious schools survives strict scrutiny, so must prohibiting discrimination by religious schools that accept public funds.

Relying on *Fulton*, 141 S. Ct. at 1868, Plaintiffs claim that the State must demonstrate that it has a compelling interest in not exempting religious schools from the MHRA.  Plft. M., at 19.  But religious schools that do not take public funds are exempt from the MRHA's education provisions and, whether they take public funds or not, are exempt from aspects of the MHRA's employment provisions.  In any event, Plaintiffs misread *Fulton*.  There, Philadelphia's standard foster care contract required foster care agencies to provide services without regard to sexual orientation, but exceptions could be made at the "sole discretion" of a city official.  The Supreme Court acknowledged Philadelphia's "weighty" interest in preventing discrimination but found that the "creation of a system of exceptions under the contract undermines the City's contention that its non-discrimination policies can brook no departures."  *Fulton*, 141 S. Ct. at 1882.  The City failed to survive strict scrutiny because it "offer[ed] no compelling reason why it has a particular interest in denying an exception to [a church-affiliated agency] while making them available to others."  *Id*.  Here, though, there is no "system of exceptions."  And Maine need no more carve out an exception for religious schools than did the I.R.S. in *Bob Jones*.

## II. The Remaining Factors Warrant Denying Injunctive Relief.

To warrant injunctive relief, the alleged irreparable harm must be more than speculative. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996); *Kelly Servs., Inc. v. Greene*, 535 F. Supp.2d 180, 188 (D. Me. 2008).  As discussed above, it is not all clear how, if at all, the application of the MHRA to St. Dominic's would cause harm.  Plaintiffs offer no evidence that Cheverus has been adversely affected by complying with the MHRA.  And even

---

[17] Because *Bob Jones Univ.* was decided before *Smith*, 494 U.S. at 872, the Court applied strict scrutiny. Today, the I.R.S. ruling would likely be upheld as a neutral law of general applicability.

if the Court were to enjoin Defendants, that would not prevent the harm Plaintiffs are claiming. An injunction would not stop an aggrieved person from filing a legal action.

The balance of equities and the public interest cut against Plaintiffs. As is discussed above, St. Dominic has failed to demonstrate that application to it of the MHRA would burden Plaintiffs' religious practices or stifle their religious expression. On the other hand, Maine has a compelling interest in the broad application of its anti-discrimination laws, and the public interest would suffer if its efforts to eliminate discrimination were impeded.

## Conclusion

For the reasons set forth above, Defendants respectfully request that Plaintiffs' preliminary injunction motion be denied.

Dated:  July 11, 2023  
       Augusta, Maine

Respectfully submitted,  
AARON M. FREY  
Attorney General

s/ Christopher C. Taub_____  
Christopher C. Taub  
Chief Deputy Attorney General  
Sarah A. Forster  
Assistant Attorney General  
Office of the Attorney General  
State House Station 6  
Augusta, ME 04333  
Telephone: (207) 626-8800  
Email: christopher.c.taub@maine.gov  
      sarah.forster@maine.gov  
*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this, the 11th day of July, 2023, I electronically filed the above document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.  To my knowledge, there are no non-registered parties or attorneys participating in this case.

<u>/s/ Christopher C. Taub</u>
CHRISTOPHER C. TAUB
Chief Deputy Attorney General
Six State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
Fax (207) 287-3145
Christopher.C.Taub@maine.gov