## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ST. DOMINIC ACADEMY, a d/b/a of the ROMAN CATHOLIC BISHOP OF PORT-LAND, a corporation sole; ROMAN CATH-OLIC BISHOP OF PORTLAND, a corporation sole; and KEITH and VALORI RA-DONIS, on their own behalf and as next friends of their children K.Q.R., L.R.R., and L.T.R., | No. 2:23-cv-00246-JAW |
| *Plaintiffs*, | **PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO DISMISS PERSONAL CAPACITY CLAIMS** |
| v. | |
| A. PENDER MAKIN, in her personal capacity and in her official capacity as Commissioner of the Maine Department of Education, and JEFFERSON ASHBY, EDWARD DAVID, JULIE ANN O'BRIEN, MARK WALKER, and THOMAS DOUGLAS, in their personal capacities and in their official capacities as Commissioners of the Maine Human Rights Commission, | |
| *Defendants*. | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ..............................................................................................1

STATEMENT OF FACTS ..................................................................................2

LEGAL STANDARD..........................................................................................6

ARGUMENT ......................................................................................................6

    I.   The Commissioners are not entitled to qualified immunity for excluding
        St. Dominic and the Radonis family from the town tuitioning program. ............................6

        A.  The Commissioners cannot hide behind state law......................................................7

        B.  The Commissioners have violated Plaintiffs' First Amendment rights........................9

        C.  Plaintiffs' rights are clearly established....................................................................14

CONCLUSION..................................................................................................16

CERTIFICATE OF SERVICE ..........................................................................17

CERTIFICATE OF COMPLIANCE ..................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
  143 S. Ct. 2298 (2023) ................................................................................................13

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963) ......................................................................................................7

*Carson v. Makin,*
  142 S. Ct. 1987 (2022) .............................................................................................9, 15

*Church of Lukumi Babalu Aye v. City of Hialeah,*
  508 U.S. 520 (1993) ...................................................................................................12

*Cummings v. Missouri,*
  71 U.S. (4 Wall.) 277 (1867) ......................................................................................16

*District of Columbia v. Wesby,*
  583 U.S. 48 (2018) .....................................................................................................14

*El Dia, Inc. v. Rossello,*
  165 F.3d 106 (1st Cir. 1999) .....................................................................................8, 9

*Fortuna v. Town of Winslow,*
  607 F. Supp. 3d 29 (D. Me. 2022) ...............................................................................3

*Guillemard-Ginorio v. Contreras-Gomez,*
  490 F.3d 31 (1st Cir. 2007) .........................................................................................7

*Harlow v. Fitzgerald,*
  457 U.S. 800 (1982) .....................................................................................................8

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
  565 U.S. 171 (2012) ...................................................................................................13

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.,*
  515 U.S. 557 (1995) ...................................................................................................12

*InterVarsity Christian Fellowship/USA v. Univ. of Iowa,*
  5 F.4th 855 (8th Cir. 2021) ..........................................................................................7

*Laird v. Air Carrier Engine Serv., Inc.,*
  263 F.2d 948 (5th Cir. 1959) .......................................................................................5

*Legal Sea Foods, LLC v. Strathmore Ins. Co.*,
    36 F.4th 29 (1st Cir. 2022) ................................................................................2

*LSO, Ltd. v. Stroh*,
    205 F.3d 1146 (9th Cir. 2000) ...........................................................................7

*Marrero-Mendez v. Calixto-Rodriguez*,
    830 F.3d 38 (1st Cir. 2016) ................................................................................6

*Medina-Padilla v. U.S. Aviation Underwriters, Inc.*,
    815 F.3d 83 (1st Cir. 2016) ..............................................................................15

*Michigan v. DeFillippo*,
    443 U.S. 31 (1979) .............................................................................................7

*Ms. S. v. Reg'l Sch. Unit 72*,
    829 F.3d 95 (1st Cir. 2016) ................................................................................3

*Nansamba v. N. Shore Med. Ctr., Inc.*,
    727 F.3d 33 (1st Cir. 2013) ................................................................................5

*Ocasio-Hernandez v. Fortuno-Burset*,
    640 F.3d 1 (1st Cir. 2011) .......................................................................2, 6, 7, 9

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    140 S. Ct. 2049 (2020) .....................................................................................13

*Punsky v. City of Portland*,
    54 F.4th 62 (1st Cir. 2022) ...............................................................................14

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) .........................................................................................12

*Rocket Learning, Inc. v. Rivera–Sánchez*,
    715 F.3d 1 (1st Cir. 2013) ................................................................................14

*Rogers v. Jarrett*,
    63 F.4th 971 (5th Cir. 2023) ..............................................................................6

*Stamps v. Town of Framingham*,
    813 F.3d 27 (1st Cir. 2016) ..............................................................................14

*Students for Fair Admissions, Inc. v. President and Fellows of Harv. Coll.*,
    143 S. Ct. 2141 (2023) ................................................................................15-16

*Territory of Alaska v. Am. Can Co.*,
    358 U.S. 224 (1959) ...........................................................................................3

*Thomas v. Rev. Bd.*,
   450 U.S. 707 (1981).................................................................................................12

*U.S. v. Negron-Narvaez*,
   403 F.3d 33 (1st Cir. 2005)....................................................................................5

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943)..............................................................................................14

**Statutes**

5 M.R.S. § 4553 ...........................................................................................................5

5 M.R.S. § 4566 .......................................................................................................2, 3

5 M.R.S. § 4602 .....................................................................................................4, 10

5 M.R.S. § 4603 ...........................................................................................................2

Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871) .............................................6

**Other Authorities**

Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev.
   201 (2023)...............................................................................................................6

Letter from Amy M. Sneirson, Exec. Dir. of the Me. Hum. Rts. Comm'n, and
   Barbara Archer Hirsch, Counsel to the Me. Hum. Rts. Comm'n, to Hon. Anne
   Carney, Me. Senate Chair (Apr. 20, 2021) ........................................................3, 5

Letter from Amy M. Sneirson, Exec. Dir. of the Me. Hum. Rts. Comm'n, and
   Barbara Archer Hirsch, Counsel to the Me. Hum. Rts. Comm'n, to Hon. Anne
   Carney, Me. Senate Chair (May 14, 2021) ..................................................4, 5, 11

Me. Hum. Rts. Comm'n, *2022 Annual Report* (2023) ..................................................3

Me. Hum. Rts. Comm'n, *Commissioners* ......................................................................3

Me. Hum. Rts. Comm'n, *Interpretation of the Education Provisions of the MHRA*
   (Jan. 13, 2016)......................................................................................................3, 4

Statement by Attorney General Aaron Frey on Supreme Court Decision in *Carson
   v. Makin*, Office of the Maine Attorney General (June 21, 2022) ..........................12

**INTRODUCTION**

Congress passed Section 1983 to stop state officials from enforcing clearly unconstitutional state laws. It is undisputed that the Commissioner of Education and the Maine Human Rights Commissioners (the "Commissioners") are responsible for regulation and enforcement of the challenged provisions of the Maine Human Rights Act (the "Act"). These provisions are plainly unconstitutional because they continue the exclusion of religious schools from Maine's town tuitioning program that *Carson v. Makin* forbids. The Commissioners cannot claim to be ignorant of this; the Human Rights Commissioners proposed these new provisions after *Carson* was appealed, and counsel for Commissioner Makin vowed to use them against religious schools the day *Carson* was decided. The Commissioners may be held personally liable for the actions they have taken to advocate for and enforce these clearly unconstitutional rules.

The Commissioners resist this conclusion and propose a blanket rule that they may never be held personally liable for official acts like "offering legislative testimony, proposing statutory amendments, and issuing interpretative guidance." Mot. at 2. But this is the inverse of the rule in Section 1983, which affirmatively requires that officials be acting "under color of state law." For personal capacity lawsuits, the key question is not whether the Commissioners were acting in their official capacity (they were) but whether the constitutional rights they violated were so clearly established that a reasonable official would have known that what he was doing was wrong.

The Commissioners likewise assert that there are no allegations tying them to the unconstitutional rules that Plaintiffs challenge. *Id*. at 7-8. But Plaintiffs have pleaded more than enough personal involvement to survive a motion to dismiss. Specifically, Plaintiffs have pleaded that, after *Carson* was appealed to the Supreme Court in 2021, the Human Rights Commissioners advocated for specific changes to the Act that targeted the practices of religious schools. Dkt. 1, Verified Compl. ¶¶ 106-10. Plaintiffs have alleged that Commissioner Makin, speaking through counsel in press statements issued following the oral argument in *Carson*, publicly pointed to the newly revised Act as an alternative basis for excluding religious schools from the town tuitioning program. *Id.* ¶¶ 114-16. Plaintiffs have also alleged that, following Commissioner Makin's loss in *Carson*,

her attorney publicly stated Commissioner Makin's view that religious schools would still be excluded from town tuitioning unless they complied with the Act. *Id.* ¶¶ 118-19. And Plaintiffs have also alleged that as recently as this spring, the Human Rights Commissioners testified in favor of a further change to the Act for the purpose of strengthening their legal arguments against allowing religious schools to participate in town tuitioning. *Id.* ¶ 130.

And even if none of that were true, the Commissioners would still be subject to personal liability because of what they are doing right now—enforcing an unconstitutional law that perpetuates the decades-long exclusion rejected in *Carson*, while violating at least nine other Supreme Court cases along the way. If the preliminary injunction motion is denied and the personal capacity claims are dismissed, the Radonis family will never be made whole—even if they win at the U.S. Supreme Court. This is precisely what happened to the families in *Carson*. The Commissioners have barred the schoolhouse door long enough. It is time for them to step aside or face the consequences of their choice not to do so.

## STATEMENT OF FACTS

When reviewing a motion to dismiss the court must "accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the plaintiff's favor." *Legal Sea Foods, LLC v. Strathmore Ins. Co*., 36 F.4th 29, 34 (1st Cir. 2022) (cleaned up). The allegations are not to be read in isolation: "[t]he question confronting a court on a motion to dismiss is whether *all* the facts alleged, when viewed in the light most favorable to the plaintiffs, render the plaintiff's entitlement to relief plausible." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 14 (1st Cir. 2011) (emphasis in original). The facts alleged in Plaintiffs' Verified Complaint meet this standard.

To begin: the Commissioner of Education and the Maine Human Rights Commissioners do not dispute that they share joint authority over the educational discrimination provision of the MHRA. *See, e.g.*, 5 M.R.S. § 4566 (Human Rights Commission investigative authority); 5 M.R.S. § 4603 (Education Commissioner regulatory authority); *see also* Dkt. 30, Defs' Answer ¶ 160 (Education Commissioner "has joint rule-making authority with the [Human Rights Commission] to

effectuate the educational provisions of the [Act]"), ¶ 165 (Human Rights Commission "is empowered to hold hearings," "issue subpoenas," and "conduct . . . investigation[s]" under the Act).

But as the Verified Complaint alleges, they do more than enforce and regulate; they have also shaped these laws in ways specifically intended to exclude religious schools—both in anticipation of *Carson* and in its wake.

When *Carson* was still pending, Commissioner Makin argued that no religious schools would take part in the town tuitioning program if they had to give up their religious hiring rights and other religious policies. *See* Dkt. 1 ¶¶ 100-05, 110-13, 118-19.

Once Supreme Court review was sought, the Human Rights Commission took up the mantle to "mak[e] recommendations for further legislation or executive action concerning infringements on human rights in Maine."[1] *See* Dkt. 1 ¶¶ 10, 106. In doing so, those Commissioners acted through their Executive Director and Commission Counsel to convey the policy of the Commission to the Legislature.[2] Specifically, the Commissioners proposed L.D. 1688 in May 2021, shortly after cert

---

[1]   Letter from Amy M. Sneirson, Exec. Dir. of the Me. Hum. Rts. Comm'n, and Barbara Archer Hirsch, Counsel to the Me. Hum. Rts. Comm'n, to Hon. Anne Carney, Me. Senate Chair, et al. at 1 (Apr. 20, 2021), https://perma.cc/7B9E-2J2X (cited in Dkt. 1 ¶¶ 10, 156, 228) (citing 5 M.R.S. § 4566(11)). As the Commissioners acknowledge, "the court may consider such documents" attached to the Complaint. Dkt. 31 at 9 n.2.

[2]   *Id.* at 1. The Commissioners have resisted liability on the grounds that nothing ties them directly to statements made by the Commission's Executive Director and Counsel to the Maine Legislature on their behalf. *See* Dkt. 31 at 8. For that reason, we pause to explain the relationship between members of the Commission and Commission staff. Courts may take judicial notice of public agency and legislative records such as these. *See, e.g.*, *Ms. S. v. Reg'l Sch. Unit 72*, 829 F.3d 95, 103 (1st Cir. 2016) (public agency proposals and record materials); *Fortuna v. Town of Winslow*, 607 F. Supp. 3d 29, 35 (D. Me. 2022) (agency websites); *Territory of Alaska v. Am. Can Co.*, 358 U.S. 224, 226 (1959) (legislative records).

The Commissioners themselves appoint both the Executive Director and the Commission Counsel. 5 M.R.S. § 4566(3). The Executive Director is responsible for hiring and supervising the Commission's staff, and the Commission Counsel makes recommendations on enforcement actions under the Act, subject to the Commissioners' vote, and then "directs these legal efforts and represents the agency." *See* Me. Hum. Rts. Comm'n, *2022 Annual Report* at 5, 7 (2023), https://perma.cc/EF4N-U23Y. Both the Executive Director and Commission Counsel are tasked with reporting the Commissioners' legislative, regulatory, and policy positions to the Legislature. *Id.* at 5.

All of the Commissioners named in the Verified Complaint have had direct involvement in the violation of Plaintiffs' rights. Commissioners Ashby, David, and O'Brien were serving when the Commission proposed and testified in support of L.D. 1688 in May 2021. Me. Hum. Rts. Comm'n, *Commissioners*, https://perma.cc/GFN5-H2H6. These three Commissioners, as well as Commissioners Walker and Douglas, were serving when the Commission testified in support of eliminating the exception for single-sex schools in May 2023. *Id.* All of the Commissioners have continued to hold out the guidance on gender identity discrimination as the policy of the Commission on the Commission's website. Dkt. 1 at ¶¶ 141, 142 (citing Me. Hum. Rts. Comm'n, *Interpretation of the Education Provisions of the MHRA*, at 4 (Jan. 13, 2016), https://perma.cc/D5Z3-PMP8).

was filed in *Carson*. *See* Dkt. 1 ¶¶ 10, 106, 156. During the same spring, the Commissioners also submitted legislative testimony in which they threatened any religious organizations that decided to participate in state programs with the loss of their religious hiring rights. *See id.* ¶ 228.

The Commissioners urged L.D. 1688's amendments to the Act's "current education coverage"—described as "woefully out of date"—pointing out that the erstwhile version "provide[d] that the sexual orientation protections in education do not apply to education facilities owned, controlled or operated by a bona fide religious corporation, association or society."[3] L.D. 1688 *repealed* that exemption. Dkt. 1 ¶ 108.

The Commissioners have also adopted official guidance which, among other things, requires schools to facilitate students' efforts to change their gender identity over their parents' objections, to use a student's preferred pronouns while at school, and to require all employees and instruct other students to do so as well. Dkt. 1 ¶¶ 141-42 (citing Me. Hum. Rts. Comm'n, *Interpretation of the Education Provisions of the MHRA,* at 4 (Jan. 13, 2016), https://perma.cc/GU3F-6Q4B). As the Commissioners were well aware, their interpretation of the Act's sexual-orientation and gender-identity provision as requiring schools to facilitate a student's efforts to change his or her gender identity over parental objections is at odds with basic Catholic teaching. *See* Dkt. 1 ¶¶ 12, 99, 105-06, 108, 113-16, 118-19, 131-32, 137-46, 155, 177-78. Not to neglect a belt and suspenders, L.D. 1688 tacked on a religious nondiscrimination rule and an "equal religious expression" rule—lest any religious schools slip through the cracks. Dkt. 1 ¶¶ 6, 12, 99-100, 107, 109; 5 M.R.S. § 4602(1), (5)(D).

These changes targeted the religious practices that Commissioner Makin had identified as important to religious schools in *Carson.* Dkt. 1 ¶¶ 101-03, 118-19, 155, 177-78. In the Human Rights Commissioners' words, Maine "intend[s] to allow for religious expression" in private "but also to require nondiscrimination in public"—meaning that "the organization's right to freely exercise

---

3    Letter from Amy M. Sneirson, Exec. Dir. of the Me. Hum. Rts. Comm'n, and Barbara Archer Hirsch, Counsel to the Me. Hum. Rts. Comm'n, to Hon. Anne Carney, Me. Senate Chair, et al. at 1-2, 5, & n.9 (May 14, 2021), https://perma.cc/949L-VP88 (Commission's written testimony in support of L.D. 1688).

religious beliefs … becomes circumscribed once the organization *opens itself to the public or seeks out taxpayer funds*."[4]

After the Commissioner of Education lost *Carson*, she pledged through counsel to continue to work to exclude certain religious schools using the Act.[5] *See* Dkt. 1 ¶¶ 118-19, 178. To date, two religious schools have asked—in two separate lawsuits—to be allowed to participate in town tuitioning as *Carson* requires. *See* Dkt. 1 ¶ 130. True to her word, the Commissioner of Education, along with the Human Rights Commissioners, have vigorously opposed granting a preliminary injunction that would allow families like the Radonises to educate their children while the parties sort out their legal rights in court. *See generally* Dkt. 25, Defs' Opp. to Prelim. Inj.

In response to the *Crosspoint Church* plaintiffs' argument that the Act was not generally applicable because it exempted single-sex schools, the Commissioners scrambled to plug up that hole. *See* Dkt. 1 ¶¶ 129-30. They have insisted in this litigation that "the exemption for single-sex schools was simply a mistake" that needed correcting. Dkt. 25 at 14. But the Commissioners knew about this "mistake" long before now. The Human Right Commissioners highlighted this to the Legislature two years ago when pressing for L.D. 1688: "The MHRA specifically excludes from its definition of 'educational institution' single-sex schools."[6] *See* 5 M.R.S. § 4553(2-A). Yet the Commissioners were apparently willing to live with this mistake until it jeopardized their arguments in *Crosspoint Church* and in this case. Only then did they urge the legislature to include single-sex schools in the definition of "educational institution." *See* Dkt. 1 ¶ 130.

---

[4]    Letter from Amy Sneirson to Anne Carney (Apr.), *supra* note 1, et al. at 3 (cited in Dkt. 1 ¶¶ 10, 156, 228) (emphasis added).

[5]    An attorney's actions and statements, if made within the scope of her representative authority, are attributable to her clients. *See, e.g., Nansamba v. N. Shore Med. Ctr., Inc.*, 727 F.3d 33, 38 (1st Cir. 2013) ("Attorneys act for their clients, and the neglect of an attorney acting within the scope of his or her authority is attributable to the client."); *U.S. v. Negron-Narvaez*, 403 F.3d 33, 39 (1st Cir. 2005) (attributing litigation statements made by counsel to the client where the client affirmed agreement with statement); *Laird v. Air Carrier Engine Serv., Inc.*, 263 F.2d 948, 953 (5th Cir. 1959) ("When [an attorney] speaks in Court . . . he speaks for and as the client.").

[6]    Letter from Amy Sneirson to Anne Carney (May), *supra* note 3, at 5 n.9.

These and all other facts alleged in the Verified Complaint must be taken as true and considered as a whole when evaluating the Commissioners' Motion to Dismiss. *Ocasio-Hernandez*, 640 F.3d at 14.

## LEGAL STANDARD

"Dismissal of a complaint pursuant to Rule 12(b)(6) is inappropriate if the complaint satisfies Rule 8(a)(2)'s requirement of 'a short and plain statement of the claim showing that the pleader is entitled to relief,'" *Id.* at 11-12 (quoting Fed. R. Civ. P. 8(a)(2)). "A 'short and plain' statement needs only enough detail to provide a defendant with 'fair notice of what the ... claim is and the grounds upon which it rests.'" *Id.*

## ARGUMENT

### I. The Commissioners are not entitled to qualified immunity for excluding St. Dominic and the Radonis family from the town tuitioning program.

Qualified immunity protects government officials from trial and monetary liability unless the pleaded facts establish "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Marrero-Mendez v. Calixto-Rodriguez*, 830 F.3d 38, 43 (1st Cir. 2016). The Verified Complaint includes more than enough allegations to state a claim under this test.[7]

---

[7]     Nor do Defendants explain how their arguments square with the enacted text of Section 1983, which undermines their "justification[s] for qualified immunity." *Rogers v. Jarrett*, 63 F.4th 971, 980 (5th Cir. 2023) (Willett, J., concurring) (citing Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201 (2023)).

        As passed by the Reconstruction Congress, the text of what is now called Section 1983 included a critical proviso on its broad imposition of liability for rights-violating state officials: that they "shall, *any . . . law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding*, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress[.]" Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871) (emphasis added). Put differently, "the Reconstruction Congress . . . explicitly stated—right there in the original statutory text—that it was nullifying all common-law defenses against § 1983 actions[.]" *Rogers*, 63 F.4th at 979 (Willett, J., concurring). Inexplicably, however, the Revisor of Federal Statutes omitted the Notwithstanding Clause "from the first compilation of federal law in 1874," and that error "has never been corrected," *id.* at 980, let alone directly confronted by the Supreme Court. Reinert, *supra* at 246 n.233.

        Modern qualified immunity doctrine is thus the product of a disastrous game of telephone. "[T]he Supreme Court's original justification for qualified immunity—that Congress wouldn't have abrogated common-law immunities absent explicit language—is faulty because the 1871 Civil Rights Act *expressly included such language*." *Rogers*, 63 F.4th 971 at 980 (Willett, J., concurring). But only the Supreme Court can set the record straight. *Id.* at 981.

## A.  The Commissioners cannot hide behind state law.

The Commissioners protest that they are entitled to qualified immunity because they have not "personally engaged in any unlawful conduct." Dkt. 31, Defs' Mot. to Dismiss at 1. In doing so, they appear to argue that they cannot be held personally liable for actions taken as part of their official duties, including advocating for unconstitutional amendments to a state law that they enforce. *See id.* at 6-9. That's simply not the case. "Although state officials are ordinarily entitled to rely on presumptively valid state statutes, courts have held such reliance unreasonable where the relevant law is 'so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws.'" *Guillemard-Ginorio v. Contreras-Gomez*, 490 F.3d 31, 40 (1st Cir. 2007) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979)) (collecting cases).

Thus, state officials who enforce laws that clearly violate First Amendment rights are not entitled to qualified immunity. *See id.*; *see also InterVarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855, 865-67 (8th Cir. 2021) (denying qualified immunity to state university officials who selectively enforced the school's human rights policy against religious groups after being told by the Eighth Circuit that this violated the Constitution). Even officials who merely *threaten* to enforce a law in a manner that chills First Amendment activity cannot claim qualified immunity. *See LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1153-54, 1157-60 (9th Cir. 2000) (denying qualified immunity where "[o]fficials censored [the plaintiff's] art exhibition by applying pressure and threats to a necessary conduit: the licensees whose facilities LSO must rent in order to hold its shows"); *cf. Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66-67 (1963) (holding "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation," even informally, was "suppression" of allegedly obscene publications in violation of First and Fourteenth Amendments). Thus, the First Circuit has said that the standard for personal liability under Section 1983 "can be satisfied by conduct setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Ocasio-Hernandez,* 640 F.3d at 16 (cleaned up).

It stands to reason, then, that a group of officials like the Commissioners—which has actively worked together to create a law designed to suppress First Amendment activity and which is both tasked with enforcing and fully intends to enforce the law they fought for—should not be able to claim immunity, either. As explained in Plaintiffs' motion for a preliminary injunction and below, the Commissioners' activity—when viewed in the light most favorable to Plaintiffs, as it must be—crossed a threshold from simply relying on valid interpretations of state law and policy advocacy into the realm of using their official positions to try to suppress religious activity in violation of clear constitutional doctrine. Plaintiffs have alleged that the Commissioners worked to create a law whose purpose was to exclude religious schools from participating in the town tuitioning program. *See* Dkt. 1 ¶¶ 10, 106-09, 114-19, 129-30, 141-42, 155-56, 175, 228. And Plaintiffs have alleged that Commissioner Makin's public statements, made through counsel, make clear the unconstitutional law the Commissioners helped to create will be enforced, *see id.* ¶¶ 115-16, 118-19, which has inevitably prevented St. Dominic from participating in the program and thus chilled its First Amendment activity. Because the Commissioners should have known that employing such tactics to chill First Amendment activity violated Plaintiffs' rights, they "should be made to hesitate" through personal liability for their actions. *El Dia, Inc. v. Rossello*, 165 F.3d 106, 110 (1st Cir. 1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)).

The Commissioners' primary rejoinder is that "plaintiffs do not allege facts regarding any specific Commissioner's direct involvement in these actions." Dkt. 25 at 8. Not so. As discussed above, the Complaint alleges that the Commissioners, acting through their Executive Director and Commission Counsel, proposed the 2021 amendments that violated St. Dominic's rights, threatened St. Dominic with further loss of its rights if it participated in the town tuition program, and supported the 2023 amendments intended to counter the legal arguments raised in *Crosspoint Church. Supra* at 5; *see also* Dkt. 1 ¶¶ 129-30. And the Commissioners are each individually responsible for what they are doing *now* to use the very unconstitutional law they helped to create to exclude religious schools from the program. If any individual Commissioner opposed these unconstitutional actions, now or in the past, that Commissioner is free to come forward with evidence

8

to exonerate him or herself at the appropriate time. Likewise, the Commissioners remain free to disavow enforcement of their unconstitutional law. But at this early stage of the proceedings, Plaintiffs have more than met their burden to plead that the Commissioners who took these actions in 2021 and 2023 and continue to take them to this day are personally liable for violating Plaintiffs' constitutional rights. *Ocasio-Hernandez*, 640 F.3d at 17 ("[T]he requirement of plausibility on a motion to dismiss under Rule 12(b)(6) simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the illegal conduct." (cleaned up)).

### B.  The Commissioners have violated Plaintiffs' First Amendment rights.

In their Motion for a Preliminary Injunction, Plaintiffs have explained how the Commissioners are violating their Free Exercise, Free Speech, and Establishment Clause rights in detail, and their arguments are incorporated by reference here and reviewed below.[8] For brevity's sake, Plaintiffs discuss just four claims in this response.

*Free Exercise – Religious Discrimination.* "Clearly established law prohibits the government from conditioning the revocation of benefits on a basis that infringes constitutionally protected interests[.]" *El Dia*, 165 F.3d at 110. This principle should be doubly obvious here, where the Supreme Court told Maine officials in *Carson* that "condition[ing] the availability of benefits" on a school's lack of religious character "'effectively penalizes the free exercise' of religion" and violates the Free Exercise Clause. *Carson v. Makin*, 142 S. Ct. 1987, 1997-98 (2022). *Carson* specifically rejected Maine's argument that it could exclude religious schools based not just on the schools' religious status, but on its religious use of funds in pursuing its religious educational

---

[8]    Dkt. 5, Mot. for Prelim. Inj. at 5 (arguing that the Commissioners are violating Plaintiffs' constitutional rights "(1) by targeting religion in violation of the Free Exercise Clause (*Lukumi*); (2) by denying access to an otherwise available public benefit program in violation of the Free Exercise Clause (*Carson*); (3) by categorically exempting certain secular schools from the burdens imposed on religious schools (*Tandon*); (4) by infringing on the rights of parents to direct the religious education of their children in violation of the Free Exercise Clause (*Yoder*); (5) by coercing speech on religious matters in violation of the Free Speech Clause (*Hurley*); (6) by interfering with Plaintiffs' right of expressive association in violation of the Free Speech Clause (*Roberts*); (7) by causing entanglement of church and state in violation of the Establishment Clause (*Carson*); (8) by interfering with the operation of religious schools in violation of church autonomy principles (*Our Lady of Guadalupe*); and (9) by imposing unconstitutional conditions in violation of the First Amendment (*AOSI*)"). Plaintiffs incorporate all of the arguments in their Preliminary Injunction Motion by reference here.

mission. *Id.* at 2001. "Any attempt to give effect to such a [use-status] distinction by scrutinizing whether and how a religious school pursues its educational mission would also raise serious concerns about state entanglement with religion and denominational favoritism." *Id.*

Yet the Act, as amended, does just that. If St. Dominic joined the town tuitioning program and became subject to the Act, nearly every decision that it made about how to "pursue[] its educational mission" would become subject to joint oversight by Commissioner Makin and the Human Rights Commission. Dkt. 30 ¶¶ 160, 240. Consider the language of the text that for which the Commissioners so vociferously advocated. *See* Dkt. 1 ¶¶ 106-09. The Act now says that "[i]t is unlawful educational discrimination … on the basis of … religion [or] sexual orientation … to … exclude a person from participation in … any … program or activity."). 5 M.R.S. § 4602(1)(A). St. Dominic welcomes students of all faiths and none, but it gives preference to Catholic students in admissions and financial aid, and it asks all students to support Catholic teaching and engage in specific religious practices like daily prayer, weekly Mass, and Church-led service projects. Dkt. 1 ¶ 136. It is, after all, *Catholic.* The Commissioners could apply the Act to force St. Dominic to admit non-Catholic students who object to Catholic teaching and who refuse to support the school's Catholic religious mission. They could prevent St. Dominic from requiring any students, even Catholic ones, to take part in the religious life of the school once admitted. And they could force St. Dominic to facilitate a student's desire to change their gender identity over the objection of the student's parents.

There's more. The revised Act also says that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing." 5 M.R.S. § 4602(5)(D). This would put St. Dominic to a Hobson's choice. Under the Act, each religious exercise St. Dominic engages in—daily Catholic prayers, weekly Catholic masses, service projects carried out in cooperation with the local Catholic parish—would create the right to an equal opportunity for non-Catholic or even anti-Catholic religious expression. If students use the school loudspeakers to start the day with a Catholic prayer, non-Catholic students could ask to use the same loudspeakers to offer their own, non-Catholic prayer. If students attend schoolwide Mass in

the cafeteria each week, non-Catholic students could ask to use the same space to host a non-Catholic revival service open to all. Whenever Catholic theology and moral thought comes up in class, students could seek to use school time and resources to teach religious beliefs that are inconsistent with or even hostile to the Catholic faith—on matters ranging from the nature of the Eucharist to the propriety of birth control. And the list goes on. The more St. Dominic engages in its own religious expression, the more power the Commissioners have to force it to include non-Catholic or even anti-Catholic religious expression. Under the Act, the only way out from under the Commissioners' entangling oversight is for St. Dominic to stop engaging in religious expression at all and become, effectively, nonreligious—the very outcome the Supreme Court forbade in *Carson*.

*Free Exercise – Religious Targeting.* None of this is an accident. The Commissioners have admitted that they eliminated the sexual-orientation and gender-identity religious exemption and proposed the religious nondiscrimination and equal religious expression amendments to the Act in 2021 to avoid funding religious policies they regarded as discriminatory. Dkt. 25 at 13. In their written testimony in support of L.D. 1688, the Human Rights Commissioners specifically highlighted that—absent amendment—the Act would continue to "provide[] that the sexual orientation protections in education do not apply to education facilities owned, controlled or operated by a bona fide religious corporation, association or society."[9] The proposed amendment targeted just that exception for elimination.

Nor did the targeting stop there. The day *Carson* was decided, counsel for Commissioner Makin denounced the religious admission and hiring policies of the two religious schools involved in *Carson* and promised to use the Act to "ensur[e] that public money is not used to promote" religiously-grounded policies that Commissioner Makin regarded as "discrimination, intolerance, and bigotry."[10] When one of the *Carson* schools sued to take part in the program this spring, the

---

[9]     Letter from Amy Sneirson to Anne Carney (May), *supra* note 3, at 1-2, 5 & n.9 (citing 5 M.R.S. § 4602(4)).

[10]    Statement by Attorney General Aaron Frey on Supreme Court Decision in *Carson v. Makin*, Office of the Maine Attorney General (June 21, 2022), https://perma.cc/544J-DAFN (cited in Dkt. 1 ¶¶ 119, 178).

Human Rights Commission rushed to testify in support of a legislative fix intended to make the Commissioners' legal case stronger. Dkt. 1 ¶130; Dkt. 5 at 9.

The Commissioners' primary defense is to point out that the "inclusive Jesuit Catholic" high school Cheverus—after applying, being accepted, and avoiding enforcement action so far—has acceded to their conditions and is receiving funding. Dkt. 25 at 1; Dkt. 29, Pls.' Prelim. Inj. Reply at 1. But in *Thomas*, the Supreme Court repudiated the argument that just because "another" member of a faith "had no scruples" about complying with the government's conditions on a program somehow meant that the conditions were "scripturally acceptable" to all sincere adherents to the faith. *Thomas v. Rev. Bd.*, 450 U.S. 707, 715 (1981) (cleaned up). Forty-some year later, it should surprise no one that "[i]ntrafaith differences of that kind are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses." *Id.* The State's slicing up of Catholic orders today is as impermissible as drawing lines between Santería versus kosher slaughter three decades ago. *See Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 536 (1993) (exempting kosher slaughter while banning other religious ceremonies provided "support for [the] conclusion that Santeria alone was the exclusive legislative concern"). Allowing religious expression that the Commissioners agree with while banning expression they don't makes the targeting problem worse, not better.

*Free Speech – compelled speech and expressive association.* The Act's nondiscrimination and equal religious expression requirements violate Plaintiffs' freedom of speech and association as well. The First Amendment protects the right to "associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, … and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984). Thus, the government cannot "compel [a] speaker to alter [its] message by including one more acceptable to others." *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.*, 515 U.S. 557, 581 (1995*)*. Nor can the government "force an individual to include other ideas with his own speech that he would prefer not to include." *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023). By preventing St. Dominic from asking families to support Catholic moral teaching and its Catholic religious mission—and by forcing St.

Dominic to allow non- or anti-Catholic religious expression as the price of engaging in its own Catholic religious expression—the Commissioners violate St. Dominic's freedom of speech and association.

*Establishment Clause – religious autonomy in hiring.* The Commissioners admit that "many— and perhaps all" of St. Dominic's teachers are subject to the ministerial exception—which means that St. Dominic has the freedom to select and supervise them without looking over its shoulder to gauge whether the Human Rights Commission agrees with their employment decisions. Dkt. 25 at 10, 19-20 n.16. There is thus no dispute that the Act's employment discrimination provisions, which do not recognize the ministerial exception, violate the Establishment Clause. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020). Yet the Commissioners advocated for the exact, broad-based religious hiring restrictions on town tuitioning hopefuls that they now concede was constitutionally untenable *at the time* they pitched it. *See* Dkt. 1 ¶¶ 119, 156-58. All the while, they were empowered and vocally prepared to bring violators to heel. Admitting they were clearly wrong means just that—they were clearly wrong, and they do not get the benefit of qualified immunity.

Making matters worse, the Commissioners also admit that the Act has an exception that allows religious employers to hire employees that are willing to conform to the employers' "religious tenets." Dkt. 25 at 20. They knew about that, too, when they joined hands in the revised exclusion for religious schools. That telling admission comes with a telling footnote on the same page, in which the Commissioners suggest that if the Plaintiffs ever concluded that "homosexual and transgender individuals are unable to conform to" Plaintiffs' "religious tenets," a state court *could* conclude that Plaintiffs are subject to the Act. *Id.* at 20 n.16. Translation: be careful about how you exercise your (Catholic) religious beliefs. This is not just religious discrimination in violation of the Free Exercise Clause; it is viewpoint discrimination—conditioning Plaintiffs' hiring rights on the Human Rights Commissioners' agreement with the Plaintiffs' beliefs about marriage, gender, and sexuality. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

**C. Plaintiffs' rights are clearly established.**

The second prong of modern qualified immunity analysis has two parts. "The first relates to the clarity of the law at the time of the alleged violation, while the second considers the specific facts of the case at bar." *Punsky v. City of Portland*, 54 F.4th 62, 65–66 (1st Cir. 2022) (cleaned up).

*Clarity of the law.* A "clearly established" right is one that is "sufficiently clear" that "every reasonable official would have understood that what he is doing violates that right." *Stamps v. Town of Framingham*, 813 F.3d 27, 34 (1st Cir. 2016). A single U.S. Supreme Court decision is sufficient to determine that a constitutional right is "clearly established." *District of Columbia v. Wesby*, 583 U.S. 48, 66 n.8 (2018).

Here, the Commissioners' efforts to create and weaponize the Act violate at least nine. *Trinity Lutheran, Espinoza,* and *Carson* clearly established that St. Dominic has the right to participate in the town tuitioning program without forfeiting its religious character. *Lukumi* clearly established that state officials cannot create a web of rules designed to filter out the religious practices they dislike. *Hurley*, *Roberts*, and *303 Creative* clearly established that the state cannot use nondiscrimination laws to force an expressive association like St. Dominic to alter its message by including other voices. *Hosanna-Tabor* and *Our Lady of Guadalupe* clearly established that St. Dominic, not the government, must determine who teaches the faith to the next generation.

*Application to this case.* The Commissioners cannot manufacture their own immunity. Under the second part of the second prong, "the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable official that his conduct was unlawful *in the situation he confronted*." *Rocket Learning, Inc. v. Rivera–Sánchez*, 715 F.3d 1, 9 (1st Cir. 2013) (emphasis in original) (cleaned up). This prong is quickly dispatched: this situation is the exclusion in *Carson* all over again. It involves the same state, the same program, and many of the same constitutional claims.

Yet, in their 24-page opposition to Plaintiffs' Motion for a Preliminary Injunction, the Commissioners cite *Carson* once—in the statement of facts. Dkt. 25 at 3. They admit that the Act

violates *Hosanna-Tabor* and *Our Lady* but have not agreed to an injunction on that basis. Dkt. 25 at 10, 19-20. Having conceded one First Amendment violation, their primary argument is that this Court should dismiss Plaintiffs' case altogether so that Plaintiffs' remaining First Amendment rights may be decided in a future enforcement action. Dkt. 25 at 1, 2 ("Plaintiffs' claims are best resolved in the context of an actual claim of discrimination."). These are not the actions of reasonable officials engaged in a good faith effort to obey the Constitution.

It is no answer to say that the Commissioners are still in the dark because *Carson* involved the education law, not the Act. As the Human Rights Commissioners are well aware (for they proposed them!) the most egregiously unconstitutional sections of the Act were not adopted until *Carson* was already appealed to the Supreme Court. Dkt. 1 at 16. The Supreme Court specifically warned Maine officials of the unconstitutional entanglement that would result if they tried to control religious schools' internal religious policies. *Carson*, 142 S. Ct. at 1998, 2001. And the Commissioners' own briefs acknowledge that the ministerial exception bars many applications of the laws they advocated for and enforce. Dkt. 25 at 10. No reasonable official could read *Carson* and conclude that the challenged provisions of the Act are constitutional.

*     *     *

Boiled down, the Commissioners' argument is that the Commissioners are in the clear when they pursue the same ends under different labels. But "[p]ouring old wine into a new bottle does not make the wine into new wine." *Medina-Padilla v. U.S. Aviation Underwriters, Inc.*, 815 F.3d 83, 87 (1st Cir. 2016). And "'[w]hat cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows,' and [a constitutional] prohibition … is 'levelled at the thing, not the name." *Students for Fair Admissions, Inc. v. President and Fellows of Harv. Coll.*, 143 S. Ct. 2141, 2176 (2023) (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1867)).

## CONCLUSION

It is truly a unique case when state officials openly defy the Supreme Court. Yet, that is what Plaintiffs have alleged. The Commissioners cannot hide behind their official positions while continuing to actively violate St. Dominic's and the Radonises' clearly established First Amendment rights. Taking all the inferences in Plaintiffs' favor and viewing all the allegations as a whole, Plaintiffs have plausibly stated a claim for relief. The motion to dismiss should be denied.

Respectfully submitted,

/s/ *Adèle Auxier Keim*
Adèle Auxier Keim*
Mark L. Rienzi*
Benjamin A. Fleshman*
Michael O'Brien*†
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave., NW
 Suite 400
Washington, DC 20006
Telephone: (202) 955-0095
Fax: (202) 955-0090

* Admitted *pro hac vice*
† Not a member of the DC Bar; admitted in
Louisiana. Practice limited to cases in federal court.

/s/ *James B. Haddow*
James B. Haddow
Maine Bar No. 003340
Petruccelli, Martin & Haddow LLP
Two Monument Square, Suite 900
Portland, ME 04112-8555
Telephone: (207) 775-0200 x 6413
Fax: (207) 775-2360

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on September 1, 2023, I caused the foregoing to be served electronically via the Court's electronic filing system on all parties.


*/s/ Adèle Auxier Keim*
Adèle Auxier Keim

Dated: September 1, 2023

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the form and length requirements of Local Rule 7(b), (d), because it has 16 pages and has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Times New Roman font.

/s/ *Adèle Auxier Keim*
Adèle Auxier Keim

Dated: September 1, 2023