# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ST. DOMINIC ACADEMY, a d/b/a of the ROMAN CATHOLIC BISHOP OF PORT-LAND, a corporation sole; ROMAN CATH-OLIC BISHOP OF PORTLAND, a corporation sole; KEITH and VALORI RADONIS on their own behalf and as next friends of their children L.R.R., and L.T.R.; and NANCY and DANIEL CRONIN on their own behalf and as next friends of their child Z.C. | No. 2:23-cv-00246-JAW |
| | **FIRST AMENDED VERIFIED COMPLAINT** |
| *Plaintiffs*, | **INJUNCTIVE RELIEF SOUGHT** |
| v. | |
| A. PENDER MAKIN, in her personal capacity and in her official capacity as Commissioner of the Maine Department of Education, MEGAN SANDERS in her official capacity as Commissioner of the Maine Human Rights Commission, JULIE ANN O'BRIEN, MARK WALKER, and THOMAS DOUGLAS in their personal capacities and in their official capacities as Commissioners of the Maine Human Rights Commission, and JEFFER-SON ASHBY and EDWARD DAVID, in their personal capacities. | |
| *Defendants*. | |

## INTRODUCTION

1.    For years, Catholic schools in Maine served rural families that participated in Maine's town tuitioning program (the "program"). Under this program, Maine pays private school tuition for families who live in rural areas where there is no public school. But in 1980, Maine announced that it was excluding all "sectarian" religious schools—including Catholic schools—from its program. John Bapst, a Diocesan high school in Bangor, closed immediately. Between 1998 and 2019, Maine families filed five separate lawsuits challenging Maine's discriminatory rule. In *Carson v. Makin*, 142 S. Ct. 1987 (2022), the U.S. Supreme Court held that Maine's rule violated the Free Exercise Clause of the First Amendment.

2.    Nevertheless, Maine persists in its religious discrimination. In 2021, just after the parents in *Carson v. Makin* filed a petition for a writ of certiorari to the Supreme Court, Maine amended the section of the Maine Human Rights Act (the "Act") that applies to co-educational public and private K-12 schools that receive public funds. Maine implemented these changes to continue the exclusionary practices that the Supreme Court declared unconstitutional in *Carson*.

3.    Keith and Valori Radonis live in Whitefield, Maine. Prior to filing this lawsuit in June 2023, their two oldest children used town tuitioning money to attend Erskine Academy—a nonreligious private school that participates in the program.

4.    For the past year and a half, Keith and Valori have paid for their daughter to attend St. Dominic Academy, the only Diocesan high school in Maine, out of their own funds.

5.    Daniel and Nancy Cronin live in Fayette, Maine. Their son is eligible for the program, but the nearest public high school doesn't provide the academic support that he needs, and the nearest private school that participates in the program would cost them over $40,000 a year.

6.    Daniel and Nancy believe that St. Dominic offers the best environment for their son. And at $14,450 a year, it is the least expensive private day school in Maine. So they both work additional jobs to pay for his tuition at St. Dominic while Maine litigates to keep its exclusionary practices.

1

7.   St. Dominic Academy—and indeed all of the schools operated by the Roman Catholic Diocese of Portland—would like to resume serving the rural Maine families that participate in the program.

8.   However, they cannot do so, because in 2021, just after the parents in *Carson* asked the Supreme Court to review their case, Maine amended its human rights law to add more rules intended to keep religious schools out. Among other things, Maine:

- Imposed a **new** religious neutrality requirement on schools, stating that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing";

- Imposed a **new** religious nondiscrimination requirement on schools; and

- **Removed** the religious exemption that had previously allowed religious (but "nonsectarian") schools to handle sensitive issues relating to sexual orientation and gender identity in a way that reflected their faith commitments. 5 M.R.S. § 4602(5).

9.   Neither the provisions restricting schools' religious expression nor the provisions relating to sexual orientation and gender identity currently apply to the non-religious, single-sex private schools that also participate in the program. *Id*. § 4553(2-A).

10.   Private post-secondary schools, which are also eligible to receive student-directed Maine funding, are likewise not covered by these provisions of the Act. *Id*.

11.   And none of the provisions of the Act are enforceable against public and private schools outside of Maine, even though the same law that authorizes state funding for private schools in Maine also allows Maine to pay tuition at private schools in other states and public schools in Canada. 20-A M.R.S. § 3252.

12.   Maine's efforts to exclude religious schools were not confined to its Legislature. During the same spring 2021 timeframe when the *Carson* cert petition was pending, the Maine Human Rights Commission, the quasi-independent state agency charged with enforcing the Act, stated its view that, under the Act, religious schools that accept public funds lose their religious hiring

rights.[1] The Commission adopted this interpretation knowing that it would discourage religious schools from accepting town tuitioning funds. The Commissioner of Education took a similar position in *Carson*, arguing that no school would accept town tuitioning funds because it would mean losing their religious hiring rights.

13.   After the Supreme Court ruled in *Carson* that Maine could not exclude religious schools from the program, Maine's Attorney General Aaron Frey issued a statement. He denounced religious schools that "promote a single religion to the exclusion of all others" as discriminatory, vowed to work with the governor and legislature to prevent public money from going to these schools, and asserted that under the Act, religious schools could not receive public money unless they gave up their religious hiring practices—*Carson* notwithstanding.[2]

14.   Maine's attempts were open and blatant: craft a new policy to get out from under the clear pronouncement of *Carson*. In a June 2022 opinion piece in the New York Times, law professor Aaron Tang praised Maine for "outmaneuver[ing]" the Supreme Court by passing a "legislative fix" to "avoid the consequences of a ruling," and pointed out that, as a result of the revisions to the Maine Human Rights Act that were passed in 2021, two religious schools that were hoping to take part in Maine's town tuitioning after *Carson* had already backed out.[3]

15.   Maine continues its efforts today. After a religious school pointed out in litigation that Maine's present exemption for single-sex schools renders its rules not generally applicable, Maine rushed through an amendment to the Act to eliminate it. L.D. 1833, 131st Leg. (Me. 2023).

16.   Plaintiffs—a Catholic school, a Catholic diocese, and two rural Maine families—seek declaratory and injunctive relief against Maine's ongoing efforts to "outmaneuver" the Supreme Court and continue to exclude religious schools from the program.

---

[1]   Letter from Amy M. Sneirson, Exec. Dir. of the Me. Hum. Rts. Comm'n to Hon. Anne Carney, Me. Senate Chair & Hon. Thom Harnett, Me. House Chair 3 (April 20, 2021), https://perma.cc/7B9E-2J2X.

[2]   Statement of Maine Attorney General Aaron Frey on Supreme Court Decision in *Carson v. Makin*, Office of the Maine Attorney General (June 21, 2022), https://perma.cc/544J-DAFN.

[3]   Aaron Tang, *There's a Way to Outmaneuver the Supreme Court, and Maine Has Found It,* N.Y. Times (June 23, 2022), https://perma.cc/YUR2-YYZX.

17.   Plaintiffs request that this Court enforce the constitutional rule clearly established in *Carson*, enjoin the unconstitutional conditions that Maine officials continue to impose on the program, and allow the Diocese, St. Dominic, and the Radonis family to move forward without delay.

18.   Plaintiffs also request that this Court order the Commissioner of Education and the Commissioners of the Maine Human Rights Commission to pay damages for the harm they have caused by continuing to exclude St. Dominic and the Radonis and Cronin families from the program.

## IDENTIFICATION OF PARTIES

19.   The Roman Catholic Bishop of Portland is a Maine corporation sole and the legal entity representing the ecclesiastical entity of the Roman Catholic Diocese of Portland (the "Diocese"). The Diocese is a canonical part of the Roman Catholic Church and operates Diocesan schools throughout the State of Maine.

20.   St. Dominic Academy is a Roman Catholic school located in Lewiston and Auburn, Maine. It is an educational ministry of the Diocese. With the exception of the provisions challenged in this lawsuit, St. Dominic meets or is capable of meeting the requirements to become approved for tuition purposes.

21.   Keith and Valori Radonis are residents of Whitefield, Maine. When this lawsuit was filed in June 2023, their child K.Q.R. was 16 years old and was eligible to receive town tuitioning under the program. He is now 18 years old and has graduated from high school, so he is no longer eligible for town tuitioning. Their child L.R.R. is 16 years old and is currently eligible to receive town tuitioning under the program. However, because of Defendants' discriminatory rules, her parents have had to pay out of pocket for her to attend St. Dominic. Their child L.T.R. is 11 years old and will become eligible to receive town tuitioning under the program when he enters ninth grade in the 2027-28 school year.

22.   Daniel and Nancy Cronin are residents of Fayette, Maine. Their child Z.C. is 14 years old and is currently eligible to receive town tuitioning under the program. However, because of Defendants' exclusionary rules, his parents have had to pay out of pocket for him to attend St. Dominic.

4

23.   Defendant A. Pender Makin is the Commissioner of the Maine Department of Education (the "Department"). She is sued in her personal and official capacities.

24.   Defendant Jefferson Ashby was a member of the Maine Human Rights Commission (the "Commission"), the quasi-independent state agency charged with enforcing the Act from June 2019 to August 2023. He is sued in his personal capacity.

25.   Defendant Edward David was a member of the Commission from February 2020 to August 2024. He is sued in his personal capacity.

26.   Defendant Julie Ann O'Brien is a member of the Commission. She is sued in her personal and official capacities.

27.   Defendant Mark Walker is a member of the Commission. He is sued in his personal and official capacities.

28.   Defendant Thomas Douglas is a member of the Commission. He is sued in his personal and official capacities.

29.   Defendant Megan Sanders is a member of the Commission. She is sued in her official capacity only.

## JURISDICTION AND VENUE

30.   This action arises under the Constitution and laws of the United States. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

31.   The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

32.   Venue lies in this district under 28 U.S.C. § 1391(b)(1) because all Defendants reside in the District of Maine.

33.   Venue also lies in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in the District of Maine.

**FACTUAL ALLEGATIONS**

**<u>Diocesan Schools in Maine</u>**

34.   Education is central to the Catholic faith. The Code of Canon Law—a code of ecclesiastical laws governing the Catholic Church—instructs that Catholic schools serve as "the principal assistance to parents" in forming children in the Catholic faith. 1983 Code c.795-96.

35.   Thus, canon law calls upon Catholics "to foster Catholic schools, assisting in their establishment and maintenance." *Id.* c.800 § 2. If Catholic schools are not available in a particular area, "it is for the diocesan bishop to take care that they are established." *Id.* c.801 § 1. The bishop also has the responsibility to "regulate and watch over" their operations. *Id.* c.802 § 1, c.804 § 1.

36.   Consistent with this religious obligation, the Diocese began founding schools in Maine more than 100 years ago. As the Catholic community in Maine grew, particularly through the arrival of significant numbers of French-Canadian immigrants in the 1870s, Diocesan schools grew with it. Today the Diocese operates eight schools, educating more than 2,100 students statewide.

37.   The Diocese's mission in operating these schools is "to strengthen the Catholic Church and to create an environment in which the faith is preserved, nourished, shaped and communicated" so that its "students will become faith-filled Christians" who contribute to the "Church and communities."[4]

38.   Catholic schools are part of the Catholic Church's evangelizing mission. Thus, the Diocese's policy is that "[s]tudents of other religious beliefs should be admitted whenever possible." Diocese of Portland, Student Handbook at 3 (June 30, 2017). But because the primary purpose of these schools is to assist Catholic parents in providing their children with a Catholic education, the Diocese gives preference in both admission and financial aid to Catholic students, and further preference to children who are members of the parish to which the school belongs.

39.   In all its schools and for all its students, whether Catholic or non-Catholic, the Diocese admits only students who "understand, accept, and [are] willing to support the mission and goals

---

[4]   Roman Catholic Diocese of Portland, *Mission of Maine's Catholic Schools* (June 12, 2023), https://perma.cc/5L8E-JPGF.

6

of the school," and who are willing to agree to attend religion classes, Mass, and other religious activities. *Id.* at 1-3.

40. In line with this Diocesan policy, St. Dominic students must agree to uphold "Catholic Christian morals." St. Dominic Academy Addendum to the Maine Catholic School Student Handbook at 3 (July 2018).

41. Consistent with federal law, the Diocese has adopted the following nondiscrimination policy for its schools:

> Maine Catholic Elementary and Secondary Schools within the Roman Catholic Diocese of Portland admit students of any race, color, national and ethnic origin to all the rights, privileges, programs, and activities generally accorded or made available to students at the school. They do not discriminate on the basis of race, color, national and ethnic origin in administration of their educational policies, admissions policies, scholarship and loan programs, and athletic and other school administered programs.

Diocese of Portland, Student Handbook at 3.

42. A primary characteristic of Catholic schools is "concern for teaching the integration of faith, culture, and life." Diocese of Portland, School Personnel Policies and Procedures Manual at 2 (Oct. 1, 2022). And the "personnel of a Catholic school are critical to achieving this ministry." *Id.* Each school employee shares the responsibility to form students in the faith by the knowledge they share and by the faith they model in action.

43. Teachers and other employees are evaluated on how they maintain and promote the Catholic identity and mission of the school. And as a condition of employment, all employees must "[l]ive personal lives in such a way that fundamental teachings of the Catholic Church are upheld." *Id.* at 5.

**<u>St. Dominic Academy</u>**

44. St. Dominic Academy is a Roman Catholic school with campuses in Lewiston and Auburn, Maine.

45. St. Dominic offers education from pre-kindergarten through twelfth grade. Pre-kindergarten through fifth grade are offered at St. Dominic's Lewiston campus, and grades six through twelve are offered nearby at its Auburn campus.

46. The first of several elementary schools that would eventually be consolidated into St. Dominic Academy were founded in the 1870s by the "Grey Nuns"—the Sisters of Charity of St. Hyacinthe—to educate children from French-speaking families who had come to work in local mills. French language secondary schools for men and women soon followed. By the 1880s, the schools began to offer evening classes to mill workers, who enrolled by the hundreds.

47. St. Dominic's high school was founded in 1941 by Father Francois Drouin, OP as a hockey academy for boys. St. Dominic's hockey program has been highly successful, winning 26 state championships.

48. Because of this long history, there are families in the Lewiston-Auburn area that have sent three generations of children to the Catholic schools now represented by St. Dominic Academy.

49. St. Dominic has received Basic School Approval from the State of Maine.

50. St. Dominic is also accredited by the New England Association of Schools and Colleges.

51. St. Dominic is the only Catholic high school operated by the Diocese in Maine. As a result, it is not unusual for students to commute from 30 to 60 minutes away to attend St. Dominic.

52. Several towns that participate in town tuitioning are within an hour drive from St. Dominic, including Whitefield, Raymond, Fayette, Chelsea, Alna, Westport, Windsor, Vassalboro, Dresden, West Bath, and Hanover.

53. Some of these towns are near Augusta, where St. Dominic has operated a bus for students in the past and plans to do so again when enrollment warrants it.

54. Students eligible for town tuitioning have attended St. Dominic in recent years, and St. Dominic expects more such students to enroll in the future. On information and belief, there are additional families who would be eligible for town tuitioning and who would send their children to St. Dominic if it were approved for tuition purposes.

**The Radonis Family**

55. Keith and Valori Radonis live in Whitefield, Maine with their two minor children, L.R.R. (age 16), and L.T.R. (age 11).

8

56.   Whitefield has no public high school, and the Radonis children are thus eligible to receive town tuitioning for grades 9-12.

57.   Both Keith and Valori were raised in Catholic homes, and they strive to be faithful Catholics today. They also strive to raise their children according to their Catholic faith.

58.   Valori was raised in Auburn, where her family was active in the local Catholic parish.

59.   Keith attended a Catholic high school, an experience that he regards as foundational for his faith and character as an adult.

60.   Keith is a retired Navy pilot. As a result of Keith's work in the Navy, the Radonis family has lived in Virginia, Rhode Island, and elsewhere in the U.S. and overseas. In each location, the Radonis family has found meaning and connection in the local Catholic community.

61.   After Keith retired from the Navy, the Radonis family moved to Maine to be close to Valori's parents.

62.   The Radonis family owns and operates a small organic farm, where they raise organic poultry and bison to sell locally.

63.   For Keith and Valori, providing a Catholic education is an expression of their faith. They believe that they have made a covenant with God to have and raise children according to the Catholic faith. It is their religious responsibility as parents to plant, nurture, and cultivate the seed of faith in their children.

64.   They also believe that a Catholic education is the best way to create a foundation of faith for their children that will last a lifetime.

65.   Prior to moving to Maine, Valori homeschooled her two oldest children using a Catholic curriculum.

66.   When the family moved to Maine, they enrolled their children at St. Michael School, a school affiliated with St. Michael Catholic Parish, so that they could continue their Catholic education.

67.   Their youngest child, L.T.R., is 11 years old and during the 2024-25 school year he is in sixth grade. He currently attends St. Michael, approximately 30 minutes from the Radonises' home.

68.   The Radonis family would like L.T.R. to continue at St. Michael through eighth grade, and then transfer to St. Dominic for high school. St. Dominic is about 55 minutes from the Radonises' home and is located in Auburn, where Valori's mother lives.

69.   Their daughter, L.R.R., is 16 and during the 2024-25 school year she is in eleventh grade. When this lawsuit was filed in June 2023, she attended high school at Erskine Academy in China, Maine. Erskine is approximately 25 minutes from the Radonises' home. Whitefield paid tuition for L.R.R. to attend Erskine Academy under the program. But for Maine's illegal exclusion of religious schools from the program, the Radonises would have used their town tuitioning dollars to send L.R.R. to St. Dominic for her freshman year of high school.

70.   Shortly after this lawsuit was filed in June 2023, the Radonises and St. Dominic asked for a preliminary injunction so that L.R.R. could use town tuitioning funds to attend St. Dominic for the 2023-24 academic year, which was L.R.R's sophomore year of high school.

71.   When the school year began in the fall of 2023, the Radonis family faced a choice: they could pay L.R.R.'s tuition out of their own funds, or they could wait another year while the legal process continued. Because they did not want L.R.R. to miss another year of Catholic education, they enrolled her in St. Dominic Academy, where she currently attends. The Radonises pay for her tuition out of their own funds.

72.   L.R.R. plans to complete her high school education at St. Dominic.

73.   The Radonises also have an older son, K.Q.R., who is in college. K.Q.R. attended high school at Erskine Academy. Whitefield paid tuition for K.Q.R. to attend Erskine Academy. But for Maine's illegal exclusion of religious schools from the program, the Radonises would have used their town tuitioning dollars to send K.Q.R to St. Dominic for high school in 2022-23 and 2023-24. But he never had that opportunity.

74.  Because of Maine's discriminatory policies, the Radonis family has now had to pay more than $30,000 for two years at St. Dominic. This number will continue to grow with each year that Maine continues to exclude religious schools because of their religious policies.

**The Cronin Family**

75.  Daniel and Nancy Cronin live in Fayette, Maine with their minor child Z.C. (age 14).

76.  Fayette has no public middle or high school, and Z.C. is thus eligible to receive town tuitioning for grades 9-12.

77.  Before Z.C. was born, Daniel and Nancy decided to move to Fayette in part because they knew that it offered town tuitioning, and having the opportunity to choose the best school for their son was important to them.

78.  Daniel is an elementary school math interventionist. He also works as a woodworker and wilderness guide.

79.  Nancy is the executive director of the Maine Developmental Disabilities Council. She also builds databases and teaches at a local community college. In addition to these positions, Nancy serves as the Chair of the Fayette School Committee, which is the "municipal school unit" that oversees public education in Fayette.

80.  When Z.C. was in elementary school, he was diagnosed with a learning disability and required support and accommodation from the Fayette public elementary school.

81.  When it came time for Z.C. to enroll in high school, Nancy and Daniel believed that the neighboring public high school that accepted town tuition students from Fayette could not provide their son with the same academic opportunities while providing him appropriate supports.

82.  The nearest private school approved to participate in the program is Kents Hill School. For the 2024-25 school year, Kents Hill charged $36,750 in tuition. *Tuition and Financial Aid*, Kents Hill School, https://perma.cc/ET43-Z3UV ("2024-25 Tuition"). Kents Hill offers appropriate educational support for Nancy and Daniel's son, but Kents Hill charges additional fees for these services—between $3,650 and $11,000 each year. *Id.* ("Supplemental Program Fees").

83. For the 2023-24 school year, the maximum town tuition amount that Maine paid for students attending Kents Hill was $14,098.13.[5]

84. For Nancy and Daniel, the cost of sending Z.C. to Kents Hill was prohibitive, even with town tuitioning. For example, if Z.C. needed the lowest level of "Learning Center Support," which costs $3,650, his annual tuition would be over $40,000. Maine would pay $14,098 through the town tuitioning program, but the Cronins would be still be left with a $26,300 tuition bill each year.

85. By contrast, St. Dominic has the lowest tuition of any private day school in Maine, $14,450.[6]

86. After researching St. Dominic, Nancy and Daniel felt that it offered the best combination of support and activities for their son.

87. Z.C. loves and plays hockey, and he was excited to apply to St. Dominic, whose hockey program is well-known. He spent many hours writing his application essay, and was thrilled when he was accepted.

88. Nancy and Daniel knew about the *Carson* decision and were hopeful that there would be a way for them to use their town tuition funds to send Z.C. to St. Dominic.

89. When they learned that Maine is still excluding St. Dominic from the program, and that they could not use town tuitioning funds for Z.C., the Cronins were devastated.

90. Nancy and Daniel felt that they could not give up on Z.C.'s goal of attending St. Dominic. So in order to pay for Z.C.'s tuition, Daniel and Nancy work additional jobs.

91. Z.C. has enrolled in St. Dominic for the 2024-25 school year. He is thriving, and he hopes to continue attending St. Dominic in the future.

92. Through her work as a member of the School Committee, Nancy is familiar with the contracts between the Town of Fayette and Regional School Unit No. 38 (RSU 38), a public school

---

[5] Maine Department of Education, *Private Schools Approved for the Receipt of Public Funds, 2023-24 school year*, https://perma.cc/SA5X-DMPL.
[6] St. Dominic Academy, *Afford*, https://perma.cc/A7QY-UDGN.

district that receives many town tuitioning students from Fayette. These contracts are public documents.

93.   The six-year contract currently in effect between Fayette and RSU 38 is attached to this Complaint as Exhibit 1. This contract states that it was filed with the Commissioner of the Maine Department of Education on July 26, 2021. On information and belief, Commissioner Makin has personal knowledge of this contract and other similar contracts between town tuitioning districts and neighboring public school districts.

94.   Under this contract, RSU 38 may refuse to admit town tuitioning students from Fayette under two circumstances.

95.   First, if limiting the number of town tuitioning students is "necessary to maintain an acceptable quality of service with existing personnel, buildings, programs, placements and other resources," RSU 38 may turn town tuitioning students from Fayette away. Exhibit 1 at 2.

96.   Second, if a town tuitioning student requires special education, and RSU 38 determines that it does not have the right program already available, RSU 38 has "no obligation" to create a new program. Thus, RSU 38 may decline to provide appropriate special education services for town tuitioning students from Fayette.  Exhibit 1 at 2.

97.   Through her work in the community, Nancy is aware of town tuitioning families in Fayette whose disabled children have been turned away by RSU 38 because of the nature of their disabilities.

**Maine's Town Tuitioning Program**

98.   The Maine Constitution requires each town in the state to provide its school-aged children with a free education. *See* Me. Const. Art. VIII.

99.   But Maine is the most rural state in the nation, and it isn't feasible for every small rural town to maintain its own schools from kindergarten through twelfth grade.

100. Thus, since at least 1873, Maine has allowed towns without a public school serving particular grades—most often high school—to fulfill their constitutional obligation by paying tuition for students to attend a private school.

13

101. Under current law, each Maine town or small group of towns is organized into a "school administrative unit" (or "SAU") that bears the legal responsibility to provide for the education of each child living in that area from kindergarten through twelfth grade. 20-A M.R.S. § 2(2).

102. If the SAU does not maintain a school for a particular grade, it must either (1) contract with a particular public or private school to educate each student of that grade, or (2) pay tuition for each student of that grade at the public or private school of the parent's choice that is "approved for tuition purposes" and "at which the student is accepted." 20-A M.R.. §§ 5203, 5204, 2951.

103. In the parts of the state that have no municipal government, the Department is similarly responsible either to maintain local public schools or pay tuition for school-aged children to attend another public or private school that is "approved for tuition purposes." 20-A M.R.S. §§ 3252(1); 3253-A(1).

104. Under this program, Maine has approved and paid tuition to schools across the country and even internationally.

105. For example, Maine or Maine towns have paid for Maine students to attend private schools in Vermont, New Hampshire, Massachusetts, Connecticut, New York, Pennsylvania, Virginia, Michigan, Colorado, Utah, California, and in Quebec, Canada.[7]

106. Schools that wish to serve students who are eligible for town tuitioning during the 2023-2024 school year must apply for approval "for tuition purposes" from the Department by August 31, 2023.[8]

107. Maine also operates state grant programs for students in post-secondary institutions. These grants may be used at any public or private post-secondary institution in Maine, including those that are religious.[9] And while Maine requires public post-secondary institutions to comply with

---

[7]    *See, e.g.*, List of Schools Approved for Tuition Purposes, 2014-15: https://perma.cc/5RXJ-TLTF; 2015-16: https://perma.cc/2GRS-NZW8; 2016-17: https://perma.cc/728J-CJUF; 2017-18: https://perma.cc/TB26-5MAP; 2018-19: https://perma.cc/J9QC-A5R9; 2019-20: https://perma.cc/8JT9-4SXQ; 2020-21: https://perma.cc/C6DV-WK62; 2021-22: https://perma.cc/3UDF-WPDJ; 2022-23: https://perma.cc/3RYC-EYE4; *see also* 20 M.R.S. § 3252(7) (authorizing the Commissioner of Education to pay tuition to public schools in Quebec).

[8]    *See Private School Approval*, Maine Department of Education, https://perma.cc/RDZ3-6GNE.

[9]    *See Maine State Grant Program*, The Finance Authority of Maine, https://perma.cc/CU5U-NEFW.

the educational discrimination provisions of the Maine Human Rights Act, all private post-secondary schools are fully exempt. 5 M.R.S. § 4553(2-A).

**<u>Maine's Ongoing Efforts to Exclude Religious Schools</u>**

108. For over a century, the program served Maine and its students well. Private religious and nonreligious schools alike—including Diocesan schools like St. Dominic and its predecessors—participated in the program and assisted Maine's towns to fulfill their responsibility to provide an education for young Mainers.

109. Then in the 1980s, Maine began to exclude certain religious schools from the program.

110. In 1980, Maine's Attorney General issued an opinion concluding that the First Amendment's Establishment Clause prohibited the state from paying the tuition of students who attend "sectarian" schools. Me. Op. Att'y Gen., No. 80-2, 1980 WL 119258 (Jan. 7, 1980) ("1980 Opinion"). The 1980 Opinion relied heavily on the now-overruled decision in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).

111. The 1980 Opinion drew a line between "sectarian" schools (which the Opinion interpreted to include religious schools like those operated by the Diocese) and schools that were "religiously affiliated" but "not necessarily characterized by a pervasively religious atmosphere." 1980 Opinion, 1980 WL 119258, at *14. The 1980 Opinion concluded that aid to "sectarian" schools was unconstitutional, but left open the possibility of funding "religiously affiliated" schools that were not "pervasively sectarian." *Id.*

112. Similarly, when defending the funding ban before the U.S. Supreme Court in *Carson*, Maine argued that "[a]ffiliation or association with a church or religious institution" was a "potential indicator" that a school might be sectarian, but it was not "dispositive." *Carson v. Makin*, 142 S. Ct. at 1994.

113. This move—distinguishing between (acceptable) religious schools and those that are "sectarian"—is not new. Bans on state aid to "sectarian" schools have a "shameful pedigree." *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2259 (2020).

114. At a time in the late-19[th] Century when readings from the King James Version of the Bible were mandatory in many public schools, House Speaker and later Senator James Blaine of Maine championed a constitutional amendment (called the "Blaine Amendment") that would have banned state aid to "sectarian" schools in order to prevent states from partnering with Catholic schools to carry out their educational mission. "[I]t was an open secret that 'sectarian' was code for 'Catholic.'" *Id.* at 2270.

115. When Senator Blaine's federal constitutional amendment failed, he used his position in Congress to force territories seeking statehood to include so-called "Baby Blaines" in their proposed constitutions. These Blaine Amendments were "born of bigotry" and "arose at a time of pervasive hostility to the Catholic Church and to Catholics in general." *Id.* at 2259.

116. It is ironic that, while Maine's senator was working to prevent other state governments from choosing to work with Catholic schools, Maine Catholics were educating thousands of Maine children—especially the children of recently-arrived immigrants—and in many cases partnering with the state to do so.

117. It is against this historical background that the Maine Legislature added a new requirement to the program in 1982 that any school receiving tuition funds be "a nonsectarian school in accordance with the First Amendment of the United States Constitution." 20-A M.R.S. § 2951(2).

118. Maine refused to give up the sectarian exclusion even after the U.S. Supreme Court made clear that the Establishment Clause does not bar the use of state tuition vouchers at religious schools. *See Zelman v. Simmons-Harris*, 536 U.S. 639 (2002).

119. With the Establishment Clause justification for the sectarian exclusion eliminated, the Maine Legislature considered a bill in 2003 to repeal it. *See* L.D. 182, 121st Legislature, "An Act to Eliminate Discrimination Against Parents Who Want to Send Their Children to Religious Private Schools," https://perma.cc/VFK9-WUPR.

16

120. But opponents of the bill fashioned a new justification for the sectarian exclusion, arguing that religious schools should not receive tuition funds because they are "discriminatory." Legislative Record, Me. House of Representatives, 121st Legislature, at H-582-89 (May 13, 2003), https://perma.cc/YLG7-3Z5S.

121. Since then, Maine, and Defendants specifically, have repeatedly explained that the purpose of the sectarian exclusion is to bar schools "that promote a particular faith" from the program because Maine viewed them as "discriminatory" rather than "religiously neutral." *Carson* OA Tr. at 48, 54, 69, 82;[10] *see also Anderson v. Town of Durham,* 2006 ME 39, ¶ 57, 895 A.2d 944, 960 (2006) (noting that Maine refused to extend tuitioning to religious schools to "avoid[ ] involvement in discrimination in admissions and hiring."); *Eulitt ex rel. Eulitt v. Maine, Dep't of Educ.,* 386 F.3d 344, 356 (1st Cir. 2004) (noting concerns about religious schools' "admission," "religious tolerance" and "participation in religious activities").

122. This sectarian exclusion meant that Diocesan schools—including St. Dominic—were barred from the program. To remain in the program, a Diocesan school would be forced to give up much of its religious teaching and identity.

123. The sectarian exclusion also made it impossible for many religious parents in Maine to provide the religious education they desired for their children. These parents paid taxes that supported the SAUs in their towns. But they were barred from accessing the benefits to send their children to the schools of their choice simply because the schools were religious in a way that Maine disapproved of.

124. Some such parents were able to make the financial sacrifice to pay their children's tuition themselves, while others simply could not afford it and were forced to send their children to schools that did not provide the type of education that the parents wanted for their children.

125. For years, these Maine parents attempted to regain equal access to the program.

---

[10]   *See* https://perma.cc/Y2AF-3C8K.

126. Between 1994 and 2017, Maine parents seeking to use town tuitioning or similar program funds at private religious schools challenged Maine's program five times.[11] Three out of these five lawsuits involved parents who wished to send their children to St. Dominic Academy or its predecessor schools.

127. Then in 2017, the U.S. Supreme Court decided in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017), that excluding a religious organization "from a public benefit for which it is otherwise qualified, solely because it is a church, is odious to our Constitution." *Id.* at 467.

128. With *Trinity Lutheran* showing that Maine's discrimination against religious education was unconstitutional, another group of religious Maine parents challenged the sectarian exclusion in *Carson*, 142 S. Ct. 1987.

129. But Maine did not relent. Instead, it doubled down. Knowing that the sectarian exclusion in its education law was vulnerable to a Free Exercise challenge in light of *Trinity Lutheran*, Defendants began looking for ways to shore up their arguments and other ways to keep religious schools out of the program should the sectarian exclusion ultimately be held unconstitutional.

130. After the complaint in *Carson* challenged the sectarian exclusion in Maine's education law under *Trinity Lutheran*, the Defendants turned to a different law—the Maine Human Rights Act (the "Act")—to attempt to keep religious schools out of the program.

131. During *Carson*, Maine threatened to strip the Act's religious exemptions from any religious schools that sought to participate in the program. *See* Defendant's Motion for Summary Judgment at 13-14, *Carson v. Makin*, 401 F. Supp. 3d 207 (D. Me. 2019) (No. 18-327). Maine used this threat to assert that the parents in *Carson* lacked standing, because the religious schools that the *Carson* plaintiffs wanted to attend would never choose to participate in the program if it meant giving up their right to hire employees that shared their faith. *Id.* The *Carson* plaintiffs

---

[11]   *Strout v. Albanese*, 178 F.3d 57 (1st Cir. 1999) (district court case filed in 1994; included parents who wished to send their children to St. Dominic); *Bagley v. Raymond Sch. Dep't*, 728 A.2d 127 (Me. 1999); *Anderson v. Town of Durham*, 2006 ME 39, ¶ 47, 895 A.2d 944, 958 (St. Dominic); *Joyce v. State*, 2008 ME 108, ¶ 4, 951 A.2d 69, 70; *Eulitt ex rel. Eulitt v. Maine, Dep't of Educ.*, 386 F.3d 344, 352 (1st Cir. 2004) (St. Dominic).

argued that religious schools' employment decisions should remain protected under the Act. *See* Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment at 8-10, *Carson*, 401 F. Supp. 3d 207 (No. 18-327).

132. But the district court was "doubtful" of the plaintiffs' interpretation of the Act and concluded that "[a]t the very least, the statute is ambiguous and might well deter the schools from proceeding to take public funds so as to avoid the risk." *Carson v. Makin*, 401 F. Supp. 3d at 209 & n.9.

133. At the First Circuit, the Department and the Attorney General repeated their argument about the Act. They insisted that religious schools accepting funds would be forced to make "a significant change to how [they] operate" because they would lose their statutory religious exemption from the employment provisions in the Act. Br. of Appellee at 23, *Carson v. Makin*, 979 F.3d 21 (1st Cir. 2020).

134. The First Circuit questioned whether Defendants could use the Act to keep religious schools out of the program, noting the "free exercise concerns that might then arise." *Carson*, 979 F.3d at 31 (citing *Bostock v. Clayton County*, 140 S. Ct. 1731, 1754 (2020) ("other employers in other cases may raise free exercise arguments that merit careful consideration")).

135. Once *Carson* reached the Supreme Court, Defendants took even more aggressive actions to keep religious schools out of the program.

136. While the Supreme Court considered *Carson*, the Commission proposed—and Maine enacted—sweeping changes to the Act's provisions on educational discrimination. This law, L.D. 1688, took a three-pronged approach to attempt to keep religious schools out of the program.

137. First, L.D. 1688 prohibits "educational institution[s]"—which include co-ed private schools that participate in the program—from discriminating in education on the basis of "religion." 5 M.R.S. § 4602(1), (5). Among other things, this appears to mean that a religious school cannot participate in the program if it gives preference in admissions to students who share the school's religious beliefs.

138. Second, L.D. 1688 repeals the religious exemption that religious schools participating in the program would have had from the Act's prohibition on sexual orientation and gender identity discrimination in education.

139. Third, L.D. 1688 adds a new religious neutrality rule barring religious schools from "discrimat[ing] between religions" in "permit[ting] religious expression." 5 M.R.S. § 4602(5)(D).

140. Maine's arguments before the Supreme Court in the *Carson* case made it increasingly clear that L.D. 1688 was intended to keep religious schools out of the program should the sectarian exclusion be struck down.

141. Defendants repeatedly described the purpose of the sectarian exclusion using language strikingly similar to the new prohibitions in L.D. 1688.

142. Defendants argued again and again that the "defining feature" of the schools allowed to participate in the program is "religious neutrality." *See* OA Tr. at 48, 52, 54, 69, 73, 82, 86.

143. They also argued that the sectarian exclusion was meant to keep out schools that "actively discriminate[] against certain protected classes," because Maine only wants schools that are "inclusive," and "not discriminatory." *Id.* at 69, 85.

144. Following the oral argument, the Attorney General issued a press statement that explicitly connected the purposes of the sectarian exclusion with L.D. 1688's amendments to the Act. He explained his view that "[s]chools that require students to undergo religious instruction are excluded [from the program] because the education they provide is not equivalent to a public education." Statement from Attorney General Frey on *Carson v. Makin* oral argument (Dec. 8, 2021), https://perma.cc/BGL4-YHLY.

145. The Attorney General further stated:

> Schools receiving taxpayer funds are appropriately subject to the Maine Human Rights Act (MHRA), which prohibits discrimination against individuals on the basis of several protected classes. The two religious schools that the parents in this case want to send their children to have made it clear that they are not interested in complying with the MHRA and, therefore, these schools have not even applied to the Maine Department of Education to be eligible to participate in Maines tuition program. Put differently, these schools want to continue to discriminate against individuals based on their status in a protected class and that is inconsistent with the protections afforded to all Mainers under the MHRA.

*Id*.

146. He concluded: "It would be inappropriate if Maine taxpayers were forced to fund schools which exclude and discriminate against other Mainers, as that would erode the foundational principles of a public education that is diverse and accessible to all." *Id.*

147. On June 21, 2022, the Supreme Court issued its decision in *Carson*, holding that Maine's sectarian exclusion violates the Free Exercise Clause. The Court explained that the First Amendment does not permit "enactments that exclude some members of the community from an otherwise generally available public benefit because of their religious exercise." 142 S. Ct. at 1998. The Court held that Maine's sectarian exclusion entailed further First Amendment problems because "scrutinizing whether and how a religious school pursues its educational mission would … raise serious concerns about state entanglement with religion and denominational favoritism." 142 S. Ct. at 2001.

148. That same day, the Attorney General issued another statement to the press, again explaining that L.D. 1688's amendments to the Act would continue to keep religious schools out of the program in the absence of the sectarian exclusion.

149. The statement read:

> "I am terribly disappointed and disheartened by today's decision," said AG Frey. "Public education should expose children to a variety of viewpoints, promote tolerance and understanding, and prepare children for life in a diverse society. The education provided by the schools at issue here is inimical to a public education. They promote a single religion to the exclusion of all others, refuse to admit gay and transgender children, and openly discriminate in hiring teachers and staff. One school teaches children that the husband is to be the leader of the household. While parents have the right to send their children to such schools, it is disturbing that the Supreme Court found that parents also have the right to force the public to pay for an education that is fundamentally at odds with values we hold dear. I intend to explore with Governor Mills' administration and members of the Legislature statutory amendments to address the Court's decision and ensure that public money is not used to promote discrimination, intolerance, and bigotry."
>
> While the Court's decision paves the way for religious schools to apply to receive public funds, it is not clear whether any religious schools will do so. Educational facilities that accept public funds must comply with anti-discrimination provisions

of the Maine Human Rights Act, and this would require some religious schools to eliminate their current discriminatory practices.

Statement of Attorney General Aaron Frey, https://perma.cc/544J-DAFN.

150. The connection between the now-defunct sectarian exclusion and L.D. 1688 did not go unnoticed in the public. Just two days after the *Carson* decision, the New York Times published an essay by U.C. Davis Law Professor Aaron Tang entitled "There's a Way to Outmaneuver the Supreme Court, and Maine Has Found It."[12]

151. Writing about L.D. 1688, Professor Tang explained:

> Let's start with the Carson case. Anticipating this week's decision, Maine lawmakers enacted a crucial amendment to the state's anti-discrimination law last year in order to counteract the expected ruling. … The legislative fix made by Maine lawmakers offers a model for lawmakers elsewhere who are alarmed by the court's aggressive swing to the right. Maine's example shows that those on the losing end of a case can often outmaneuver the court and avoid the consequences of a ruling.

*Id*.

152. Maine's then-Speaker of the House also bragged publicly that Maine "changed the guidelines" with L.D. 1688 because it "[a]nticipated the ludicrous [*Carson*] decision from the far-right SCOTUS."[13]

---

[12]   Tang, *There's a Way to Outmaneuver the Supreme Court*, https://perma.cc/YUR2-YYZX.

[13]   Ryan Fecteau (@SpeakerFecteau), Twitter (June 26, 2022, 8:51 AM), https://twitter.com/SpeakerFecteau/status/1541041572636237826 (replying to Santiago Mayer (@santiagomayer), Twitter (June 25, 2022, 10:24 AM), https://twitter.com/santiagomayer_/status/1540702357532442624).



153. Defendants' efforts to outmaneuver the Supreme Court and undermine its holding in *Carson* have so far been largely successful. Since the Court struck down the sectarian exclusion, only one religious school has applied to the Department to be approved for tuition purposes.

154. Were it not for L.D. 1688's amendments to the Act's education provisions and Defendants' reinterpretations of the Act's employment provisions, St. Dominic and other Diocesan schools would apply to be approved for tuition purposes and, on information and belief, would be approved. On information and belief, many other religious schools would also apply and be approved.

**Defendants' Current Exclusion of Religious Schools**

155. Without judicial relief, St. Dominic and other Diocesan schools will continue to be excluded from the program by these unconstitutional education and employment provisions.

***Education Provisions***

156. The Act places certain conditions on "educational institution[s]." The Act defines "educational institution[s]" to include public elementary, secondary, and post-secondary schools as well as "any private school or educational program approved for tuition purposes if both male and female students are admitted." 5 M.R.S. § 4553(2-A).

157. All private post-secondary schools are excluded, even though they may receive state funds through the Maine State Grant Program.

158. In addition, schools outside Maine that participate in the program—including schools in neighboring states, like Massachusetts, and those in other countries, like Canada—are exempt because the Act does not apply extraterritorially.

159. And until recently, single-sex private schools approved for tuition purposes were likewise exempt because they fell outside the statutory definition of "educational institution." 5 M.R.S. § 4553 (2-A). Thus, during the 2022-23 school year, Maine paid tuition to two all-girls boarding schools in Massachusetts. *Supra* note 5.

160. However, a month after the religious school in *Crosspoint Church*, a parallel case, cited this exemption as an example of how the MHRA was not generally applicable for purposes of Free Exercise analysis, Maine lawmakers introduced a bill to remove the exemption. The Commission testified in support of this bill. The revision passed on June 12, 2023, and the governor signed it into law three days later. Complaint, *Crosspoint Church v. Makin*, No. 1:23-cv-00146 (D. Me. Apr. 27, 2023); L.D. 1833, 131st Leg. (Me. 2023), Me. Pub. L. 2023, ch. 188.

161. On information and belief, the Human Rights Commissioners supported and the Maine Legislature enacted this change for the purpose of trying to strengthen the Commission's arguments in *Crosspoint Church*.

162. Until the Act was amended by L.D. 1688 in 2021, religiously affiliated schools that qualified as "nonsectarian" were likewise exempt from the rules regarding sexual orientation and gender identity discrimination.[14] Me. Pub. L. 2005, ch. 10, sec. 21, § 4602(4) ("[t]he provisions in this subsection relating to sexual orientation do not apply to any education facility owned, controlled

---

[14] Nonsectarian, religiously affiliated schools are not a null set. As Maine emphasized to the Supreme Court in *Carson*, religiously affiliated schools that Maine did not regard as "sectarian" could still participate in the program. Thus, schools like the Maine Coast Waldorf School, which belongs to an educational movement that "has its foundations in Anthroposophy" and which offers a "non-sectarian and non-denominational" education "based on a belief that there is a spiritual dimension to the human being and to all of life," could and did participate over many years. Waldorf Education, FAQs About Waldorf, https://perma.cc/L3BB-95FG; *see also supra* note 5 (listing Maine Coast Waldorf School receiving tuition every year from 2015 to 2022).

or operated by a bona fide religious corporation, association or society."); *see also* Me. Pub. L. 2005, ch. 10, sec. 3, § 4553(9-C) (defining "sexual orientation" to include "gender identity.").

163. As amended by L.D. 1688, the relevant portions of the Act's educational discrimination provision, 5 M.R.S. § 4602, now read:

> 1. Unlawful educational discrimination. It is unlawful educational discrimination in violation of this Act, on the basis of … sexual orientation or gender identity, … or religion, to:
>
>> A. Exclude a person from participation in, deny a person the benefits of, or subject a person to, discrimination in any academic, extracurricular, research, occupational training or other program or activity;
>>
>> B. Deny a person equal opportunity in athletic programs;
>>
>> C. Apply any rule concerning the actual or potential familial status or marital status of a person or to exclude any person from any program or activity because of pregnancy or related conditions or because of sex or sexual orientation or gender identity;
>>
>> D. Deny a person admission to the institution or program or to fail to provide equal access to and information about an institution or program through recruitment; or
>>
>> E. Deny a person financial assistance availability and opportunity….
>
> 5. Application. Nothing in this section …
>
>> C. Requires a religious corporation, association or society that does not receive public funding to comply with this section as it relates to sexual orientation or gender identity; or
>>
>> D. Requires an educational institution to participate in or endorse any religious beliefs or practices; to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing.

164. St. Dominic cannot comply with § 4602(5)(D)'s requirement that "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing."

165. Diocesan schools like St. Dominic teach about religion from a Catholic perspective. While Diocesan schools welcome children from all faiths and none, families that choose these schools

25

for their children understand and agree that they will learn about religion from a Catholic perspective. So, for example, St. Dominic provides regular Mass that students are required to attend. To continue doing so, Maine's law would require St. Dominic to also allow schoolwide chapel services led by a rabbi, imam, or Protestant preacher. This is inconsistent with St. Dominic's commitment as a Catholic school.

166. Similarly, while Diocesan schools welcome students from all faiths or no faith who are willing to learn in a thoroughly Catholic educational environment, Diocesan schools do place some limits on students' religious expression at school. For example, St. Dominic would not allow students to publicly condemn, mock, or denigrate Catholic beliefs or publicly seek to dissuade other students from believing in them. Nor would St. Dominic permit students to organize clubs or distribute literature for these purposes. St. Dominic's religious beliefs also require teachers and staff to uphold core Catholic teachings in word and deed, regardless of their individual beliefs. This requirement is rooted in Catholic theology, which asks teachers to "reveal the Christian message not only by word but also by every gesture of their behavior."[15]

167. Diocesan schools also cannot comply with 5 M.R.S. § 4602(1), which prohibits discrimination on the basis of religion. While Diocesan schools welcome students of all faiths and none, as a Catholic school they invite families to join them in their Catholic educational mission and participate in the religious life of the school through practices like attending Mass, praying before meals, and participating in Church-led service projects. Diocesan schools also give preference to Catholic students in admissions and financial aid.

168. Diocesan schools also cannot comply with 5 M.R.S. § 4602(1), which says that educational institutions may not discriminate on the basis of sexual orientation or gender identity.

---

[15] Sacred Congregation for Catholic Education, *The Catholic School* at ¶ 43 (1977).

169. Diocesan schools firmly believe that everyone is created "in the image of God" and "possess an inalienable dignity which comes to them immediately from God their creator."[16] Accordingly, they believe that each person should be treated with dignity, compassion, and respect. And they do not inquire about a student's sexual orientation or gender identity at the time of admission.

170. However, Diocesan schools cannot delegate their responsibility to make religiously grounded decisions regarding appropriate student conduct to the Maine Human Rights Commission.

171. For example, the Catholic faith views parents as the primary educators of their children. "'The role of parents in education is of such importance that it is almost impossible to provide an adequate substitute.' The right and duty of parents to educate their children are primordial and inalienable."[17]

172. But the Commission, the state agency responsible for enforcing the Act, has interpreted the gender-identity nondiscrimination provision to require a school to facilitate a student's efforts to change his or her gender identity even if the school knows that the student's parents object.[18]

173. The Commission has also interpreted the gender identity provision to require the school to use a student's preferred name and pronouns, and if the student so requests, to "require[ ]" all employees and "instruct" other students to do so as well. *Id.* at 3. The Commission warns that a "pattern" of refusing to use the student's preferred pronouns may be considered a violation of the Act. *Id.* at 3-4.

174. The Commission's approach to gender identity, which requires Maine schools to do what students ask over the objection of their parents, is inconsistent with the Diocese's commitment to respect parents' "primordial and inalienable" "right and … duty" to educate their children.[19]

---

[16]   Catechism of the Catholic Church § 369.

[17]   Catechism of the Catholic Church § 2221.

[18]   *See* Me. Hum. Rights Comm'n, "Interpretation of the Education Provisions of the MHRA," at 4 (Jan. 13, 2016), https://perma.cc/D5Z3-PMP8.

[19]   Catechism of the Catholic Church § 2221.

175. The Commission's approach would also require Diocesan schools to discipline staff and students who have a religious or conscientious objection to using a student's preferred pronouns if they do not correspond to the student's biological sex.

176. Pope Francis, the head of the Roman Catholic Church worldwide, has counseled that Catholics must be "understanding of human weakness and the complexities of life," while emphasizing that "biological sex and the socio-cultural role of sex (gender) can be distinguished but not separated" and that "protecting our humanity" means first of all "accepting it and respecting it as it was created."[20]

177. The Commission's rules compelling schools to enforce students' preferred pronouns—regardless of their parents' wishes, and without reference to the student's biological sex—would require Diocesan schools to discipline staff and students who, after reflecting on Pope Francis' words, conclude that they cannot do so. This is untenable.

***Employment Provisions***

178. Catholic educators must "bear witness to Christ" "by their life as much as by their instruction." *Gravissimum Educationis* § 8 (1965). And canon law requires them to be "outstanding in correct doctrine and integrity of life." 1983 Code c. 803, § 2.

179. Accordingly, the employment handbook for Diocesan schools provides: "All employees must comply with the teachings of the Roman Catholic Church and must perform all agreed upon articles under the terms of employment. Since Maine Catholic schools are Catholic institutions, they should reflect the values and beliefs of the Catholic faith. Employee conduct and behavior should be consistent with the principles of the Catholic Church. The employee's personal and professional life shall reflect the philosophy of Catholic education and be in accordance with the policy of the diocese and onsite procedures." Diocese of Portland, School Personnel Policies and Procedures Manual at 27 (Oct. 1, 2022). Each school employee agrees to follow this handbook as a condition of employment.

---

[20]   Pope Francis, *Amoris Laetitia*, no. 56 (2016) (quoting the *Relatio Finalis*, no. 58 (2015)).

180. The Diocese also asks all teachers in its schools to enter into a "ministerial agreement," promising among other things that they "will exhibit the highest Christian ethical standards and personal integrity and demonstrate and exemplify Catholic teachings based on Christian principles, supporting the teachings, disciplines, and traditions of the Catholic Church while at work and in [their] personal life."

181. The Supreme Court has recognized that "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school[]." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2064 (2020). For that reason, the Court has held that the First Amendment forbids courts from interfering in any way with a religious community's selection of its religious teachers, including through the application of employment nondiscrimination laws. *Id.* at 2064.

182. The Act, like the federal employment nondiscrimination laws in *Our Lady*, is subject to this rule, which is known as the "ministerial exception."

183. The Act makes it unlawful for "any employer to fail or refuse to hire or otherwise discriminate against any applicant for employment because of … sexual orientation or gender identity." 5 M.R.S. § 4572(1)(A).

184. But the Act also includes a religious exemption, which provides: "This subchapter [on employment discrimination] does not prohibit a religious corporation, association, educational institution or society from giving preference in employment to individuals of its same religion to perform work connected with the carrying on by the corporation, association, educational institution or society of its activities. Under this subchapter, a religious organization may require that all applicants and employees conform to the religious tenets of that organization." 5 M.R.S. § 4573-A(2).

185. Nothing in this text makes the religious exemption contingent on whether or not a religious employer receives public funds.

186. But in *Carson*, the Department and Attorney General nonetheless took the position that a school that participates in the program forfeits its religious exemption to the sexual orientation and

gender identity employment discrimination provisions, because of a separate, narrower version of the religious exemption in another part of the Act. *Carson*, 401 F. Supp. 3d at 207. The district court concluded that their reading was a "plausible" interpretation of Maine law. *Id.* at 209.

187. The Commission has likewise interpreted the religious exemption to be limited to religious employers that receive no public funds. While the *Carson* cert petition was pending, the Commission submitted testimony to the Maine Legislature opposing a bill that would have clarified the rights of religious schools that receive town tuitioning funds and stating its view that, under the Act, "a religiously affiliated school … may continue to operate within its beliefs, at its own expense, but once public funds … are utilized … the organization must not discriminate" in "employment."[21]

188. Notwithstanding Defendants' views to the contrary, Diocesan schools cannot constitutionally be required to give up their religious hiring rights as a condition of participating in the program. *See, e.g.*, *Carson v. Makin*, 979 F.3d at 31, *rev'd and remanded*, 142 S. Ct. 1987 (2022) (acknowledging that applying the Act in a way that abrogates religious schools' hiring rights would raise concerns under the Free Exercise Clause).

189. However, the Commission and the Attorney General have repeatedly asserted that the Act does just that.

### Enforcement of the Education and Employment Provisions

190. The Act is enforced in a variety of ways.

191. The Commissioner of Education and the Maine Human Rights Commission both have authority to issue rules implementing the education provisions of the Act.

192. On information and belief, schools applying to the Department to participate in the program must certify their compliance with the education and employment provisions in the Act as a prerequisite to being "approved for tuition purposes."

---

[21]   Letter from Me. Hum. Rts. Comm'n to Hon. Anne Carney, et al. at 3 (Apr. 20, 2021), https://perma.cc/8RXA-YTH6. The Commission appears to believe that even receiving pandemic recovery funds or money from federal school lunch programs is enough to strip religious organizations of their hiring rights under Maine law. *See id.*

193. On information and belief, the Department would not approve Diocesan schools for tuition purposes knowing that Diocesan schools will not violate their faith in order to comply with the education and employment provisions in the Act.

194. Because Diocesan schools do not and cannot comply with the education and employment provisions as the Defendants interpret them, applying to be approved for tuition purposes would be futile.

195. In the alternative, if the Department approved Diocesan schools for tuition purposes, they would immediately become subject to the Act's education and employment provisions as interpreted by the Defendants and would face a credible threat of enforcement.

196. The Act empowers the Commission to investigate "alleged infringements upon human rights and personal dignity" using its independent subpoena power. 5 M.R.S. § 4566. A private party may file a complaint with the Commission, which may then conduct its own investigation and file suit in Maine Superior Court. 5 M.R.S. § 4612. And private parties may also file suit directly in Superior Court themselves. 5 M.R.S. § 4621. If the court finds that unlawful discrimination has occurred, it may impose penalties up to $100,000 for repeat offenders. 5 M.R.S. § 4613.

197. In short, applying to be approved for tuition purposes would either be futile—because the Department would deny the application for failure to comply with the Act—or exceptionally risky—because upon approval each Diocesan school would immediately face a credible threat that the Commission or a private plaintiff would enforce the Act against it. Either way, Diocesan schools need judicial relief to protect their First Amendment rights before they can apply.

198. By excluding the Diocese and its schools from participating in the program, Defendants have imposed harm by denying them funding and restricting their ability to serve Maine families.

199. By depriving the Radonises and the Cronins of the right to use town tuitioning funds to send their children to St. Dominic, Defendants have harmed them and their children. The Radonises and the Cronins have had to spend their own resources to send their children to St. Dominic because Maine refuses to allow them to spend their town tuitioning funds at the school of their choice.

## CLAIMS

### Count I
### 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. I:
### Religious Targeting

200. All preceding paragraphs are realleged and incorporated herein by reference.

201. The Free Exercise Clause of the First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

202. The Free Exercise Clause applies to states and their subdivisions and municipalities through the Fourteenth Amendment to the U.S. Constitution.

203. "[A] law targeting religious beliefs as such is never permissible." *Trinity Lutheran*, 582 U.S. at 466 n.4 (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)).

204. Because "[t]he Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion," the government "cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices," *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018).

205. Maine has targeted the religious beliefs of both schools and Maine families by:

- Removing the single-sex school exemption and religious exemption from its educational nondiscrimination law;

- Adding new religious nondiscrimination and equal religious expression requirements; and

- Interpreting its employment discrimination law to hold that religious schools that receive government funds lose their religious exemption to the state employment discrimination law.

32

206. Maine's Human Rights Commission has publicly stated that religious schools that participate in Maine's program will lose their religious exemptions.

207. During the *Carson* litigation, Maine's Attorney General also took the position that religious schools that participate in Maine's program will lose their religious exemptions, and argued that, for that reason, parents seeking to send their children to religious schools that wished to retain their religious hiring rights lacked standing to sue. *Carson*, 401 F. Supp. 3d at 209; *Carson*, 979 F.3d at 30.

208. Maine's Attorney General made specific remarks disparaging the beliefs and practices of religious schools that seek to participate in Maine's program, including:

- "The education provided by the [religious schools in *Carson I*] is inimical to a public education."

- These religious schools provide "an education that is fundamentally at odds with values we hold dear" because "[t]hey promote a single religion to the exclusion of all others, refuse to admit gay and transgender children, and openly discriminate in hiring teachers and staff."

Statement of Attorney General Aaron Frey, https://perma.cc/544J-DAFN.

209. The Attorney General vowed "to explore with Governor Mills' administration and members of the Legislature statutory amendments to address the Court's decision [in *Carson I*] and ensure that public money is not used to promote discrimination, intolerance, and bigotry." *Id.*

210. Maine and its officials do not have a compelling reason for their actions, and they have not selected the means least restrictive of religious exercise in order to further their interests.

211. Defendants are persons within the meaning of 42 U.S.C. § 1983.

212. Plaintiffs have suffered and will suffer harm absent relief.

**Count II**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I:**
**Free Exercise of Religion—Categorical Exclusion from Otherwise**
**Available Government Benefits**

213. All preceding paragraphs are realleged and incorporated herein by reference.

214. Under the Free Exercise Clause, imposing "special disabilities on the basis of religious views or religious status" triggers strict scrutiny. *Trinity Lutheran*, 582 U.S. at 460-61.

215. Thus, a system that precludes religious entities and families from obtaining generally available state benefits solely because of their religious character or beliefs is unconstitutional unless the government can satisfy strict scrutiny. *Espinoza*, 140 S. Ct. at 2261.

216. St. Dominic's Catholic religious beliefs and identity permeate its entire school and mission. Its religious exercise is offering education from a distinctively Catholic perspective.

217. The Radonises and the Cronins lives in an area that does not provide a public high school, and they are eligible to receive tuition assistance payments to cover the cost of educating their children.

218. The Radonises' sincerely held religious beliefs require them to provide their children with a Catholic education to the best of their abilities.

219. "Maine offers its citizens a benefit: tuition assistance payments for any family whose school district does not provide a public secondary school." *Carson*, 142 S. Ct. at 1997.

220. Maine amended the Act while *Carson* was pending to add the new requirements that schools that take part in the program must not "discriminate" on the basis of religion and "to the extent that an educational institution permits religious expression, it cannot discriminate between religions in so doing." 5 M.R.S. § 4602. Collectively, these are referred to as "religious nondiscrimination requirements."

221. The religious nondiscrimination requirements closely track Maine's arguments at the Supreme Court, where Maine asserted that under its prior program "a school is excluded only if it promotes a particular faith and presents academic material through the lens of that faith." *Carson*, 142 S. Ct. at 2001.

222. Thus, the religious nondiscrimination requirements amount to a "religious gerrymander[ ]" and have the effect of excluding religious schools like St. Dominic from the program. *Id.* at 2000.

223. This also has the effect of precluding families like the Radonis family and the Cronin family from using town tuitioning funds to obtain a religious education for their children.

224. The religious nondiscrimination requirements require Plaintiffs to choose between exercising their religious beliefs and receiving an otherwise available benefit. Plaintiffs are thus "disqualified from this generally available benefit 'solely because of their religious character'" and beliefs. *Id.* at 1997.

225. "By condition[ing] the availability of benefits in that manner, Maine's tuition assistance program … effectively penalizes the free exercise of religion." *Id.* (internal quotations omitted).

226. Categorically excluding schools because of their religious exercise of "[e]ducating young people in their faith, inculcating its teachings, and training them to live their faith," *id.* at 2001, furthers no governmental interest.

227. Discrimination against religious schools and families is not the least restrictive means of furthering a compelling governmental interest.

228. Defendants are persons within the meaning of 42 U.S.C. § 1983.

229. Plaintiffs have suffered and will suffer harm absent relief.

**Count III**
**42 U.S.C § 1983**
**Violation of U.S. Const. Amend. I:**
**Free Exercise Clause—Not Generally Applicable**

230. All preceding paragraphs are realleged and incorporated herein by reference.

231. State action "burdening religious practice must be of general applicability." *Lukumi*, 508 U.S. at 542.

232. A law is not generally applicable if it treats "*any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam); *see also Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021); *Lukumi*, 508 U.S. at 542-46.

233. Under this rule, the Act's educational nondiscrimination rules are not generally applicable. 5 M.R.S. § 4602.

234. The Act's rules regarding educational nondiscrimination do not apply to private post-secondary schools, even if those schools receive state funds, because they are not covered by the Act's definition of educational institutions.

235. The Act's rules are also unenforceable with respect to schools outside of Maine (whether in neighboring U.S. states or in Canada), because the Act does not apply extraterritorially.

236. Thus, Maine law treats "comparable secular activity more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296.

237. The Act is therefore subject to strict scrutiny, requiring the State to have a compelling interest in discriminating against religious schools, and this rule must be the least-restrictive means of achieving that end. *Lukumi*, 508 U.S. at 531-32.

238. Conditioning access to government funding on a school's willingness to give up its religious identity and exercise furthers no governmental interest.

239. Moreover, by creating categorical exemptions for out-of-state schools and all private post-secondary schools, Maine has not treated its own interests as compelling.

240. Discrimination against K-12 religious schools located in Maine is not the least restrictive means of furthering a compelling governmental interest.

241. Defendants are persons within the meaning of 42 U.S.C. § 1983.

242. Plaintiffs have suffered and will suffer harm absent relief.

**Count IV**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I:**
**Free Exercise Clause—Parental Right to Direct**
**Children's Education and Upbringing**

243. All preceding paragraphs are realleged and incorporated herein by reference.

244. "[T]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (quoting *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925)).

245. Parent's' right to direct the education and upbringing of their children is not only deeply embedded in "[t]he history and culture of western civilization," *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972); it also has "a constitutional dimension," *Troxel*, 530 U.S. at 65.

246. "[T]his traditional interest of parents with respect to the religious upbringing of their children" is a "fundamental right[] and interest[]" and is "specifically protected by the Free Exercise Clause of the First Amendment." *Yoder*, 406 U.S. at 214; *see also Emp. Div. v. Smith*, 494 U.S. 872, 881 (1990) (citing *Yoder*, 406 U.S. 205). It is also "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel*, 530 U.S. at 65; *see also Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

247. Keith and Valori Radonis's sincere religious beliefs compel them to provide a Catholic education for their children to the best of their abilities.

248. By prohibiting the Radonis family from using otherwise available town-tuitioning funds to send their children to a Catholic school unless that school abandons its religious identity, Maine has interfered with the Radonises' right to direct the religious upbringing of their children.

249. Daniel and Nancy Cronin believe that they have an obligation to provide their son the education, support, and interpersonal activities required by his learning disability to the best of their abilities (including to the point of working additional jobs), and that St. Dominic offers the best combination of education, support, and activities for their son.

250. By prohibiting the Cronin family from using otherwise available town-tuitioning funds to send their son to St. Dominic unless that school abandons its religious identity, Maine has interfered with the Cronins' right to direct the education and upbringing of their son.

251. Defendants do not have a compelling interest in interfering with religious families' ability to direct the upbringing of their children.

252. Defendants' discriminatory policies are not the least restrictive means to further any governmental interest.

253. Defendants are persons within the meaning of 42 U.S.C. § 1983.

254. The Radonis and Cronin families have suffered and will suffer harm absent relief.

**Count V**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I:**
**Ministerial Exception**

255. All preceding paragraphs are realleged and incorporated herein by reference.

256. "The First Amendment protects the right of religious institutions 'to decide for them-
selves, free from state interference, matters of church government as well as those of faith and
doctrine.'" *Our Lady*, 140 S. Ct. at 2055 (quoting *Kedroff v. Saint Nicholas Cathedral of Russian
Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)).

257. An institution's right to religious autonomy "ensures that the authority to select and con-
trol who will minister to the faithful … is the church's alone." *Hosanna-Tabor Evangelical Lu-
theran Church & Sch. v. EEOC*, 565 U.S. 171, 194-95 (2012).

258. "Applying this principle," the Supreme Court has repeatedly held that "the First Amend-
ment bar[s] a court from entertaining an employment discrimination claim" regarding a teacher or
other ministerial employee responsible for transmitting the faith to the next generation. *Our Lady*,
140 S. Ct. at 2055 (citing *Hosanna-Tabor*, 565 U.S. at 171).

259. Nevertheless, during the *Carson* litigation, Maine threatened to use the Act's employment
nondiscrimination policies to force any religious schools that participated in the program to aban-
don their religious hiring policies. *Carson*, 979 F.3d at 30, *rev'd and remanded*, 142 S. Ct. 1987.

260. Likewise, while the cert petition for the *Carson* litigation was pending before the Supreme
Court, the Maine Human Rights Commission submitted written testimony to the Maine Legislature
in which the Commission asserted that private religious schools that receive any government funds
(including but not limited to town tuitioning funds) become subject to the Maine Human Rights
Act's employment nondiscrimination requirements.[22]

261. Similarly, the Attorney General of Maine, in his official statement issued the day that
*Carson* was decided, accused some religious schools that sought to participate in Maine's program

---

[22]   Letter from Amy M. Sneirson, Exec. Dir. of the Me. Hum. Rts. Comm'n to Hon. Anne Carney, Me. Senate Chair,
et al. 3 (April 20, 2021), https://perma.cc/7B9E-2J2X.

of "openly discriminating in hiring teachers and staff" and asserted that "[e]ducational facilities that accept public funds must comply with anti-discrimination provisions of the Maine Human Rights Act, and this would require some religious schools to eliminate their current discriminatory practices."[23]

262. Applying the Act's employment nondiscrimination provisions to school employees who have the "responsibility of educating and forming students in the faith … threatens the school's independence in a way that the First Amendment does not allow." *Our Lady*, 140 S. Ct. at 2069.

263. Defendants are persons within the meaning of 42 U.S.C. § 1983.

264. The Diocese and its schools have suffered and will suffer harm absent relief.

**Count VI**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I:**
**Religious Autonomy**

265. All preceding paragraphs are realleged and incorporated herein by reference.

266. The First Amendment protects the right of a religious institution to make "personnel decision[s] based on religious doctrine" even when that decision does not involve a ministerial employee. *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 660 (10th Cir. 2002).

267. Maine and its officers intend to enforce the Act's employment nondiscrimination provisions against religious schools that accept town tuitioning funds.

268. St. Dominic maintains religious conduct standards for all employees, both ministers and non-ministers. Enforcing the Act to bar these religious standards infringes on the school's right to govern its own internal affairs, frame its own policies and doctrine, create and maintain a school environment that is faithful to its religious beliefs, and make employment decisions based on those religious beliefs free from government interference. This violates the First Amendment. *See Our Lady*, 140 S. Ct. at 2060.

269. Defendants are persons within the meaning of 42 U.S.C. § 1983.

270. The Diocese and its schools have suffered and will suffer harm absent relief.

---

[23] Statement by Attorney General Aaron Frey (June 21, 2022), https://perma.cc/544J-DAFN.

## Count VII
## 42 U.S.C. § 1983
## Violation of U.S. Const. Amend. I:
## Excessive Entanglement with Religion

271. All preceding paragraphs are realleged and incorporated herein by reference.

272. *Carson* explained that "scrutinizing whether and how a religious school pursues its educational mission" would "raise serious concerns about state entanglement with religion and denominational favoritism," both of which violate the Establishment Clause. 142 S. Ct. at 2001 (citing *Our Lady*, 140 S. Ct. at 2064; *Larson v. Valente*, 456 U.S. 228, 244 (1982)).

273. If the Diocesan schools are approved for tuitioning purposes, they will become subject to the challenged portions of the Act.

274. Enforcing the challenged portions of the Act against the Diocese will require the Commission and Maine Courts to sit in judgment on the internal religious policies of the Diocesan schools.

275. This will result in excessive entanglement between Maine and the Diocesan schools.

276. It will also open the door to allowing Maine to show denominational favoritism by approving religious schools whose religious beliefs align with Maine's beliefs about religious non-discrimination, gender identity, and sexual orientation.

277. Defendants are persons within the meaning of 42 U.S.C. § 1983.

278. The Diocese and its schools have suffered and will suffer harm absent relief.

## Count VIII
## 42 U.S.C. § 1983
## Violation of U.S. Const. Amend. I:
## Free Speech—Compelled Speech and Expressive Association

279. All preceding paragraphs are realleged and incorporated herein by reference.

280. Using government power to force a group that is formed for expressive purposes to include a message not its own "violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

281. The Free Speech Clause prohibits the government from compelling people to speak messages against their will.

282. The Free Speech Clause also prohibits the government from forcing a group formed for expressive purposes to accept members who oppose those purposes. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648, 650, 659 (2000).

283. St. Dominic was formed for the expressive purpose of proclaiming the Catholic faith to the next generation. It is an expressive association within the meaning of *Hurley* and *Dale*.

284. Maine amended the Act in a way that would require religious schools that participate in the program to admit students and hire faculty and staff who are opposed to St. Dominic's religious views.

285. Maine also amended the Act to prohibit "religious discrimination" and require equal religious expression.

286. These rules would alter the content of St. Dominic's Catholic message, against its will.

287. These rules would also force St. Dominic to change its own message by giving students and families that do not share St. Dominic's Catholic faith equal time with students and families that do.

288. These rules would also force St. Dominic to surrender control over the religious speech on its campuses to the State of Maine.

289. These rules would therefore "significantly affect [the school's] ability to advocate" for its religious "viewpoints." *Dale*, 530 U.S. at 648.

290. These rules would also infringe on the ability of St. Dominic and the Radonis family to join together to accomplish the expressive purpose of educating the Radonises' children in the Catholic faith.

291. Coercing religious schools into altering their religious speech and expression serves no compelling government interest.

292. Maine has not selected the means least restrictive of religious speech to further its interests.

293. Defendants are persons within the meaning of 42 U.S.C. § 1983.

294. Plaintiffs have suffered and will suffer harm absent relief.

**Count IX**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I:**
**Unconstitutional Conditions**

295. All preceding paragraphs are realleged and incorporated herein by reference.

296. The "unconstitutional conditions doctrine … vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013).

297. "The 'unconstitutional conditions' doctrine limits the government's ability to exact waivers of rights as a condition of benefits, even when those benefits are fully discretionary." *United States v. Scott*, 450 F.3d 863, 866 (9th Cir. 2006) (citations omitted); *see also Koontz*, 570 U.S. at 608 ("[W]e have repeatedly rejected the argument that if the government need not confer a benefit at all, it can withhold the benefit because someone refuses to give up constitutional rights." (citations omitted)).

298. In order to participate in Maine's program, private religious schools must give up their religious identity by, among other things:

- Abandoning religious hiring rights that are protected by the First Amendment;

- Allowing all religious expression equally, even when it is inconsistent with the school's own religious beliefs;

- Abandoning religious requirements related to student and faculty behavior.

299. In order to receive Maine's town tuitioning funds, the Radonis family and other families like them must abandon their religious beliefs by sending their children to a secular school.

300. Such requirements violate the unconstitutional conditions doctrine.

301. Defendants are persons within the meaning of 42 U.S.C. § 1983.

302. Plaintiffs have suffered and will suffer harm absent relief.

**Count X**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. XIV:**
**Equal Protection—Discrimination Based on Religion**

303. All preceding paragraphs are realleged and incorporated herein by reference.

304. The Equal Protection Clause prohibits discrimination on the basis of religion.

305. Maine's application of the Act to exclude religious schools like St. Dominic from the program penalizes St. Dominic because of its religious beliefs.

306. It also penalizes the Radonis family for their religious beliefs.

307. Private co-educational schools that do not share St. Dominic's religious beliefs are allowed to participate in Maine's program.

308. Families who do not share the Radonis family's religious beliefs and who wish to send their children to private co-educational schools are allowed to participate in Maine's town-tuitioning program.

309. Defendants do not have a compelling interest in discriminating on the basis of religion and denying religious schools equal protection.

310. Defendants' religious discrimination is not the least restrictive means to further any governmental interest.

311. Defendants are persons within the meaning of 42 U.S.C. § 1983.

312. Plaintiffs have suffered and will suffer harm absent relief.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs request that the Court:

a. Declare that the religious expression, religious discrimination, sexual orientation, and gender identity provisions of 5 M.R.S. § 4602 violate the First Amendment to the United States Constitution as applied to Plaintiffs;

b. Declare that the religious expression, religious discrimination, sexual orientation, and gender identity provisions of 5 M.R.S. § 4602 violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as applied to Plaintiffs;

43

c.   Declare that applying 5 M.R.S. § 4553(10)(G) to strip the Diocese and its schools of their religious hiring rights if they accept public funds violates the First Amendment to the United States Constitution as applied to Plaintiffs;

d.   Declare that applying 5 M.R.S. § 4553(10)(G) to strip the Diocese and its schools of their religious hiring rights if they accept public funds violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as applied to Plaintiffs;

e.   Issue preliminary and permanent injunctive relief prohibiting Defendants from applying the religious expression, religious discrimination, sexual orientation, and gender identity provisions of 5 M.R.S. § 4602 to the Diocese and its schools if they accept public funds;

f.   Issue preliminary and permanent injunctive relief prohibiting Defendants from applying 5 M.R.S. § 4553(10)(G) to strip the Diocese and its schools of their religious hiring rights if they accept public funds;

g.   Award actual damages in an amount to be determined;

h.   Award nominal damages;

i.   Award Plaintiffs reasonable attorney's fees and costs; and

j.   Award all such other relief as the Court may deem proper.

## JURY DEMAND

Plaintiffs request a trial by jury on all issues so triable.

Dated: November 21, 2024

Respectfully submitted,

/s/ *Adèle Auxier Keim*
Adèle Auxier Keim*
Mark L. Rienzi*
Benjamin A. Fleshman*
Michael O'Brien*
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave., NW
 Suite 400
Washington, DC 20006
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

44

* Admitted *pro hac vice*

/s/ *James B. Haddow*
James B. Haddow
Maine Bar No. 003340
Petruccelli, Martin & Haddow LLP
Two Monument Square, Suite 900
Portland, ME 04112-8555
Telephone: (207) 775-0200 x 6413
Fax: (207) 775-2360

*Counsel for Plaintiffs*

## VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746

I, Keith Radonis, declare under penalty of perjury that the foregoing allegations that pertain to me and my family are true and correct to the best of my knowledge.

Dated: 11/8/24

Keith Radonis

46

## VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746

I, Valori Radonis, declare under penalty of perjury that the foregoing allegations that pertain to me and my family are true and correct to the best of my knowledge.

Dated: *11/08/2024*

Valori Radonis

47

## VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746

I, Nancy Cronin, declare under penalty of perjury that the foregoing allegations that pertain to me and my family are true and correct to the best of my knowledge.

Dated:

11/13/2024

Nancy Cronin

## VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746

I, Daniel Cronin, declare under penalty of perjury that the foregoing allegations that pertain to me and my family are true and correct to the best of my knowledge.

Dated:

11/13/2024

/s/

Daniel Cronin

**VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I, Shelly Wheeler, declare under penalty of perjury that the foregoing allegations that pertain to St. Dominic Academy and the Roman Catholic Diocese of Portland are true and correct to the best of my knowledge.

Dated: _November 21, 2024_

/s/ _____
Shelly Wheeler
Superintendent of Schools
Roman Catholic Diocese of Portland